UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at COVINGTON

- - -

UNITED STATES OF AMERICA,   : Docket No. 16-CR-43
                              :
                Plaintiff,   : Covington, Kentucky
                              : Monday, November 27, 2017
                              : 8:30 a.m.
versus                           :
                              : **Jury Trial Day 1 of 3**
BRANDON MORAN,               :
                              :
                Defendant.  :

- - -

TRANSCRIPT OF TRIAL
BEFORE DAVID L. BUNNING
UNITED STATES DISTRICT COURT JUDGE and a jury

- - -

APPEARANCES:

For the United States:      ELAINE K. LEONHARD, ESQ.
                              WADE THOMAS NAPIER, ESQ.
                              U.S. Attorney's Office
                              207 Grandview Drive
                              Suite 400
                              Ft. Mitchell, KY 41017

For the Defendant:          ERIC G. ECKES, ESQ.
                              Pinales Stachler
                              455 Delta Avenue
                              Suite 105
                              Cincinnati, OH 45226

Court Reporter:             LISA REED WIESMAN, RDR-CRR
                              Official Court Reporter
                              35 W. Fifth Street
                              Covington, KY 41011
                              (859) 291-4410

     Proceedings recorded by mechanical stenography,
transcript produced by computer.

1    (Proceedings commenced at 2:07 p.m.)

2        THE COURT:  All right.  The jury's not in the

3    courtroom.  Anything we need to take up before we bring the

4    jury in?

5        MS. LEONHARD:  No, sir.

6        MR. ECKES:  No, Your Honor.  This is Mr. Curtin in

7    the courtroom, so you're aware.

8        THE COURT:  I like your bow tie.

9        MR. CURTIN:  Thank you, sir.

10        THE COURT:  Bring them in.

11    Are you going to wear one tomorrow?

12        MR. CURTIN:  Yes, sir.

13        THE COURT:  I will not be wearing one.

14    (The jury entered the courtroom at 2:09 p.m.)

15        THE COURT:  Ladies and gentlemen, now that you've

16    been sworn, I'm going to give you a brief set of preliminary

17    instructions, which should help guide you in your

18    participation during the trial.

19        As I told you earlier, it will be your duty to find from

20    the evidence what the facts are.  You and you alone will be

21    the judges of the facts.  You will then have to apply to those

22    facts the law as the Court will give you.

23        You must follow that law, whether you agree with it or

24    not.  Nothing that the Court will say or do during the trial

25    is intended to indicate or should be taken by you as

1    indicating what your verdict should be.

2       The evidence from which you will find the facts will

3    consist of the testimony of the witnesses, documents and other

4    things received into the record as exhibits, and any

5    stipulations that the parties have agreed to.

6       Certain things are not evidence.  They include the

7    following: Statements, arguments and questions by the lawyers

8    are not evidence.  Objections to questions are not evidence.

9       The lawyers have an obligation to their clients to make

10   objections when they believe evidence being offered is

11   improper under the federal rules of evidence.  You should not

12   be influenced by the objection or the Court's ruling.

13      If the objection is sustained, ignore the question.  If

14   the objection is overruled, treat the answer like any other.

15      If you are instructed that some item of evidence is

16   received for only a limited purpose, you must follow that

17   instruction.

18      Additionally, testimony that the Court has excluded or

19   told you to disregard is not evidence and cannot be considered

20   as evidence.

21      Finally, anything that you may have seen or heard outside

22   the courtroom is not evidence and must be disregarded.

23      As I instructed you earlier, you are only to decide the

24   case based upon the evidence presented in the courtroom.

25      There are two kinds of evidence, direct and

1    circumstantial.  Direct evidence is direct proof of a fact,

2    such as the testimony of an eyewitness.  Circumstantial

3    evidence is proof of facts from which you may infer or

4    conclude that other facts exist.

5        If certain evidence reasonably leads to a conclusion, you

6    are free to reach that conclusion.  Circumstantial and direct

7    evidence are both -- can be considered by you equally.

8        I will give you more detailed instructions on these as

9    well as other matters at the end of the case, but keep in mind

10   you may consider both kinds.

11       It will be up to you to decide which witnesses to believe

12   and which witnesses not to believe and how much of any

13   witness's testimony to accept or reject.  I will give you some

14   guidelines for determining the credibility of the witnesses at

15   the end of the case.

16       Now, as you know, this is a criminal case, and there are

17   three basic rules that apply in every criminal case.

18       First, the defendant is presumed innocent until proven

19   guilty.  The indictment against him brought by the United

20   States is only an accusation, nothing more.  It is not proof

21   of guilt or proof of anything else.  He therefore starts the

22   trial with a clean slate.

23       Second, the burden of proof is on the government from the

24   beginning until the end of the case.  He has no burden to

25   prove his innocence or to present any evidence or to testify.

1    Since the defendant has the absolute right to remain silent,

2    the law prohibits you from arriving at your verdict by

3    considering that he may not have testified.

4        We talked a little bit about that earlier this morning.

5        Third, the government must prove the defendant's guilt

6    beyond a reasonable doubt.  I will give you further

7    instructions on that later.  In this respect, a criminal case

8    is different than a civil one.  In this case, the indictment

9    charges the defendant with four violations of federal criminal

10   law.

11       In Count 2, the United States alleges that the defendant

12   knowingly distributed child pornography on June 6, 2016, when

13   law enforcement successfully downloaded four files depicting

14   minors engaged in sexually explicit conduct from his computer.

15       In Count 4 of the indictment, the United States further

16   alleges that he knowingly possessed child pornography when, on

17   June 14, 2016, a search warrant was executed on his residence

18   and law enforcement seized his computer, which was then

19   forensically examined and found to contain child pornography.

20       In Counts 1 and 3 of the indictment, the United States

21   alleges that he knowingly received child pornography on two

22   dates, May 15, 2016 and June 12, 2016.

23       Specifically, the United States alleges that the forensic

24   examination of his computer revealed that the files depicting

25   minors engaged in sexually explicit conduct were downloaded on

1  to his computer using the internet on or about those two

2  dates.

3      The indictment merely serves to advise him of the charges

4  he is facing.  It is not evidence of anything.  I will give

5  you more detailed instructions on the law of the case at the

6  end of the case.  And those instructions will control your

7  deliberations and decision.  Those will include elements of

8  each offense, the distribution count, the possess count and

9  the receipt counts.  There will be instructions on each of

10  those and explanatory instructions as well.

11      Now a few words about your conduct as jurors during the

12  trial.

13      First, do not discuss the case with anyone or permit

14  anyone to discuss it with you.  I'll remind you about that

15  admonition every time you leave the courtroom.

16      Until you retire to the jury room at the end of the case

17  to deliberate on your verdict, you're simply not to talk about

18  it.

19      Second, do not read or listen to anything touching on the

20  case in any way.  If someone should try to talk to you about

21  the case, bring it to the Court's attention promptly by

22  contacting one of the court security officers.

23      Third, do not try to do any research or make any

24  investigation about the case on your own, such as visiting the

25  places mentioned during the trial or getting on the internet

1  to find out more about the case, the witnesses, or the

2  defendant.

3      Fourth, please try to listen to the testimony of the

4  witnesses while they are testifying because the transcript is

5  ordinarily not available later, during deliberations.

6      Finally, do not form an opinion until all the evidence is

7  in, including any evidence offered by the defendant.  Keep an

8  open mind until you start your deliberations at the end of the

9  case.

10      Now, if you wish, you may take notes.  Notepads were

11  passed out for you.  By all means, you don't have to take

12  notes.  If you want to take notes, you can.  I would ask that

13  you put your juror number on the front page of the notepad so

14  we know who it belongs to.  At the end of the night, we'll

15  collect them, lock them up in the clerk's office and pass them

16  out the following morning.

17      The trial will now begin.  First, the United States will

18  make an opening statement, which is simply a roadmap to help

19  you understand the evidence as it comes in.  Then the

20  defendant's attorney will give an opening statement.

21      Opening statements are neither evidence nor argument.

22      The government will then present its witnesses and

23  counsel for the defendant may cross-examine them.

24      Following the government's case, the defendant may, if he

25  wishes, present witnesses whom the government may

1  cross-examine.

2      After all the evidence is in, the Court will instruct you

3  on the law.  After instructing you on the law, the attorneys

4  will present their closing arguments to summarize and

5  interpret the evidence for you.

6      After that, you'll be then able to deliberate on your

7  verdict.

8      All right.  Mr. Napier, I understand you're giving the

9  opening on behalf of the United States, sir.

10          MR. NAPIER:  Yes, Your Honor.  Thank you.

11          THE COURT:  You may proceed.

12          MR. NAPIER:  May it please the Court, Mr. Eckes.

13      Good afternoon, members of the jury.  This is a case

14  about real child victims and the dark reality of internet

15  technology.

16      There are few things more disturbing in this world than

17  watching those who are most vulnerable in our society being

18  abused.

19      The evidence that you are going to see in this case is

20  terribly disturbing because it involves the sexual

21  exploitation of children.

22      You're going to be evaluating evidence that was found on

23  the defendant's computer, and just to be straight up with you,

24  it is not going to be easy.

25      What will be easy about this case is following the

1    evidence and determining that the defendant, Brandon Moran,

2    through the use of his computer, knowingly received, knowingly

3    possessed, and knowingly distributed videos and images that

4    were undeniably child pornography.

5        Now, I say undeniably because the defendant has actually

6    stipulated to the fact that images found on his computer

7    depicted child pornography.

8        But, also, the very titles of the files themselves that

9    you will be reviewing leave no doubt that he was downloading,

10   viewing, and sharing these images through the use of his

11   computer.

12       Now, I want to take a few minutes to talk about what the

13   evidence in this case will show.

14       There are four counts in the indictment.  There's four

15   charges.  And I know Judge Bunning just explained those to

16   you, but I just want to give a very simple summary.

17       Count 1 is that in May of 2016, the defendant received

18   child pornography on his computer by downloading it through

19   the internet.

20       Count 2 is that the following month, in June, the

21   defendant distributed child pornography through the use of his

22   computer.

23       Count 3 is that in June of 2016, the defendant again

24   received child pornography on his computer by downloading it.

25       And Count 4 is that in June of 2016, at the time of his

1    arrest, the defendant was in possession of various child

2    pornographic images and videos located on his computer.

3        Now, ladies and gentlemen, how will you know this?  Well,

4    the evidence is very straightforward, and our goal is to take

5    you through that evidence in a methodical way.

6        You are first going to hear how this case started.

7    Thankfully, in Kentucky, we have investigators assigned

8    specifically to a task force called the Kentucky Internet

9    Crimes Against Children Task Force.  Their job is to police

10   the internet, so to speak, for any signs of criminal activity

11   as it relates to children.

12       Think of it as akin to a police officer patrolling the

13   city playground or a school resource officer patrolling the

14   school yard to ensure the safety of our children.

15       As society changes and technology advances, so does the

16   method of patrolling for law enforcement.  In today's

17   technological age, the internet and cyberspace is an area

18   where a lot of danger can lurk.

19       It can occur while someone, like the defendant, is

20   setting in front of his computer screen in the basement of his

21   mother's home.

22       You will hear from three detectives in this case.  First,

23   you will hear from Detective Bob Couchman, who will talk about

24   the process of investigating and identifying who is sharing

25   child pornography from the internet.

1    He'll tell you about the law enforcement tools that are

2    available to alert authorities when someone is downloading or

3    sharing these disgusting materials.  He's going to tell you

4    how people obtain child pornography.

5    Child pornography is contraband.  You cannot legally

6    possess it.  No way and no how.  And because it cannot be

7    legally possessed, it also makes it a little more difficult

8    for investigators to find because people like the defendant

9    find it by using key words and means that you and I maybe

10   wouldn't readily identify or recognize.

11   Detective Couchman will tell you that you can't just go

12   to Google and type in a search for child pornography and get

13   contraband back.  That's because website operators know that

14   it's illegal, just like the people who seek it, like the

15   defendant in this case.

16   So how did the defendant get child pornography?  You

17   don't just stumble upon it.  You have to seek it out.  You

18   have to seek it out, ladies and gentlemen, and you have to

19   have knowledge about how to find it.

20   You're going to see titles of files with words like "pedo

21   lolita, PTHC, hussyfan, two preteen lesbian to cam."

22   Detectives are going to explain to you the significance of

23   some of these terms.  They're like code words for people like

24   the defendant who are seeking out child pornography.

25   PTHC, for example, stands for preteen hard core.

1    You're also going to hear that the defendant had

2    installed this special software on his computer.  It's called

3    a peer-to-peer program.  It's called BitComet.  It basically

4    allows computers to talk to each other and actually download

5    files from one computer to another.

6    You will hear that there are legitimate uses for this

7    software.  People use it to download games or movies or music,

8    for example.  But it is also commonly used to download and

9    share child pornography.

10    Detective Couchman will tell you how he identified that

11    there was a computer on the internet in Maysville, the

12    defendant's computer, that was sharing child pornography on a

13    peer-to-peer network.

14    Then you're going to hear how this peer-to-peer --

15    through this peer-to-peer network, another user, a third

16    party, can connect with others on the peer-to-peer program and

17    obtain child pornography.

18    Detective Couchman will describe for you how peer-to-peer

19    is like a cyber handshake.  You connect to other users of

20    BitComet and obtain files that they have until the file is put

21    together for the user to view.

22    You're going to hear about four downloads that Detective

23    Couchman did by connecting with the defendant's computer on

24    June the 6th, 2016, through this peer-to-peer program.

25    All four downloads were child pornography.  Two were

1  videos and two were photos of videos.  One video was of a

2  young, prepubescent girl having oral and anal sex with an

3  adult male.

4      Second, you're going to hear from Detective Brian Cooper

5  with the Kentucky State Police.  Detective Cooper works out of

6  the KSP post in Morehead, assigned to the Maysville area.

7  Detective Cooper coordinated with Detective Couchman after

8  seeing these four files had been shared.

9      It was then Detective Cooper's job to find out who in

10 Maysville was doing this.  So you will hear how he identified

11 the IP address, he served a subpoena on the internet service

12 provider, and he finally narrowed down that the downloads were

13 coming from the house where the defendant was living in his

14 mother's basement.

15     Detective Cooper is then going to tell you how he

16 obtained a search warrant for the house and about interviewing

17 the defendant and taking into custody the electronic equipment

18 that the defendant acknowledged was his.

19     The defendant agreed to an interview that day by

20 Detective Cooper, and you're going to hear that interview

21 during the course of the trial.  And, yes, the defendant spoke

22 to law enforcement that day, and he told his story.

23     But even more important than the defendant's story is the

24 story that the forensics of the defendant's computer told.

25 You see, folks, the technology, the file paths, the shared

1    folder, the search history, none of it lies.  It doesn't lie,

2    and it tells a compelling story in this case.

3        The third detective that you will hear from is Detective

4    Viergutz, who is assigned to the e-crimes unit with the

5    Kentucky State Police.  It's his job to extract from computers

6    the complete story; to delve into the forensics, so to speak.

7        What did the defendant have saved on his computer?  What

8    was once saved on his computer but had since been deleted?

9    Detective Viergutz is trained to identify all of these things,

10    and you're going to hear that he does dozens of these exams on

11    electronics every year.

12        You're going to hear Detective Viergutz explain, as I

13    said earlier, that you don't just happen upon child

14    pornography.  Likewise, you don't just stumble upon a

15    peer-to-peer network.  You search it out, you download it on

16    to your computer so that you can use it.

17        The name itself, peer-to-peer, implies sharing.

18    Peer-to-peer.  Think of it as another way of saying one to

19    another.

20        Detective Viergutz will explain to you how BitComet,

21    BitTorrent, and other peer-to-peer programs simply do not work

22    if the user isn't willing to share, because the download speed

23    will be too slow.  Users of these programs know that.  A major

24    advantage of using the software is the ability to obtain fast

25    downloads because they are coming in little bits and pieces

1  from multiple sources.

2      Detective Viergutz will tell you about the process of

3  identifying those four downloads done by Detective Couchman on

4  June the 6th and how the images and videos were no longer

5  saved on the defendant's computer, but he was able to find the

6  file paths.

7      And even though those four downloads weren't still in his

8  downloads folder, there was a My Shares folder on his computer

9  that still housed a trove of child pornography.

10     The detective will also tell you about multiple downloads

11  of child pornography on the defendant's computer that were

12  completed on the dates set forth in the indictment.

13     The defendant's computer certainly does tell a story, and

14  it does not lie.  You will hear that there were more than 200

15  files of child pornography found on the defendant's computer.

16  More than 200.  Not 200 that were once there and had since

17  been all deleted, but 200 that were still there.

18     Think about the size of a photo album that holds 200

19  pictures.  That's a lot of pictures, folks, and each image and

20  each video represents one or sometimes multiple children, all

21  of whom are victims.

22     And that's no insignificant thing here, the human element

23  of this case.  Each of these files represent real people,

24  young children who were made to do unspeakable sex acts.

25     As if the act itself isn't bad enough, long after it's

1  complete, the video or the image lives on.  It's still there,
2  and every act of downloading or sharing or viewing is a
3  further humiliation to that victim.  That's not something that
4  we should lose sight of during the course of this case.

5      Now, you will also hear the recording of the defendant's
6  interview with law enforcement, and you will have to evaluate
7  his statements in that interview and how they match up to the
8  evidence in this case.

9      The evidence will show that the defendant knew what he
10 was doing when he was installing peer-to-peer software, and he
11 took full advantage of all of its features, including
12 downloading and sharing child pornography.

13     You're going to hear him say in the interview, quote, I'm
14 pretty tech savvy.  Well, he may try to downplay it now,
15 ladies and gentlemen, but you will find that he is actually
16 very tech savvy.

17     I want you to listen how he talks in the interview about
18 programs, how he talks about jump drives, zip files, torrents,
19 games, and other peer-to-peer networks that he had used.

20     You will find that he not only used BitComet, but he also
21 used several other peer-to-peer programs.  Look at how he is
22 no stranger to technology.  He has computers, a couple of
23 iPods, an iPhone, a Kindle, and a tablet.

24     The good thing about your role as a juror is that you
25 don't have to check your common sense at the courthouse doors.

1   You actually employ your common sense in carrying out your

2   civic duty.

3       The complete story of this case can almost be told in the

4   form of pictures and screenshots.  From the file names to the

5   disturbing images and videos to the photos of the defendant's

6   room and the computer equipment that he had, it's all going to

7   tell you a clear story.

8       So that's a summary of the case and the evidence that you

9   will be evaluating.

10      I do want to say a quick word about the content and the

11  nature of the evidence that you will be hearing about and

12  seeing in this case.  We are unfortunately going to have to

13  repeat some language and some words and view materials that

14  none of us would ever want to say or view.

15      Please know that when we do this, it's part of us

16  explaining the case to you and the evidence to you, and it's

17  not meant in any way to be insensitive or flippant.

18      Also, you're going to be hearing a lot of technical terms

19  and computer jargon, some of which is a little overwhelming to

20  process, but we ask that you bear with us and listen to all

21  the evidence, consider it, and it will make sense in the end.

22      This is a disturbing case, and it's a case about the dark

23  reality of the internet.  And unfortunately, that means that

24  there will be disturbing evidence.  But the testimony that you

25  will hear and the evidence that you will see will prove beyond

1    a reasonable doubt that the defendant, Brandon Moran, is

2    guilty of the crimes for which he's been charged.

3         At the end of the case, we will be returning to you and

4    we will ask you to find the defendant guilty of all the

5    charges set forth in the indictment.

6         I certainly want to thank you for your time today and for

7    your service on this jury.

8         Thank you, Your Honor.

9              THE COURT:  Thank you, Mr. Napier.

10        Mr. Eckes, you may proceed, sir.

11             MR. ECKES:  Thank you, Judge.

12        We live in a world that is more and more controlled by

13   computers, by computer programs.  Some people welcome this.

14   We certainly have to allow for it.

15        Some may find this ever presence of computers in our

16   lives frightening, quite frankly, or at least disconcerting.

17        We are removing human elements from decisions.  We are

18   removing human elements from our processes.  Computers and

19   computer programs are tools that we use.  But when our tools

20   start to do things behind the scenes that we're not fully

21   aware of, then things can get a little messy.

22        Processes occurring behind the scenes.  And now what gets

23   even more, perhaps, frightening is we turn over our tools to

24   these processes that are happening that we don't really know

25   about.

1          Computers can malfunction.  I'm assuming we're all aware

2     of that.  Computers don't always do what you want them to do.

3          There's devious people out there looking to mess with

4     computers that's not just their own computer.  And these

5     devious people, unfortunately, often know more about computers

6     than we do.  And computers are vulnerable to attack.  They're

7     complex, and they get more and more complex, and their

8     vulnerabilities increase.

9          Okay.  Well, what the heck does that have to do with

10    Mr. Moran?  We'll get there.  We'll get through the course of

11    this trial, but I want you to be thinking about that as we

12    learn about how certain programs were working.

13         You'll hear a lot about Mr. Moran's computer.  You'll

14    hear about programs that the government used to retrieve files

15    allegedly from Mr. Moran's computer.

16         You will learn about programs that the government uses to

17    search through his computer once they take it.  You will learn

18    about automated processes that were programs that were on

19    Mr. Moran's computer.

20         So in the end, this case is very much about computers,

21    technology, a very modern type of a case.

22         But it's really about taking that knowledge and comparing

23    it to the time-tested concept of proof beyond a reasonable

24    doubt.  Specifically, proof beyond a reasonable doubt of what

25    Mr. Moran's intent was, what his knowledge was, and what was

1 happening.

2     This is a case about what happens when someone gets on

3 the internet and begins to download anything and everything

4 indiscriminately, when someone engages technology, engages the

5 internet in the most reckless of manners and just begins to

6 download everything that he can click on.

7     So was there child pornography on Mr. Moran's computer?

8 The answer is yes. You guys know that. I told you that in

9 *voir dire*. That's not going to be a main issue of this case.

10     And it is awful, and it is disgusting and disturbing and

11 whatever adjectives that the United States wants to use about

12 it. They're all going to apply, I'm assuming, but they're all

13 going to be said perhaps with volume in order to try to

14 distract from what the real question is.

15     I know it's disgusting. I agree.

16     Mr. Moran told the police that they were going to find

17 child pornography on the computer. He told them that because

18 he had seen it. He told them that he didn't want it on his

19 computer. He told them that he deleted it when he would get

20 it and that sometimes it wouldn't delete.

21     So the questions that need to go through -- that need to

22 be analyzed by you in this case is how did it get there? How

23 does it generally get there? Do we know how it got there on

24 Mr. Moran's computer? What was in Mr. Moran's head? What was

25 his intent? Did he know what his computer was doing? Did he

know what these certain programs were doing?  Do we even know

what they're doing as we sit here today?  Can we trust the

government's programs beyond a reasonable doubt?

These are the type of questions to explore.  Don't need

to explore whether or not there was child pornography there.

There was.

You will learn that he downloaded all types of stuff, all

types of pornography.  Searched for all types of adult

pornography, very strange stuff.  I can't describe it any

better than that.  It's odd.

I mean, quite frankly, some of that stuff might even be

disturbing to you, and that's okay, as long as you can

understand that it's legal.

And quite frankly, that makes it more likely -- we asked

about whether it makes it more likely Mr. Moran was seeking

pornography.  If you're downloading stuff from countries all

over the world, it also makes it more likely you'll get

something you didn't intend to get.

He didn't seek out child pornography.  He does admit it

came along sometimes.  You'll learn how that can happen with

these programs.

I don't think, at this point, we need to get into the

details of how the programs work.  We'll have plenty of

lessons on that.

Now, just consider what happens, with your common sense,

1    if you get on a computer and you begin to indiscriminately

2    download everything.

3        The child pornography did not belong to Brandon.  He is a

4    strange young man, and I think you're going to see that when

5    you see the things he was looking for on his computer.  But he

6    did not download this child pornography on purpose, and he

7    certainly did not distribute it on purpose.

8        When you learn about how the United States is trying to

9    take what happened and squeeze it into distribution, you'll

10   see how far they're trying to go to get to a distribution

11   count against Mr. Moran.

12       You will hear his statement.  The government will play it

13   for you, his statement.  And this tech savvy guy, who may have

14   been speaking a little bit of hyperbole when he said that, he

15   also says things like I don't know how these torrent programs

16   really work, or I don't know how torrents work.

17       It strikes me you may not even know what a torrent is,

18   but we'll get there.

19       But what he's saying about all this stuff is that if

20   somebody else got this stuff from me, it's because I got

21   hacked.  Yeah, somebody could have got in my files.  They just

22   had to hack my computer and they can get them.

23       So think about that in relation to an intent to

24   distribute it to somebody.  So don't say he should infer from

25   the PTP -- it's peer to peer -- you should infer you're

1    definitely sharing every time you get on the thing.

2        Or you could just listen to his words and see if he

3    sounds credible when he's like, yeah, you can get it when

4    you're hacking.  You can just get my stuff.  But that's not

5    distribution, if what -- his mind is that the way someone ever

6    could get to his computer is by hacking it.

7        And you'll see in that statement, the detective will try

8    to get him to say about 20 times, "You know that you're

9    sharing this stuff, right?  You know you're sharing this

10   stuff?"  He'll say things along the lines of "the program

11   works this way."

12       They talk past each other.  Brandon is always talking

13   about his computer being hacked, and that's how somebody would

14   get files off of his computer.

15       So we will learn about these programs, these torrent

16   programs, peer programs.  We'll learn there are torrent files

17   that point to files but don't contain the actual files.  They

18   just contain metadata, which is data about data.  You activate

19   the file, and it goes to other files and goes in the

20   peer-to-peer world and retrieves the files for you.

21       We'll get to all that.  But at the end, I think you'll

22   see that the evidence does not point to Brandon Moran's guilt,

23   does not point to his intent or his knowledge of what was

24   actually happening here.

25       For that, at the end of this case, I'll ask you to find

 1    him not guilty on all counts.  Thank you.

 2              THE COURT:  Thank you.  First witness.

 3              MS. LEONHARD:  United States calls Bob Couchman.

 4              ROBERT COUCHMAN, GOVERNMENT'S WITNESS, SWORN

 5              THE COURT:  Good afternoon, sir.

 6              THE WITNESS:  Afternoon, sir.

 7              THE COURT:  You may proceed.

 8              MS. LEONHARD:  Thank you.

 9                        DIRECT EXAMINATION

10    BY MS. LEONHARD:

11    Q.  Good afternoon.  Could you please introduce yourself.

12    A.  I'm sorry?

13    Q.  Could you please introduce yourself.

14    A.  My name is Bob Couchman.

15    Q.  Mr. Couchman, how are you presently employed?

16    A.  I work for Lowe's now.

17    Q.  And what do you do for Lowe's?

18    A.  I'm a safety manager.

19    Q.  How long have you been a safety manager for Lowe's?

20    A.  Two months.

21    Q.  What did you do prior to working for Lowe's?

22    A.  I worked for the Madisonville Police Department in

23    western Kentucky.

24    Q.  Where is Madisonville?

25              THE COURT:  Hopkins County.

1        THE WITNESS:  Western Kentucky.

2    BY MS. LEONHARD:

3    Q.  On the other side of the state?

4    A.  Yes, ma'am.  Long drive.

5    Q.  What was your position with the Madisonville Police

6    Department?

7    A.  The last seven years I was an ICAC investigator, did

8    computer forensics.

9        THE COURT:  That's where Travis Ford was from, wasn't

10   it?

11       THE WITNESS:  Yes, sir.

12       THE COURT:  Enough U.K. basketball.

13   BY MS. LEONHARD:

14   Q.  You've used one acronym I want to talk a little bit

15   about, ICAC.  What does it stand for?

16   A.  Yes, ma'am.  Internet Crimes Against Children.

17   Q.  And so for -- did you say the last seven years of your

18   time with Madisonville, that's what you were primarily doing?

19   A.  Yes, ma'am.

20   Q.  Okay.  And when did you retire?

21   A.  September 1st.

22   Q.  Of this year, 2017?

23   A.  Yes.

24   Q.  And when you retired, besides being a detective with

25   Madisonville Police Department, did you hold any other titles?

1    A.   I was assigned to the Kentucky task force, Internet

2    Crimes Against Children Task Force.  I was also assigned to

3    the United States Secret Service Electronic Crimes Task Force.

4    Q.   Did you say in addition to being an investigator, you

5    also were a forensic examiner?

6    A.   Yes, ma'am.

7    Q.   Tell the jury what you did wearing both of those hats,

8    first as an investigator and then as a forensic examiner.

9    A.   I examined -- well, as ICAC, obviously, I did typical

10   Internet Crimes Against Children investigations.  I also did

11   computer forensics and cell phone forensics.

12   Q.   So if, in one of your cases or another case, say, an

13   investigator seized a piece of electronic evidence, would you

14   sometimes be called upon to examine that?

15   A.   Yes, ma'am.

16   Q.   I think you've explained that you were a member of the

17   Kentucky ICAC Task Force, correct?

18   A.   Yes.

19   Q.   And you were also assigned to the Secret Service, United

20   States Secret Service Electronic Crimes Task Force, correct?

21   A.   Yes, ma'am.

22   Q.   Did you hold any other positions with Madisonville?

23   A.   Prior to the assignment as ICAC, I was a school resource

24   officer for six years.

25   Q.   Any other positions prior to that?

1    A.   Just patrolman.

2    Q.   How many years of law enforcement experience do you have

3    with the Madisonville Police Department?

4    A.   23 with Madisonville.

5    Q.   Okay.  Prior to coming on with Madisonville, what did you

6    do?

7    A.   I was in the Army.

8    Q.   Okay.  What did you do in the Army?

9    A.   Military police.

10   Q.   Tell the jury a little bit about that.

11   A.   Wide range of things.  Combat arms, also did garrison

12   duty, which is like being a civilian police officer.

13   Q.   So you were a military police officer on the combat side;

14   is that right?

15   A.   On both sides.

16   Q.   On both sides?

17   A.   I went to Korea so I did some combat experience, was in

18   Iraq, and also did garrison duty in Fort McPherson in Atlanta.

19   Same thing as a civilian police officer, yes, ma'am.

20   Q.   Tell the jury a little bit about your educational

21   background.

22   A.   High school.  I have a lot of experience -- a lot of

23   training from ICAC, also through the United States Secret

24   Service.  They sent me several times down to Hoover, Alabama,

25   to the NCFI, National Computer Forensics Institute, where I

1   covered cell phones and computers.  Several --

2   Q.   I'm sorry.  I did not mean to interrupt.  After high

3   school, did you take college classes?

4   A.   Yes, I took college classes.  I have 130-some hours.  I

5   just never had -- put in one spot.  Military moves you around,

6   doesn't make it easy, unfortunately.

7   Q.   Let's talk about the training you had.  Let's talk first

8   about your general law enforcement training.  Prior to

9   becoming a police officer in the Commonwealth of Kentucky, did

10  you have to go through training?

11  A.   Yes.

12  Q.   What is that?

13  A.   When I went, it was a whopping ten-week long trip to

14  Richmond.

15  Q.   And what is that called?

16  A.   Just Department of Criminal Justice training, basic

17  training.

18  Q.   And when did you complete that?

19  A.   1995.

20  Q.   Okay.  And you said at that time it was a ten-week

21  program?

22  A.   Yes, ma'am.

23  Q.   What types of things did you learn during that training?

24  A.   Just basic patrolman duties, traffic accident

25  investigations, that kind of stuff.

1  Q.   Okay.  And when you're a police officer in the

2  Commonwealth of Kentucky, do you have to complete a certain

3  number of training hours each year?

4  A.   40 hours every year you have to attend, yes.

5  Q.   And you did that for all the years that you were

6  employed?

7  A.   That plus some, yes, ma'am.

8  Q.   Let's talk specifically about your training that you

9  received specific to your ICAC work.

10  A.   Okay.

11  Q.   Did you take several training courses that were

12  specifically devoted to those types of investigations?

13  A.   Yes.

14  Q.   Can you tell the jury a little bit about some of those

15  types of training?

16  A.   Each one of them focused on a different area.  We were

17  taught how to do undercover chats, posing as a child or posing

18  as someone looking to exploit a child.

19      There was investigations on different techniques of

20  downloading different peer-to-peer networks.  On-scene

21  investigations.  There's a wide array of stuff they covered.

22  Q.   Did you also take training related to social media and

23  internet investigations?

24  A.   Yes.

25  Q.   Did you specifically receive training in BitTorrent?

1    A.   Yes.

2    Q.   Okay.  We're going to talk a little bit about that later

3    on in your testimony.  Did you mention undercover chat?

4    A.   Yes.

5    Q.   Okay.  While you were with Madisonville, did you receive

6    any certifications?

7    A.   Several.  Well, there's two I carried through.  There's A

8    certification, which is basically an access data, which is

9    computer forensics.  And then there was LCE, which is Lantern

10   Certified Examiner, which is a cell phone examiner.

11   Q.   Both of those examinations you mentioned were for doing

12   examinations?

13   A.   Forensic exams, yes.

14   Q.   What types of items would you forensically examine?

15   A.   Whatever somebody would bring me.  Computers, GPS units,

16   cell phones, cameras, flash drives, SD cards.  The whole

17   gamut.

18   Q.   Anything digital in nature, essentially?

19   A.   All those are digital.

20   Q.   Electronic evidence?  I'm sorry.

21   A.   Yes.  Yeah.

22   Q.   Okay.  You testified that the last seven years of your

23   career with Madisonville that you were assigned to the ICAC

24   Task Force and the Secret Service Electronic Crimes Task

25   Force.  During that time, did you conduct a number of

1    investigations that involved peer-to-peer networks and --

2    A.   Yes.

3    Q.   -- software?

4    A.   Several, yes.

5    Q.   And I think I already covered this, but you did take

6    multiple courses in BitTorrent specifically, correct?

7    A.   Two, yes.

8    Q.   What is BitTorrent?

9    A.   It's a peer-to-peer networking -- peer-to-peer network

10   system where you're sharing files with other people or

11   receiving files from other people.

12   Q.   And can you tell the jury just in laymen terms how a

13   peer-to-peer network works?  Is it similar to accessing data

14   or content via Google over the internet?

15   A.   It's not anything like going to Google, searching for

16   something, clicking on a hyperlink.

17   Q.   Okay.

18   A.   It started out much more complicated.  It's closer to

19   that now, but it's not quite as easy as clicking on a link on

20   a website and finding what you're looking for.

21   Q.   In a peer-to-peer file sharing network, where are the

22   contents being stored?

23   A.   On peers spread across the internet.

24   Q.   What are peers?

25   A.   Other computers, other users.

1    Q.   These peers on the network, what does the network allow

2    them to do with respect to each other?

3    A.   Share those files, collect those files.

4    Q.   Okay.  And do the peers or the different computers on the

5    network, are they all linked through a centralized server?

6    A.   Not on BitTorrent, no.

7    Q.   How does BitTorrent work?

8    A.   That's where I -- can I use the demonstration I have?  It

9    will be a lot easier to explain.

10   Q.   We'll get to that momentarily.  In anticipation of your

11   testimony today, did you prepare a PowerPoint presentation

12   that explains all of this?

13   A.   Yes.

14   Q.   We'll get to that in a second.  When peers or computers

15   are on a peer-to-peer file sharing network, are they talking

16   through a centralized server, or are they talking directly to

17   each other?

18   A.   More directly to each other than through a centralized

19   server on BitTorrent.

20   Q.   Okay.  Very good.  And that's what my questions are

21   specifically focused on.

22       What does -- before we get into BitTorrent, the network,

23   how it specifically works, what does a user, a peer, a

24   computer need to be able to be part of a peer-to-peer network?

25   A.   You'd have to have client software on that computer to be

1  able to communicate on that network.

2  Q.  Do you also have to have internet access?

3  A.  Yes.

4  Q.  Okay.  So we've talked about sort of up at the top layer,

5  we have peer-to-peer networks, correct?

6  A.  Um-hmm.

7  Q.  How many peer-to-peer networks do you know of?

8  A.  There are several.  There's three I work on, four I work

9  on, but there are several.

10 Q.  What were the four networks you worked on?

11 A.  There's Ares, BitTorrent, eMule.  Wow.  What was the

12 fourth one?  Oh, and Gnutella network.

13         THE COURT:  Nutella, like the chocolate stuff?

14         THE WITNESS:  Very similar, yes, but doesn't taste

15 the same.

16 BY MS. LEONHARD:

17 Q.  So on these four peer-to-peer networks, are there then

18 specific clients' software that are compatible with those

19 networks?

20 A.  There are clients built specifically for each protocol or

21 each network to be able to communicate, and then there are

22 some clients that cross several of those networks.

23 Q.  Okay.  And so how does somebody go about getting the

24 software to use?

25 A.  Download it.

1    Q.   Okay.  And do they just go and Google it?

2    A.   If you know what network you're looking for, you can

3    Google that one, the client, yes.

4    Q.   Is it as easy as downloading the software via a Windows

5    installer?

6    A.   Um-hmm, yes.

7    Q.   Okay.  So we've talked about the networks generally, the

8    peer-to-peer networks generally and then how each network has

9    clients that are compatible with it.  In some cases, there's

10   clients that work across mutual network --

11   A.   Yes.

12   Q.   -- software?  The specific clients that we're going to

13   talk about, does each software have its own installation

14   procedure or process that you have to go through to install

15   it?

16   A.   They're all pretty much the same.  But obviously, it can

17   have different things thrown in, like -- yes, the installation

18   is pretty -- across the board pretty much the same.

19   Q.   Pretty much boilerplate?

20   A.   Yes.

21   Q.   Okay.  Does each client or software have its own privacy

22   policy that a client has to -- or a person has to acknowledge?

23   A.   I mean, they can.

24   Q.   Okay.  Do most of these clients have built-in search

25   functions that are similar to web browsing but a way for the

1   user to search for things, search things out on the client?

2   A.   It depends on the network they're accessing.

3   Q.   Okay.  And so let's get into BitTorrent specifically.  Is

4   that the network that you used as part of your investigation

5   of the defendant in this case?

6   A.   Yes, ma'am.

7   Q.   Okay.  And is that the network over which you completed

8   some downloads from a computer that was ultimately found at

9   the defendant's residence?

10  A.   Yes.  I didn't know that at the time, but yes.

11       MS. LEONHARD:  Judge, I think this would be a good

12  time for former Detective Couchman to go through his

13  PowerPoint presentation that explains peer-to-peer file

14  sharing generally and BitTorrent specifically.

15       THE COURT:  That's been marked as Government's

16  Exhibit 17 for demonstrative purposes only?

17       MS. LEONHARD:  Correct, and it's been disclosed to

18  Mr. Eckes prior to today.

19       THE COURT:  Mr. Eckes?

20       MR. ECKES:  Judge, it has been disclosed.  I do not

21  object to it for demonstrative purposes.

22       THE COURT:  All right, then.

23       MR. ECKES:  Obviously, I may have some questions

24  about it.  But to streamline the process, I don't object to

25  this procedure.

1          THE COURT:  Very well.  You may show it.  Ladies and

2    gentlemen, you should have a computer screen in front of you.

3    If it stops working, let us know and we'll try to get our IT

4    people to fix it.  The courtroom's going through -- in the

5    next few months, we'll have a complete revamp of the

6    technology.  So hopefully, everything will continue to work in

7    the interim.

8         You may proceed.

9    BY MS. LEONHARD:

10   Q.   Detective Couchman, is your monitor working?

11   A.   Yes, ma'am.

12   Q.   And you have a clicker to navigate the PowerPoint.  What

13   is this?

14   A.   That's my introduction slide right now.  That's me, where

15   I used to work.

16   Q.   Okay.  Go ahead.

17   A.   I was explaining basically how peer-to-peer networking

18   works.  To do so, I used an example of a child doing homework,

19   sitting at home working on homework.

20        Danny has finished his homework like a good boy, of

21   course, and saved it to his computer and then he gets a call

22   from his friend, working on the same homework, who says hey,

23   how about you share that with me because I want to have not

24   the same answers, of course, because that would be cheating,

25   but I want to see what your answers were.

1     So they share that file, or he asks for that file.  When

2   I say "he asks," I got to stop myself and catch myself because

3   sometimes I say they ask or he asks or she asks.  It's not

4   really them asking each other by person or by face.  It's me

5   getting on my computer, going, "Hey, I want that file."  I

6   select a file and say, "Send it to me."  The person on the

7   other end may or may not have to approve that, but he's going

8   to see that file is available.  The user on the right is going

9   to see the file is available, click on it and download it from

10  the other person's computer.

11    Of course, if a third person comes along and says, "Hey,

12  I want that homework as well," now all of a sudden, in a

13  peer-to-peer network, not only will you get it from the first

14  person, but you'll also get it from the other two people as

15  well.

16    So you're sharing the same file but smaller parts of the

17  files so it comes to you faster and more efficiently.

18  Q.   Is that one of the advantages of the BitTorrent network?

19  A.   Of any peer-to-peer networking, yes, but BitTorrent is a

20  little bit better at it than some of the other peer-to-peer

21  networks.

22  Q.   Why is that?

23  A.   Because you can get several pieces from all over the

24  place instead of having to get one specific file from two or

25  three people.  BitTorrent -- you'll see in a minute that by

1    using BitTorrent, you can actually have a container with

2    several files in it or just one file.  Just depends.

3    Q.   And how does BitTorrent pull those pieces from the

4    multiple people who have it available?  Does it do in a way

5    that makes the download faster?

6    A.   In the way it shares the pieces, yes.

7    Q.   Let me ask this question, maybe ask a better question.

8    The way that BitTorrent processes the pieces, is it sequential

9    or nonsequential?

10   A.   It's just whenever that piece gets there, it gets there.

11   Q.   Okay.  Very good.  Go ahead.

12   A.   And then a fourth person searches for it, you'll get

13   pieces from all four machines going to that fourth person.

14   The fourth person becomes a sharer.  And all four people have

15   the same file, they share the same file.

16   Q.   Very good.  Go ahead.

17   A.   As we're talking, we'll discuss some things that are

18   going to sound a little confusing to the common person.  A

19   piece or a block in a BitTorrent, like I explained earlier,

20   this cup can contain five files, but those files are broken

21   into pieces.  And you'll see them, and I'll give a better

22   graphic of that, how that works.

23        But each piece is what we're transacting.  It's the

24   smaller parts of the files or the packages being sent.

25   Q.   Okay.

1    A.   The client, of course, is the piece of software we use to

2    interact on that network, not specifically maybe a person, but

3    the actual software.

4         The peer is the computer that's sitting there that's

5    running the software, the client software.

6         The seed, of course, is someone who has a complete copy.

7    Like that homework file that is now complete on the first

8    computer, that person is now a seed.  So he has that file.  He

9    can share that file with everybody else.

10        A seeder is a computer sitting on that network that,

11   again, offers some of the pieces of that file to other users.

12        An index site is basically a website.  I don't want to

13   liken it to Google, but it's a place you go to to enter search

14   terms and say, "Hey, I'm looking for homework," and it will

15   find anything with that keyword "homework" on it and will

16   provide results back from that keyword search and allow you to

17   find those files that you're interested in.

18   Q.   Do all peer-to-peer networks have an indexing site, or is

19   that specific to -- does BitTorrent have it?

20   A.   BitTorrent has it.  Other ones do it differently.

21   Q.   Very good.  Go ahead.

22   A.   A swarm is a bunch of seeds or a bunch of other

23   computers.  For example, in my picture, the first two on top

24   together, that would be called a swarm.  That means

25   everybody's got that file and they're sending it.

1       The torrent -- and this is where it gets kind of

2   confusing.  The torrent is an information file that says

3   here's what is included with this package.  It says, you know,

4   I've got three files in this package.  It's happy birthday,

5   you know, three pictures, whatever.  The torrent file is the

6   actual package that is sent to you when you request it.

7       The tracker is a computer, another server out there

8   that's not actually built to be a server, but it's a computer

9   that's promoted on the network to be the one that says okay,

10  here's what you're looking for.  It kind of keeps track of

11  where those pieces are and who's got those pieces and where to

12  look for the pieces.

13      Does that make sense?

14  Q.  Okay.

15  A.  And, of course, a leech is a person, as it sounds, who is

16  downloading and not sharing.  When someone is doing that, it's

17  kind of counterproductive to peer-to-peer network and sharing

18  files so those people are not necessarily shunned on the

19  network, but their speeds are slowed down greatly, and not as

20  much is shared with them because they're not behaving like

21  they should on the network.  Put it that way.

22  Q.  Okay.  Go ahead.

23  A.  First, of course, you visit how to get a torrent.  You

24  first visit an indexing site, and I kind of just did one

25  because -- and when I'm explaining this, I don't want to make

BitTorrent look like it's this bad thing, a bad, evil seed out there.  Businesses actually use it quite a bit.

If you're familiar with the game Warcraft, they send a lot of their updates on a BitTorrent network.  Cisco uses BitTorrent.  There's a lot of big companies that use BitTorrent protocol to share files with their users.

You go to the indexing site, type in what you're looking for.  In this instance, I typed in "Warcraft" to see what files were out there available.  I would get a result.  Of course, if you look on the right-hand side, there's an S, which is the seed.  L is the number of leeches.  But there's two people with the seed.  It tells you the size, and there's the title, where it says "Warcraft 3, The Frozen Throne."  I can click on that, and it will give me the torrent file.

Remember, the torrent is the information about the file. The torrent file is where I would say, okay, I want that file.

I click on that torrent, it says okay, get ready, here's your file structure, here's the size you should expect, and here's what they should look like.

Now I go out and ask for these pieces.  When you click on that torrent, the user doesn't really do much more than that. The computer is doing a lot of work.  The user doesn't do much more than that.

Now, the software that is associated with a torrent or the software that your computer knows that can operate to

1    receive a torrent is then initiated and the sharing process

2    has started.

3    Q.   So we've talked at this point, you've just explained how

4    BitTorrent works as a peer-to-peer file sharing network.  Is

5    BitComet compliant software that works on the BitTorrent?

6    A.   There's several clients.  That's one, yes.

7    Q.   Okay.  Go ahead.

8    A.   The torrent, I explained earlier, is a file containing

9    metadata.

10        Metadata is data about data.  Kind of confusing.

11   Describes the files, the file names, file sizes, folder

12   structure, meaning if there's one folder, here's your stuff.

13   Or it could be broken down happy birthday, folder one, folder

14   two.  It tells the computer what to lay out when that stuff's

15   coming.

16        Of course, tracker information to help find the files

17   that you're looking for.

18        And then the SHA1 value, which is basically a fingerprint

19   of the pieces you're receiving or a file you're receiving.

20   Q.   Is SHA1 one of two types of hash values?

21   A.   Yes.  And the hash value is basic digital fingerprint.

22   Q.   A digital fingerprint for what?

23   A.   The file you're getting ready to receive.  Or any file,

24   really, but the file you're getting ready to receive in this

25   particular instance.

1  Q.  So any type of file, whether it's a Word document that

2  has an extension, doc or a PDF or a JPEG or an AVI?

3  A.  Could be any digital file at all.

4  Q.  Every digital file has a unique digital fingerprint in

5  the form of a hash value?

6  A.  Yes.  An example I give when I teach -- I teach on the

7  side as far as teaching parents what to look for.  I'll have

8  two pictures shown there.  I'll change one pixel in one

9  picture, where you can't even see with the naked eye.  Have to

10  blow it up to show the one pixel that's been changed.  It's a

11  completely different fingerprint or SHA or hash file.

12  Q.  Go ahead.

13  A.  That's what a torrent file looks like.  A user wouldn't

14  see this, but this is what a torrent file looks like.  It's

15  got the name of the file, comments, date and time.  Created by

16  uTorrent, which is another client, and, of course, you'll see

17  the file names down 1 through 10.  It says what's coming my

18  way when I ask for this file.

19  Q.  Again, does this display or does this slide show that the

20  file that you're looking for actually has an extension of

21  .torrent?  That's the torrent file you were describing, which

22  is -- whoa.

23      (Microphone feedback.)

24          THE COURT:  Go ahead.

25  BY MS. LEONHARD:

1    Q.   That's the torrent file.  And then down below, where we

2    see the ten files listed, that's what's contained in the

3    torrent, correct?

4    A.   Those are the files coming from that package, yes.

5    Q.   Very good.  Go ahead.

6    A.   That's just another view of what it looks like on --

7    well, what the user can see if they look at it -- well,

8    basically, decoding that torrent file is what the user would

9    see.

10   Q.   Okay.  Very good.  Thank you.

11   A.   And, again, there's all the same things I explained.  You

12   notice where it says path.  That's where it's going to lay out

13   the folder structure and how the files are going to come in.

14   File sizes, number of pieces is kind of important, you'll see

15   in a second.  Pieces are how everything is transmitted on the

16   BitTorrent network.  It's not files.  It's pieces.

17   Q.   Very good.  Go ahead.

18   A.   And the trackers, of course, tell me where -- if I click

19   on that torrent, tell me where to go to find the pieces for

20   that torrent I'm going to look for.  It's the sites that are

21   queried with that.

22        Of course, common question, what are pieces.  On the

23   bottom, you'll see pieces 1 through 7.  It's kind of

24   confusing, because some files can fill up several pieces.

25   Some pieces can hold several files.

1    This is where I lose a lot of people.  I have to explain

2    there's no set size for a piece.  It depends what the software

3    breaks the files into as to how big a piece is going to be.

4    In the example, I have piece 1 and piece 2 together, but

5    you'll see the cat picture, cat.jpg, takes up a piece and

6    maybe three quarters, and then it starts the next file so it

7    kind of overlaps on piece number 2.

8    Well, you'll notice that the dog one takes up one, two --

9    almost three, four, four and a half pieces, three and a half

10   pieces.  So it's broken down into those pieces, but it's still

11   not complete in one piece.  I'm not sure if I'm making sense

12   or not.

13   Then you look at bird.  Same thing.  Covers two complete

14   pieces, and there's a small piece of the fifth one that

15   contains parts of that file.  Bottom part is a complete file.

16   The top part is how they're broken into pieces when they're

17   transmitted on the BitTorrent network.

18   Q.   I think your slide illustrates exactly that, that some

19   files can fill up several pieces, and some pieces can hold

20   several files.  Is that fair?

21   A.   Graphics makes it easier to understand.

22   Q.   Certainly.

23   A.   Saying that, you'll scratch your head and go, "What the

24   heck?"

25   Q.   Very good.  Go ahead.

1   A.   How it's shared.  The one on the left is a seed when it's

2   got a complete file.  You don't have to wait to share that

3   file.  In other words, I don't have to have the whole file to

4   start sharing it with other people.  Once I have a complete

5   piece, now I can start sharing that piece with everybody else.

6   And as I get more pieces, I can share those pieces out with

7   other people.

8       Some peer-to-peer networks don't work like that.  You

9   have to have the complete file before you can share it.

10  Q.   But not BitTorrent?

11  A.   Not BitTorrent.  BitTorrent, you share pieces without

12  having a whole file.

13  Q.   Okay.  Very good.  Go ahead.

14  A.   And, of course, if you don't share, you're kind of

15  scorned on the network, and your download speeds are reduced

16  dramatically.  People who want to share with you can set to

17  where they're not going to share unless you share your files.

18  Q.   Those people are called what?

19  A.   Leeches or leechers.

20  Q.   As a practical matter, what happens to a computer that

21  becomes a leech?

22  A.   Your speeds can be choked.  It's a term where basically

23  you're slowed down to barely any download speeds at all.

24  Q.   So "choked" means that the computer basically is not able

25  to download?

1    A.   You can, just not anywhere near as fast as you normally

2    would.  You're not shared with -- what it boils down to is

3    when you're setting up your client, you can set up your client

4    to say if this person is a leech, don't share with them.  That

5    would reduce the number of options you have to download your

6    file from.

7    Q.   Go ahead.

8    A.   Another example of how it's shared, and the fact there is

9    no central server to keep track of everything.  It's kind of

10   spread across the internet.  You can't take a central server

11   out and knock everything out.  It was built for high speed

12   sharing of files.  Emphasis, of course, is on sharing.  Not

13   sharing severely limits your availability to further download.

14   Q.   Very good, Detective Couchman.  Is there anything else

15   that you'd like to explain about BitTorrent?

16   A.   I believe that's it.

17   Q.   Okay, great.  Thank you.

18        So we've talked about BitTorrent being the network.

19   BitComet is one of the clients that works on that network,

20   correct?

21   A.   Yes.

22   Q.   You've also explained how BitTorrent is different than

23   other peer-to-peer file sharing networks because the downloads

24   aren't of individual files; is that fair?

25   A.   On BitTorrent, no, they're individual pieces instead of

1    files.

2    Q.   And those individual pieces are contained in the .torrent

3    file, correct?

4    A.   Yes.

5    Q.   In your experience, conducting undercover investigations,

6    online investigations over the BitTorrent network, do the

7    torrent file names, are they often indicative of what the

8    files inside the torrent are?

9    A.   Normally, the description or the title of the file would

10   indicate what would be inside the file, yes.  In other words,

11   if I'm looking for Warcraft, it says Warcraft on it, I should

12   assume it's going to be the game or the movie.

13   Q.   I want to talk specifically about your experience doing

14   these types of investigations.  In the seven years that you

15   were conducting ICAC related investigations, were there

16   certain key words, acronyms, letters that you would look

17   for --

18   A.   Yes.

19   Q.   -- that were important to you from an investigator

20   standpoint?

21   A.   They would certainly stand out as something that someone

22   shouldn't be trading, yes, like PTHC.

23   Q.   What does that stand for?

24   A.   Preteen hard core.

25   Q.   What are other acronyms?

1    A.   There's pedo.  There's lolita.  There's -- went out of my

2    mind for some reason.  There's several that are key words.

3    There's some I can't remember.  There's Spanish translations

4    of those letters as well, but I don't remember off the top of

5    my head.

6    Q.  As an investigator, would you often look for a file name

7    that contained the letters "y-o"?

8    A.   Um-hmm.

9    Q.  What would that stand for?

10   A.   Depends.  Sometimes they would have a number behind it,

11   indicating that's how old the child is that's in the video.

12   Q.  Okay.  Just to be clear, file names, whether it's the

13   name of a torrent file or any other type of file, sometimes

14   those can be misleading and not actually --

15   A.   Yes, absolutely.

16   Q.  -- describe what the file itself contains, correct?

17   A.   Right.  Just because it says cat.jpg doesn't mean it's a

18   cat.  Could be a dog.

19   Q.  As an investigator, you would never rely just on a file

20   name to determine what that file contains, correct?

21   A.   No.

22   Q.  So we've talked about how BitTorrent is -- how BitTorrent

23   works and how it's a little bit different than some of the

24   other peer-to-peer file sharing networks that are out there in

25   terms of the downloads of a torrent file that contains the

1      individual pieces, and I think you explained this on the

2      slide.

3          Is it also true that in BitTorrent, once an individual

4      piece of a file is downloaded, that it's automatically

5      available for uploading or sharing by others?

6      A.   Yes.  That was in the slide before this one.

7      Q.   Okay.  So, Detective Couchman, are there affirmative

8      steps that a computer user has to take to find a peer-to-peer

9      network?

10     A.   Yes.  I guess it's not something you go to Google, hey,

11     find this file and it suddenly pops up.

12     Q.   Are there, likewise, affirmative steps that a computer

13     user has to take to find the software that's compatible with

14     that network?

15     A.   Yes.

16     Q.   Same question for downloading and installing that

17     software on your computer.

18     A.   Yes.

19     Q.   What about, in BitTorrent, specifically seeking things

20     out.  Does that take some sort of affirmative step or input by

21     the computer user to tell the computer what he or she is

22     looking for?

23     A.   Similar to Google, you have to tell it what you're

24     looking for.  For recipes, you can't type in "change my oil."

25     You're not going to get recipes.

1    Q.   Okay.  Finally, what about the process of once you find

2    something that you're looking for and want it, does it just

3    automatically download to your computer?  Does the computer

4    user have to affirmatively do something for that to happen?

5    A.   No, ma'am.  You have to make the request or take some

6    action to make the request, yes.

7    Q.   Okay.  BitTorrent, which we've just spent quite a bit of

8    time sort of learning about, was that one of the peer-to-peer

9    networks that you were conducting undercover investigations on

10   when you were employed by the Madisonville Police Department?

11   A.   Yes.

12   Q.   Can you tell the jury a little bit about that process and

13   how you ran it?

14   A.   What it boils down to is I have three machines and three

15   computers in my office that are set aside.  They're actually

16   attached to an undercover internet connection so that if

17   someone ever tried to track it back, they wouldn't see it was

18   a police department.  They would see it was a residence.

19   Basically, my computer sits there like another user on the

20   network.  I'm no different than anybody else.

21        Just seeing if somebody's requesting any specific

22   attributes, whether it's a specific key word or a specific

23   hash value of a file.  And if it had something that matched

24   what we were looking for, that computer then reports back to a

25   law enforcement database, and it's shared with other law

1    enforcement officers who work ICAC cases.

2    Q.   Okay.

3    A.   Really, there's no interaction with it because it sits

4    there and does the same thing as a client does on the network

5    anyway.

6    Q.   Just so the jury is clear, you're not sitting behind

7    these computers 24/7 monitoring them?

8    A.   Oh, God, no.  No, ma'am.

9    Q.   And each of these three computers, are they searching

10   different peer-to-peer networks?

11   A.   Different networks, yes.  Not searching it.  They're

12   sitting there as a client, seeing if what they're looking for

13   is available.

14   Q.   Very good.  Thank you for that correction.  You mentioned

15   different ways that your computers are looking to see if items

16   of interest are being shared.  You mentioned different key

17   words.  Is that one way that it searches?

18   A.   Yes.

19   Q.   Okay.  And you also mentioned hash values.

20   A.   Hash values, yes.

21   Q.   Would you, as an ICAC investigator, have at your disposal

22   hash values, those unique digital fingerprints for files that

23   have been confirmed to be child pornography?

24   A.   Yes.  Of course, that -- I don't want to say database,

25   but that knowledge base is built from prior investigations

1  where files are tagged, confirmed child pornography or child

2  exploitation materials.

3  Q.  As a detective assigned to the Kentucky ICAC task force,

4  why are you focused in on peer-to-peer file sharing networks?

5  A.  Because there's a lot of child exploitation materials

6  transmitted back and forth on those networks.  That's one of

7  the ways it's transmitted back and forth.

8  Q.  Based upon your experience as an ICAC detective, is that

9  one of the most common ways that child pornography is

10  transacted?

11 A.  It is nowadays, yes.

12 Q.  Why is that?

13 A.  Easy to use, I guess.  The ability to hide behind a

14 computer, I guess.  And obviously, the higher the speed --

15 higher speed file sharing and the convenience of file sharing.

16 Q.  Okay.  You mentioned previously some acronyms that are

17 important for you as an ICAC investigator, PTHC being one of

18 them.  Did you say pedo, p-e-d-o, is that another?

19 A.  Pedo, yes.

20 Q.  The use of the word or the letters y-o with a number

21 before or after?

22 A.  Yes.

23 Q.  Based upon your training and experience in these types of

24 investigations, is a lot of this material -- does a lot of

25 this material originate overseas?

1   A.   Yes.  I mean, there's some, obviously, created here; but

2   most of it probably comes from overseas, yes.

3   Q.   You also mentioned that you have at your disposal sort of

4   a library, I guess I would say, of hash values that are known

5   child pornography, correct?

6   A.   Correct, yes.

7   Q.   Can you tell the jury a little bit about how -- say you

8   as an investigator come across an image that depicts a minor

9   engaged in sexually explicit conduct.  What do you do with

10  that image?

11  A.   Once I obtain it, I want to try to authenticate it to

12  make sure it's a child.  Obviously, there's some material out

13  there that's made to look like a child but isn't.  Submit it

14  to ICAC or the ICAC headquarters in Alexandria, Virginia, and

15  the process starts to try to identify the child.  Our ultimate

16  goal is to save a child.  We don't want any child being

17  abused.

18       Once that image or video has been verified as a child, we

19  save that hash value, that digital fingerprint, and see where

20  it's being shared anywhere else or have that available to us

21  to easily identify the material again and prevent that child

22  from being victimized further.

23       Obviously, as an ICAC investigator, I have access to the

24  database, and those fingerprints are retained or the hash

25  values are retained in my office.

1    Q.   As a result of that process that you just explained, are

2    there images or videos or groups of images and videos that are

3    pretty commonly known series of child pornography?

4    A.   Yes.

5    Q.   So can you give the jury an example or two of some known

6    series of child pornography?

7    A.   Like the Vicky series has been a verified victim.   She

8    was abused a lot, and there's a lot of videos and pictures

9    floating around in that series.

10   Q.   So is the name or the word Vicky, is that something that

11   your computers that you're running over the networks, is that

12   something that your computers are searching to see if anybody

13   has?

14   A.   We would take some interest in finding out what was in

15   that file, yes.

16   Q.   Any other known series?

17   A.   There's a lot out there known to law enforcement,

18   obviously, known to those who look for that stuff.

19   Q.   You mentioned as part of your process in doing these

20   investigations that you have these three computers that are

21   running on these three different networks.   Do you have

22   specialized software or technology that you can use as part of

23   these investigations?

24   A.   Yes.   The software that runs on my client machines, to

25   the outside world, looks just like another client.   I look

1   like somebody else out there, just out there looking for

2   whatever, you know, comes across that matches my key word

3   searches.

4       When it finds somebody that has that stuff or a client

5   that has that, my machine will make a request, like anybody

6   else would, hey, I'd like to have this file.  Share that with

7   me.

8       Well, once it's downloaded from that specific IP, that's

9   the only place I get it from.  My software is restricted to

10  the point where it only gets it from -- we call it single

11  point.  Only one client is who I get that from.

12      It takes a lot longer, obviously, so I'm not getting the

13  whole internet availability like the normal use of the

14  network, but it is that single point that I get it from.

15      By the same token, once I get those pieces, it is not

16  shared.  My machine does not share anything with the outside

17  world.  That is completely turned off, basically.

18  Q.  So you're taking advantage of the downloading aspects of

19  peer-to-peer but not the sharing aspects?

20  A.  Only the downloading from one peer, not several, like

21  BitTorrent's built for.

22  Q.  Very good.  But that's that first file or that first

23  slide that you showed with the students sharing their

24  homework --

25  A.  Um-hmm.

1   Q.   -- those are all people who would have the file available

2   for sharing, correct?

3   A.   Right.

4   Q.   That's not the way you're obtaining your downloads?

5   A.   Just from a target IP, that one target IP that showed an

6   interest in that specific value.

7              THE COURT:  Why are you doing that?

8              THE WITNESS:  Why?

9              THE COURT:  From an investigative standpoint, why

10  would you do that?

11             THE WITNESS:  As far as?

12             THE COURT:  Only getting it from one.

13             THE WITNESS:  To make sure it's the one IP address

14  I'm getting it from.  Otherwise, the defense would be how do I

15  know I'm not getting it from six people.

16             THE COURT:  Thank you.

17  BY MS. LEONHARD:

18  Q.   The computers you have running on the three different

19  networks, tell the jury a little bit about where they were

20  located, who had access to them, those sorts of things.

21  A.   Oh, they're in my lab that's locked with a key.  I'm the

22  only one with a key to it.  As a matter of fact, I still only

23  have a key to it until they find somebody to take my place.

24  They're secured.  Nobody else has access.  That's ICAC

25  regulations.  No one else has access to the files other than

1    me when I was as officer.  I don't go there anymore to get

2    that stuff, but it's under lock and key at all times.  It's

3    heavily secured.

4        The machines running on it are no different actually than

5    machines that were taken from other crimes that are now turned

6    over to the police department, wiped clean forensically, and

7    then software is put on those by ICAC to access those

8    networks.

9    Q.  Your machines are running on these three networks in this

10   secure lab that only you had access to.  What happens if one

11   of your machines gets a hit, like a positive result that

12   something, one of the either hash values or key words that

13   you're searching for, somebody has available for download?

14   What happens?

15   A.  It will initiate a download.  It requests permission to

16   have a download from that specific client.  If that handshake

17   happens, it says okay, yes, we can share, I'll get those

18   pieces or parts of that file that we talked about earlier.

19       It's also reported to a national database of other ICAC

20   investigators.  They can see what positive hits I've had, as

21   well as I can see what they've had.  It's kind of like more

22   teamwork than anything else because there's certain -- I have

23   equipment that some other officers can't get.  They don't have

24   access to it or they can't afford it or whatever the case may

25   be.  So we share that information in a law enforcement

1    database.

2    Q.   And then say that information is put into that law

3    enforcement database.  Then who further investigates the case

4    from that point?

5    A.   Anybody that has jurisdiction over that specific area.

6    Q.   You've already explained to the jury how, when you're

7    doing a download in an undercover capacity, that you do it,

8    it's a single source download, meaning it comes from one IP

9    address, right?

10   A.   Correct.

11   Q.   What is an IP address?

12   A.   It's how a computer or router is addressed on the

13   internet.  It's how you're identified on the internet from

14   anybody else.  It's a unique number.

15   Q.   And does the software that you use or that you used in

16   these cases, in this case in particular, does it identify the

17   IP address assigned to the computer that you're doing the

18   single source download from?

19   A.   It will, yes.

20   Q.   Okay.  And then why is that useful, the IP address?

21   A.   Well, to verify, obviously, on the other side, whenever

22   they get the offending machine, they'll have that information

23   on that machine as well so it kind of shows both sides of the

24   story.

25   Q.   It's just one sort of -- one more sort of piece of the

1    investigation that either -- whoever the investigator is that

2    investigates the crime can follow up on?

3    A.   Right, yes.

4    Q.   Okay.  Detective Couchman, I want to now talk

5    specifically about your involvement in this case.

6    A.   Sure.

7    Q.   Specifically, what was your involvement in this case?

8    A.   I got a phone call one day that said hey, you may have

9    files belonging to somebody in my area.

10   Q.   Who did you receive that phone call from?

11   A.   Detective -- wow.  Can't think of his name now.  We

12   talked like three times.  Detective that covers that area.

13   ICAC officer.  Drawing a blank.

14   Q.   Is it Brian Cooper?

15   A.   Yes, that's it.  Detective Cooper with Kentucky State

16   Police.  He said hey -- he's called me before; but in this

17   case, he says, you may have downloads from a specific IP

18   address from my area.  He gave me the IP address.  I looked it

19   up, and sure enough I did.

20   Q.   Is that how the process is supposed to work?  Like you

21   described, once one of your machines gets a hit, it reports to

22   this law enforcement database where other investigators can go

23   see if there's any crimes in their jurisdiction?

24   A.   Yes.

25   Q.   Okay.  That's what happened here?

1  A.   Yes.  So he calls us and says, hey, you have a hit in my

2  area.  Of course, I look to verify.  I make sure that, number

3  one -- because I don't review everything that comes into my

4  machines because it gets all day every day.  If I did, I would

5  spend weeks in there doing nothing but that.

6       When somebody calls and says hey, I have something, I'll

7  go back and research that hit, so to speak, verify that there

8  is child exploitation material downloaded in it.  Again, not

9  sticking with just the title but looking at the file itself.

10      In this case, I did verify there was child exploitation

11 material transmitted from this person, basically bundled it

12 all up and sent it to him encrypted so he could have access to

13 it.

14 Q.   Detective Couchman, I'd like to hand you what's been

15 marked for identification as Government's Exhibit 2.

16           THE COURT:  Ladies and gentlemen, during the

17 recess -- we'll be in recess for 15 minutes -- continue to

18 heed the admonitions of the Court.  Don't discuss the case

19 with each other.  Keep an open mind until the evidence is in

20 and the case has been presented to you for your consideration

21 and deliberation.

22      We'll be in recess for 15 minutes.

23      (The jury exited the courtroom at 3:31 p.m.)

24           THE COURT:  The jury's out.  I simply don't know

25 exactly what happened.  There were two loud pops during the

1    direct examination, and I just want to make sure that the

2    system's working before we start using it.

3              MS. LEONHARD:  I appreciate that.

4              MR. ECKES:  When those pops happened, I saw sparking

5    from underneath.

6         (Recess from 3:31 p.m. until 3:50 p.m.)

7         (The jury entered the courtroom at 3:50 p.m.)

8              THE COURT:  Hopefully, we've got everything fixed.

9    We may end up in another courtroom tomorrow morning.  We'll

10   let you know if the changes.

11        You may proceed with further direct examination.

12             MS. LEONHARD:  Thank you.

13   BY MS. LEONHARD:

14   Q.   Detective Couchman, I think I concluded by handing you

15   what's marked as Government's Exhibit 2; is that correct?

16   A.   Yes, ma'am.

17   Q.   Does that disk contain the downloads in this case?

18   A.   Yes, ma'am.

19   Q.   How many downloads did you do?

20   A.   I received four items from that particular IP address.

21   Q.   So four files?

22   A.   Yes.

23   Q.   And those are the files contained on Government's

24   Exhibit 2?

25   A.   I'm sorry?

1    Q.   Those are the files contained on Government's Exhibit 2?

2    A.   Yes.

3         MS. LEONHARD:  Your Honor, I move admission of

4    Government's Exhibit 2.

5         THE COURT:  Any objection?

6         MR. ECKES:  No objection.

7         THE COURT:  Let it be received without objection.

8    BY MS. LEONHARD:

9    Q.   Detective Couchman, the files that you downloaded, what

10   kinds of files were they?

11   A.   There's two videos and two picture files.

12   Q.   So two image files and two video files, correct?

13   A.   Yes, correct.

14   Q.   And you can see on the display in front of you, are those

15   the names of the files of the downloads that you did?

16   A.   Yes, ma'am.

17   Q.   And can you just start with the top one, and can you read

18   it into the record, please?

19   A.   The file name is "new pthc opva 2014 real father," that

20   f-u-c-k word, "his 13 yo daughter in the basement."

21   Q.   Okay.  Is the name of the second file essentially the

22   same?

23   A.   Yes, with an MPG extension on it.

24   Q.   What does that denote?

25   A.   It's a movie file.

1    Q.   What about the third file?  What's the file name?

2    A.   "Pedo lolita pthc hussyfan two preteen lesbian to cam."

3    Q.   And then fourth file is essentially the same file name

4    with a different extension?

5    A.   Well, an AVI extension, which is a different flavor of

6    video.

7    Q.   Detective Couchman, have you viewed all four of these

8    files?

9    A.   Yes, ma'am.

10   Q.   Do they depict minors engaged in sexually explicit

11   conduct?

12   A.   Yes, ma'am.

13            MS. LEONHARD:  Your Honor, at this time, the

14   government would move to play the first video.

15            THE COURT:  Very well.

16   BY MS. LEONHARD:

17   Q.   Detective, there is no sound with this particular video,

18   correct?

19   A.   Not that I recall.

20   Q.   Okay.

21            MS. LEONHARD:  Your Honor, this video is

22   approximately nine minutes long.  With the defense's

23   concurrence, we can sort of fast forward to move through this

24   a little bit quicker, if that's okay.

25            THE COURT:  That would be great.  Thank you.

1           MR. ECKES:  No objection, Judge.

2           THE COURT:  Very well.

3    BY MS. LEONHARD:

4    Q.   Detective Couchman, you testified of the four downloads

5    you had, two of them were videos, correct?

6    A.   That's correct.

7    Q.   And one of those downloads was what we just watched?

8    A.   Yes.

9    Q.   Why don't we just go ahead and briefly take -- do you

10   remember what the two image files depicted?

11   A.   They were parts of the video files that were put together

12   to show kind of what was in the video.

13   Q.   Is it fair to say it's a compilation -- the image files

14   are compilations of still shots from the videos?

15   A.   Yes.

16   Q.   Okay.  So let's go ahead and briefly take a look at those

17   two image files.

18        Is that, again, one of the image files that you

19   downloaded on June 6 of 2016?

20   A.   Yes.

21   Q.   Okay.  Is that another one of the two image files that

22   you downloaded?

23   A.   Yes, ma'am.

24   Q.   Thank you.  Again, you performed, these were single

25   source downloads from one IP address; is that correct?

1    A.   That's correct.

2    Q.   The equipment and software that you used, does it enable

3    you to keep logs of all of the activity on your computer so if

4    somebody, if an investigator wants further details, you're

5    able to provide that?

6    A.   Yes, ma'am.

7    Q.   I'm going to hand you what's been marked for

8    identification as Government's Exhibit 3 and ask if you

9    recognize that.

10   A.   Sure.  Yes, I recognize it.

11   Q.   What is that?

12   A.   That's the log file of the transactions between the IP --

13   the client IP and my machine.

14   Q.   On what date?

15   A.   On June 6 of 2016.

16   Q.   And is that when you accomplished these downloads?

17   A.   That's when the machine would have -- yes, that's when

18   the transaction would have taken place.  I wasn't there at the

19   time in the office.

20   Q.   But these are the records that --

21   A.   Yes.

22   Q.   -- your machines made, the log entries your machine made

23   as a result of those downloads?

24   A.   Correct.

25            MS. LEONHARD:  Your Honor, move to admit Government's

1   Exhibit 3.

2            THE COURT:  Any objection?

3            MR. ECKES:  No, Judge.  I didn't see it, but I'm

4   pretty sure I know what it is.  Is it the details?

5            THE COURT:  Log details.

6            MR. ECKES:  No objection.

7            THE COURT:  Let them be received without objection,

8   Government's Exhibit 3.

9            MS. LEONHARD:  Very good.  We'll publish that to the

10  jury again.

11  BY MS. LEONHARD:

12  Q.   Tell us what we're looking at on these log details.

13  A.   It's basically a log file of a transaction of one of the

14  files.  You'll see Torrential Downpour is software that my

15  machine is using.  The remote client, which is the machine I

16  got these files from, the 64.250, that would be the internet

17  protocol address for the machine that these were downloaded

18  from or the communication was made with, I should say.

19       And then the port number being used, 17125.  Again,

20  that's just a port number that's available.  And then the

21  192.168.1.144, my computer actually is hooked up to a switch

22  or router in my office.  That's for the three machines to use

23  the same internet connection.  That's going to be the IP

24  address or the internet protocol address of that machine on

25  that network.  The outside IP address the public would see is

1    that 24.100.106.4.

2    Q.   So those two IP addresses right there are for your

3    computer?

4    A.   Correct.  The local IP obviously means within my office.

5    And then the public IP is the one that anyone on the outside

6    would see.

7    Q.   Very good.

8              THE COURT:  I've got a question here.  This comes up

9    more and more when we have electronic evidence.  The GMT, is

10   that Greenwich meantime minus 5?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  So using local time, would that be

13   12:59:17 a.m.?

14             THE WITNESS:  We would subtract five from that.  No,

15   that is local time.

16             THE COURT:  That is local time?

17             THE WITNESS:  Um-hmm.

18             THE COURT:  Okay.

19   BY MS. LEONHARD:

20   Q.   That's your local time in Madisonville?

21   A.   Yes, ma'am.  And then after that, you'll see the

22   handshake is my machine and that machine that are saying, hey,

23   can we talk.  We both say yes, we'll talk.

24        Info hash was sent, which was basically the digital

25   fingerprint for that file.  Client user peer ID, now, that can

1    be confused because on some peer-to-peer networks, you have a

2    set ID or a set name on that network.  On BitTorrent, it's not

3    a set name.  That can change with each transaction.  So that's

4    nothing that can be used to track it back to a specific peer

5    ID.

6         Of course, my machine sent ours back to the other person,

7    and then a second handshake would indicate more data as far as

8    that person may be transmitting more.  We're getting back and

9    forth.  You'll see again my IP address, and you'll see

10   BitComet, which is a peer-to-peer client software.  Looks like

11   it was version 1.39.

12   Q.   Is that the version of BitComet that the computer on the

13   other end was using?

14   A.   Yes, ma'am.

15   Q.   Okay.

16   A.   And then, of course, you'll see in the very first at

17   00:59:17, finally acknowledges it has 092 pieces.  So it

18   doesn't have any of the pieces yet.  But then at 00:59:47, it

19   has piece 56.  So that machine on the other end is receiving a

20   torrent, but it only received one piece of that torrent, piece

21   number 56.

22   Q.   That's what it's sort of telling you in parenthesis here,

23   that it possesses one of the 92 pieces?

24   A.   Yes.

25   Q.   Go ahead.

1    A.   It will tell you that client acknowledges it has piece 56

2    through 56, which encompasses all of file one.  So whatever

3    file one was is contained in that one piece.  Remember how I

4    showed the overlapping earlier, how one piece can be a part of

5    a file or several files in one?  In this particular instance,

6    piece number 56 is one complete file.

7         You'll see as it goes through that it has piece 59, piece

8    80, piece 86, and you see the numbers go up as it climbs.

9    Q.   This log detail is just detailing which pieces the

10   computer that you're downloading from has available for

11   sharing?

12   A.   And which ones we actually transacted back and forth,

13   yes.  Here it tells me it has it, yes.

14   Q.   I want to ask about this message in the middle that says

15   "received an unchoke message."  What does that mean?

16   A.   That means it's being shared and there's no choking.

17   You're unlimited as far as getting pieces back at a fast pace.

18   Q.   Is that with respect to your computer or the other --

19   A.   That would be the other side.

20   Q.   The other end.  The other computer you were downloading

21   from was not choked, meaning that it wasn't -- it was

22   downloading and uploading?

23   A.   Receiving unchoked message, which means now I've been

24   told that, okay, this person is sharing sufficiently so it's

25   not a choked connection.

1    Q.   Okay.  And if we could just go to the next page, does

2    that sequence just essentially keep repeating, this log is

3    telling you which pieces of the torrent file that you're

4    downloading the other computer has?

5    A.   Yes.

6    Q.   And at some point, as we go down a little bit further, do

7    we get an acknowledgment that the client on the other end has

8    all 92 pieces?

9    A.   I see 81 of 92.  The last one I see on this page is 81 of

10   92.

11   Q.   Does it look like right there, where I circled --

12   A.   Okay, yes.  It has all pieces of all four files.

13   Q.   So at approximately 1:01:58, the client on the other end

14   that you're downloading from acknowledges that it has all 92

15   pieces, correct?

16   A.   Yes, correct.  And it says 91 because in computer terms

17   zero is the first piece.

18   Q.   Oh.

19   A.   So zero to 91, that's why it says 91 instead of 92.

20   Q.   Very good.  If we go down a little further, right

21   underneath that, what does it say?

22   A.   The unchoked message again, which says don't restrict

23   upload or download from that client.

24   Q.   Okay.  And so we have four files, files zero, one, two

25   and three, correct?

1  A.  Correct.

2  Q.  And then at some point, do we know which -- what file

3  title goes with which file?  Does this log detail show that?

4  A.  A little below that, it says created uninitialized file

5  for index zero and it gives the title of that file.

6  Q.  Okay.  So file zero was the new pthc opva 2014 real

7  father, that one?

8  A.  Yes.

9  Q.  If we can go down a little bit further.  Then later, at

10  1:05 and 29 seconds, does it tell you which file name is for

11  the fourth file?

12  A.  Yes.

13  Q.  What is that?

14  A.  Index 3, which is the "pedo lolita PTHC hussyfan."

15  Q.  So do these log details reflect that all four of those

16  files, the two video files and two image files, were

17  completely and successfully downloaded by you?

18  A.  Yes, it does.

19  Q.  From the computer that was on the internet via that IP

20  address that we saw on the first page?

21  A.  At that IP address, that time and date, yes.

22  Q.  Okay.  And Detective Couchman, when did all of these

23  downloads occur?

24  A.  June 6th of 2016.

25  Q.  What did you do after your computers downloaded these

1    four files?

2    A.   As far as?

3    Q.   Did you do anything else as part of the investigation in

4    this case?

5    A.   I wouldn't have done anything until I got a call from

6    Detective Cooper to say, hey, you've got some activity in my

7    area.  And then that's when I would go back and check the IP

8    address he gave me and verify that it was child exploitation

9    material and then just give him the data that I had.

10   Q.   And for him to follow up on, correct?

11   A.   Yes.

12   Q.   And all four of these downloads, you accomplished over

13   the BitTorrent network, correct?

14   A.   Yes.

15           MS. LEONHARD:  Your Honor, may I have one moment?

16           THE COURT:  You may.

17           MS. LEONHARD:  Thank you, Detective Couchman.  Those

18   are all the questions I have for you at this time.

19           THE WITNESS:  Yes, ma'am.

20           THE COURT:  You're not going to be using this on

21   cross, are you?

22           MR. ECKES:  Not in the beginning, but I will be.

23           THE COURT:  If you want her to bring up Exhibit 2 and

24   3, it's what's been admitted.  She can bring that up if you

25   need to.  You may proceed --

1          MR. ECKES:  Thank you, Judge.

2          THE COURT:  -- with cross-examination.

3                        CROSS-EXAMINATION

4     BY MR. ECKES:

5     Q.   Good afternoon, Detective.

6     A.   Good afternoon, sir.

7     Q.   Detective, Ms. Leonhard, in some of the phrases, I just

8     want to be clear, recently just said like it was downloaded by

9     you.  Do you remember her saying that?

10    A.   Not physically myself.  But yes, by the machines in my

11    office.

12    Q.   That's what I want to clarify.  You're not sitting at the

13    computer --

14    A.   No, sir.

15    Q.   -- downloading things?

16    A.   No, sir.

17    Q.   This is all automated, based on your computer program?

18    A.   On my side, yes.

19    Q.   And that computer program, for reference, is named

20    Torrential Downpour?

21    A.   Correct.

22    Q.   Now, I also want to clear up, you talked about your

23    training as an undercover; undercover chats, posing as a

24    child.  None of that was utilized in this case?

25    A.   No, sir.

1    Q.   There's no chatting or anything like that?

2    A.   No.

3    Q.   Okay.  Now, these BitTorrent client programs, these are

4    made to make it easier on the user.  Would you agree with

5    that?

6    A.   They're easier than they used to be, yes.

7    Q.   And relative to how they used to be, for instance, you

8    used to have to get torrent first and then take the torrent

9    and put it into the client application, right?

10   A.   Yes.  You would get a torrent file or the torrent, send

11   to it your client, the client would get the torrent file, yes.

12   Q.   So in this case, we've talked a lot about BitComet.  In

13   that hypothetical, the old way to do it would be -- to get it

14   would be to get a torrent and then send it to the BitComet

15   client application?

16   A.   I'm not name with BitComet itself.  I didn't work with

17   that client so...

18   Q.   A client application is like BitComet, uTorrent, or other

19   things of that nature?

20   A.   Yes.

21   Q.   That's what, obviously, what I'm talking about when I say

22   client application.

23   A.   Yes.

24   Q.   That's what you've been talking about throughout this --

25   A.   Um-hmm.

1    Q.   -- in terms of peer-to-peer networks?

2         So the old way was that you would have to basically take

3    the torrent file and go to the client application?

4    A.   Yes.

5    Q.   Send it to them.  Now you click on the link, and it is

6    automated.  The client application comes up itself?

7    A.   You would have to search for whatever you're looking for

8    and then find that torrent you're looking for, click on it.

9    And if the client software is associated to a torrent, then

10   yes, it would initiate it.

11   Q.   Right.  I'm jumping ahead and leaving out some of the --

12   I understand I'm leaving out some of the prior process to get

13   to that torrent.  But ultimately, the client application is

14   going to come up as soon as you click on the link of the

15   torrent file?

16   A.   As long as it's associated properly on the computer, yes.

17   Q.   Say that again.

18        THE COURT:  As long as it's associated properly with

19   the computer.  What do you mean?

20        THE WITNESS:  Take a picture file, for example, JPG.

21        THE COURT:  JPEG?

22        THE WITNESS:  Right, JPEG.  So it's a cat.jpg.  Your

23   computer has to know the association with that extension, JPG.

24   It will tell that -- the association will say open it with

25   Photo Viewer or whatever software you view pictures with.

1          THE COURT:  Occasionally, I'll get a file where it

2     will be an attachment to an email sent by the chief judge, and

3     I'll click on it, and it will say open with.  It will be give

4     me some options.  If the option isn't there, then I'd have to

5     search the internet for something?

6          THE WITNESS:  Right.

7          THE COURT:  If I already have it installed on my

8     computer, it will just allow me to open it using that?

9          THE WITNESS:  As long as it's associated, yes.  By

10    associated, there's got to be a link between that file type,

11    and it knows what program to run to look at that file type.

12         THE COURT:  If something isn't on a computer, it

13    wouldn't do that?

14         THE WITNESS:  If you get a PDF file, for example, and

15    you don't have Adobe PDF Viewer on your computer, it's not

16    associated.

17         THE COURT:  PDF and JPEG --

18         THE WITNESS:  As long as there's some software on the

19    machine that knows what that .torrent file is, absolutely, you

20    click on it and it will open the client software.

21    BY MR. ECKES:

22    Q.   Forgive me for reiterating, but it took a while for me to

23    understand it.  A good example is Adobe.  You click on PDF,

24    and Adobe will jump into action?

25    A.   As long as it's associated.  On the normal install

1   process, an association is built between that file extension

2   and the software you're using.

3   Q.   When you download -- Adobe, you agree, could be described

4   as like a helper application?

5   A.   Well, it's a viewer, a PDF viewer.

6   Q.   So when you install that, it sort of creates that

7   connection so that for now, forever more, when you click on

8   it, unless you change something --

9   A.   Right.

10  Q.   -- it's going to pop into action?

11  A.   Correct.

12  Q.   And it's going to help your computer interpret that file,

13  as long as it's the .pdf file?

14  A.   It will tell the computer where to send that file and

15  what piece of software to view or use that file in, yes.

16  Q.   Okay.  So that's generally what happens with these

17  torrent files.  As long as the connection is there, a client

18  application is going to jump into action?

19  A.   Yes.

20  Q.   So if, hypothetically, if someone's using BitComet,

21  BitComet is going to pop up when you click on the link of the

22  torrent file?

23  A.   If that's what's associated with the .torrent file, yes.

24  Q.   Now, some of this will be stuff you've already testified

25  to, but it's just, I think, helpful to refresh.  The

1    BitTorrent is what's known as like a protocol, the over-arcing

2    network; is that right?

3    A.   Yes.

4    Q.   And you've got a lot of training in BitTorrent, this

5    overall network, correct?

6    A.   Yes.

7    Q.   All these client applications that are on people's home

8    computers, you're not an expert in each and every one of

9    those?

10   A.   No.  But they're written -- they're written to the

11   protocol, the BitTorrent protocol.  They could have more

12   written around it.  As long as they have that core BitTorrent

13   protocol, then they can access the network.

14   Q.   Right.  But what I'm getting at is there's not a --

15   you're not going to know each and every one of the ins and

16   outs of these different client applications because they're

17   all completely different?

18   A.   Correct.

19   Q.   Some of them stop working or are constantly updating and

20   things of that nature, correct?

21   A.   Right, yes.

22   Q.   Okay.  So you've defined torrent file for the jury, but I

23   want to talk a little bit more about it.  So a torrent file

24   contains metadata; is that right?

25   A.   The torrent does.  The torrent file is the package or the

1  package of files you're getting or the package that contains

2  the file of files you're getting.  The .torrent file, the

3  metadata that is basically telling you file structure, et

4  cetera.

5  Q.   Okay.  So there can be a torrent called cat.torrent?

6  A.   Yes.

7  Q.   Now, cat.torrent contains metadata, right?

8  A.   Yes.

9  Q.   It doesn't actually contain the files?

10  A.   No, it does not.

11  Q.   And that's why these index sites are not breaking the law

12  if the torrents have, ultimately, files with child pornography

13  in them?

14  A.   That's correct.

15  Q.   So possessing a torrent file, even if the files within it

16  are child pornography, is not illegal?

17  A.   It's just data, correct.

18  Q.   And I believe you said that this torrent file describes

19  the files.  It describes them within the metadata, right?

20  A.   Well, not like hey, this is a video file and here's

21  what's on the file; but as in file size, hash values, yes.

22  Q.   That's what you mean by this will describe what the file

23  is.  It's going to tell you the hash value, we've gone over

24  what that is, and different things about the file?

25  A.   Right, yes.

1    Q.  So I've heard it described this way, and see how you

2    feel.  That these torrent files point to the files.  Does that

3    make sense?

4    A.  Yes.  In a simple term, yes.

5    Q.  When you and I spoke before, you talked about magnet.  Is

6    that what you mean, that this torrent file was kind of like a

7    magnet?  It goes and retrieves the files?

8    A.  That's different.  Magnet is saying, hey, I'm looking for

9    this file.  It's skipping the torrent part, saying I'm looking

10   for this file, and goes out looking for the trackers for it.

11   The torrent you're talking about is basically where I'm

12   looking for key word cat.  Cat comes up, you click on it, you

13   find the file you're looking for through the trackers.

14   They're a little different.

15   Q.  You click on cat.torrent.  Client application jumps into

16   gear as long as it's set that way and begins to go get the

17   files that this points, the pieces --

18   A.  Yes, the package that it points to.

19   Q.  We'll get to pieces.  So, often, files are -- in the law,

20   we call them containers for various reasons.  I'm trying to

21   fit technology into old laws.  So if this is a container, what

22   it contains is metadata?

23   A.  That does, yes.

24   Q.  Right.

25   A.  But that points to the container that contains the

1    files --

2    Q.   Right.  It points to more containers.  So it can point to

3    a JPEG --

4    A.   Yes.

5    Q.   -- or a video or whatever?  It can point to anything?

6    A.   Actually, it points to the container.  It doesn't point

7    to the file itself.  It points to a container that holds those

8    files in it.

9    Q.   Okay.  And then gets them?

10   A.   And then works on getting that container.

11   Q.   The application, then, gets those files to your machine

12   in conjunction with this torrent file?

13   A.   I'm not sure.

14   Q.   So the helper application or the client application like

15   BitComet engages with this and brings the files to your

16   computer?

17   A.   Right.  It takes that metadata and says, okay, here's

18   what I've got to get ready for.  Here's the trackers I have to

19   find to see where those pieces are.  So, yes, it's basically a

20   pointer.

21   Q.   Now, you used the word, and I believe the software showed

22   this word too, of a request.  That the client application

23   makes a request to get files or pieces of files from the seed.

24   Is that right?

25   A.   Yes.

1    Q.   A seed is a person --

2    A.   Another machine on the network that has a part of that

3    file or that file, yes.

4         Or that container.  Sorry.  I'll clarify that.

5    Q.   Okay.  Now, that request, that's not made by the user

6    sending out some sort of "I request that you send me this

7    file," right?

8    A.   Way, way back.  Used to be, but not anymore.

9    Q.   So that's what's different about, you know, the initial

10   thing of homework and whatnot.

11   A.   Um-hmm.

12   Q.   The conversation that happens between the machines with

13   this peer-to-peer stuff is between the machines?

14   A.   Right.  There's not a person sitting there transacting

15   all that, no.

16   Q.   Which is how your machine was able to carry on all these

17   conversations all over the place without anybody sitting

18   there?

19   A.   Correct.

20   Q.   Now, these torrent files, cat.torrent, it also can

21   contain a folder structure for the files --

22   A.   Correct.

23   Q.   -- is that right?  So if it downloads the files to your

24   machine, let's say there's four files in the torrent, it can

25   contain information about what folder to put them in?

1   A.   Yes.  It would tell your client machine what folders to

2   write to prepare for those files, yes.

3   Q.   Okay.  What folders to write.  Now, continues to get

4   confusing, but generally a client application is going to have

5   a default folder that it's going to send it to the over-arcing

6   folder?

7   A.   An overall, yes, an overall folder for all downloads.

8   Yes, it can be set on a client.  Put it that way.

9   Q.   Like any other program you download, during the process,

10  you can tell it where to send files?

11  A.   Right.

12  Q.   Like Microsoft Word, if you wanted to configure it to

13  send to it some crazy folder, you could.  But generally, it's

14  going to send it to your documents folder?

15  A.   Yes.

16  Q.   So the over-arcing file is generally downloads or

17  something like that?

18  A.   It could be, yes.  I mean, depends on the client.

19  Q.   Okay.  But downloads, would you agree, is one that

20  happens pretty often?

21  A.   That would be a common name for it, yes.

22  Q.   So you'll see it like that; is that right?

23  A.   Yes, slashes too.  I like that.

24  Q.   And then this next folder it puts it in, is that normally

25  just the name of the torrent?

1    A.   Depends on the client.

2    Q.   Depends on the client?

3    A.   How he handles it.  Sometimes it is.  Sometimes he'll

4    break it off and make the folder either be the torrent itself

5    or could be time and date, any number of things.  Depends on

6    the client.

7    Q.   So the client application, again in conjunction with the

8    instructions from the torrent file, is creating the folder

9    structure?

10   A.   Correct.  After the whatever is set up for the download,

11   yes.

12   Q.   And hypothetically, it could be that the client

13   application would put this into a folder called cat?

14   A.   Sure.

15   Q.   Now, it can also -- folder structures can be deeper than

16   just this?

17   A.   Right.

18   Q.   So it can contain a folder structure deeper and can have,

19   like, "white" for white cats or something, right?

20   A.   Yes.

21   Q.   And then you could have another one where it's all the

22   same and, you know, there's a folder of "brown," right?

23   A.   Sure.

24   Q.   And this is all within the metadata of this torrent file?

25   A.   In that, yes.

1    Q.   Now, it would be easier if the torrent just went out and

2    grabbed the four files from four different computers, but

3    that's not what happens, right?

4    A.   Correct.

5    Q.   You talked about that.  But this BitTorrent is split into

6    pieces so a file may be one piece or may be ten pieces or may

7    be five and a half pieces, right?

8    A.   Yes.

9    Q.   And these pieces can potentially come from all over the

10   world, right?

11   A.   Correct.

12   Q.   Anybody who's got the right software running and who's up

13   and active, you can get the pieces from them?

14   A.   Yes.

15   Q.   Okay.  Now, the pieces are not necessarily going to come,

16   you know, piece 1 then get piece 2 and piece 3 and piece 4,

17   right?

18   A.   Right.

19   Q.   It comes in nonsequentially?

20   A.   Right.

21   Q.   And that makes it faster?

22   A.   Yes.

23   Q.   And now others using the software and on the network,

24   they can retrieve the pieces from you as soon as you have the

25   pieces?

1    A.   As soon as you have a complete piece, yes.

2    Q.   So you don't even have to have the entire file before,

3    generally speaking, with peer-to-peer, you're sharing pieces?

4    A.   You're saying "you."  You mean my machines or general

5    clients in general?

6    Q.   General clients.

7    A.   General clients, yes.  As soon as one piece is complete,

8    you can start sharing that piece.

9    Q.   Your program is special, and it doesn't share anything?

10   A.   Correct.

11   Q.   But generally speaking, as the pieces come, the pieces

12   go?

13   A.   Yes.

14   Q.   And then when you have enough pieces that you have all of

15   the file, let's say one of the files has, you know, five

16   pieces.  Once you have all five of those pieces, you may have

17   not gotten them sequentially, but the client software puts it

18   together and shows you the file?

19   A.   The client software puts those pieces together into that

20   file, yes.  Whether it shows you the contents or shows you the

21   actual file or not, that depends on the client.

22   Q.   We'll get there.

23   A.   Okay, I'm sorry.

24   Q.   But the client application is rearranging these puzzle

25   pieces?

1    A.   Putting them back together again, yes.

2    Q.   All right.  This may be way too juvenile, but it took me

3    forever to understand this stuff so it helped me to look at a

4    puzzle.

5         MR. ECKES:  So, Judge, at this time, I've marked for

6    demonstrative purposes only 1A and 1B, which are two

7    children's puzzles of a goldfish.

8         THE COURT:  Of what?

9         MR. ECKES:  Of a goldfish.

10        THE COURT:  All right.  Have you shown this to the

11   prosecutor?

12        MR. ECKES:  I have, Your Honor.

13        THE COURT:  Any objection?

14        MS. LEONHARD:  No, sir.

15        THE COURT:  Very well.  You're not going to -- you're

16   just using these for demonstrative purposes?

17        MR. ECKES:  That's correct.

18        THE COURT:  That's fine.  You may approach.

19        MR. ECKES:  Okay.

20        THE COURT:  Why don't you give him both of them now.

21   Save a little time.

22        MR. ECKES:  That will ruin my demonstration.

23        THE COURT:  Oh, okay.

24        MR. ECKES:  The other one's for later.

25   BY MR. ECKES:

1   Q.   So describe for the jury what you have.

2   A.   I have a piece of wood with a fish and some coral on it.

3   Q.   Let's assume that that's a a torrent called cat.torrent,

4   okay?

5   A.   It's a fish, but cat will work.

6   Q.   Cat.torrent, and it's got the metadata to go get pieces,

7   and we're going to assume that it has four files in it, and

8   the first file is a JPEG of a goldfish, and it's got four

9   pieces.  Do you follow me?

10  A.   Yes, I'm following.

11  Q.   So those four pieces could be anywhere in the world,

12  right, on four machines?

13  A.   Yes.

14  Q.   So that torrent, cat.torrent, engages with the client

15  software and begins to take the pieces, retrieve the pieces --

16  A.   Yes, retrieve the pieces.

17  Q.   -- correct?

18       Okay.  So now that torrent has brought two pieces of file

19  number one to your machine; is that right?

20  A.   Yes.

21  Q.   Somebody else out there can get some of those pieces now?

22  A.   Can get the two complete pieces you have here, yes.

23  Q.   But you don't even have the JPEG of the goldfish yet.

24  A.   That's correct.

25  Q.   So then the torrent gets you all four pieces.  They come

1    in, and I don't know if your puzzle putting skills are as good

2    as the client applications are, but it rearranges them and

3    puts it into a JPEG of a goldfish.

4    A.   It gives you the whole picture, yes.  Puts the picture

5    back together.

6    Q.   Okay.  And a JPEG is a picture, right?

7    A.   Yes.

8    Q.   All right.  I'll take that from you for now.  But then so

9    I want to talk about where we find these torrent files or

10   where someone would find them.  In essence, it's like any

11   other file in the sense of you could get it anywhere,

12   technically speaking?

13   A.   A torrent file?

14   Q.   Yes.  Somebody could email you a torrent file if they

15   wanted to?

16   A.   Yes.

17   Q.   So it's just like any other file.  You can get it

18   anywhere but, generally speaking, you get them from index

19   sites?

20   A.   Correct.

21   Q.   So they can come from wherever, but most of the way

22   this -- the general way this operates is people go to what are

23   called index sites.

24   A.   Correct.

25   Q.   And index sites, there's a lot of them --

1    A.   Um-hmm.

2    Q.   -- right?  And they host the torrent files.  They

3    actually -- well, actually, maybe not, but some of them

4    actually have the actual torrents on that site, the index

5    site?

6    A.   Just to clarify, they have the metadata, not the actual

7    files themselves.  Yes.

8    Q.   They have cat.torrent?

9    A.   Correct, yes.

10   Q.   They don't have --

11   A.   They don't have your fish.

12   Q.   They don't have the fish?

13   A.   Right.

14   Q.   But they also, correct me if I'm wrong, they may have

15   just a link to wherever somebody actually has the torrent

16   file?

17   A.   That's possible.

18   Q.   Okay.  But that's where you get the torrents?

19   A.   Yes.

20   Q.   They either host them or they link to where you go to get

21   them?

22   A.   Sure.

23   Q.   And by "link," we mean just like any other website, it's

24   generally in blue, you click on it?

25   A.   Right.

1          THE COURT:  When you say link, a hyperlink?

2          MR. ECKES:  A hyperlink, yes.

3          THE COURT:  All right.

4    BY MR. ECKES:

5    Q.  Now, sometimes these torrents, the hyperlink is -- it's

6    just like a symbol.  It's not even a word; is that right?

7    A.  Yes.  You can make anything into a hyperlink, yes.

8    Pictures, anything.  Yes.

9    Q.  Right.  So a hyperlink isn't necessarily, you know, free

10   cat pictures.  It could be anything that caused you to get

11   cat.torrent.  So whatever the content provider of that torrent

12   puts into the hyperlink?

13   A.  Of course, as a user, you have to search for whatever

14   term it's looking for.  But yes, that's possible.

15   Q.  Now, so a hyperlink could be a symbol, and I think you

16   said it could also be a picture.

17   A.  Yes.

18   Q.  So you could click on a picture that is a torrent file,

19   is hyperlinked to a torrent file.  So you click on the picture

20   and then cat.torrent is engaged on your machine, right?

21   A.  Assuming that's what you're searching for is cats, yes.

22   Q.  Well, but it's up to the content provider to make sure

23   that the picture links to the actual torrent file, right?

24   A.  Sure, yes.

25   Q.  By content provider, I mean generally the index site

1  itself.

2  A.  Indexing sites, yes.

3  Q.  It's not mechanically impossible for the indexing site

4  to, you know, put a picture of a dog and ends up being

5  cat.torrent.

6  A.  That would take him some work.  But yes, they can do

7  that.

8  Q.  I think the best way to summarize it, and correct me if

9  you don't agree, is that a user is going to do some sort of

10 action, generally a key word search, but through some sort of

11 interaction with the index site is going to lead them to the

12 torrent?

13 A.  Yes.

14 Q.  And it's up to the indexing site's programming to make

15 sure that what you're searching for is what you're getting?

16 A.  Well, you kind of do two different ways on that.

17 Q.  You're right.  So the indexing site, because the indexing

18 site could be tricked by the actual person that created the

19 torrent, I suppose?

20 A.  Sure.

21 Q.  So okay.  But so as a user, you are relying on the

22 indexing site's ability to match things, to match key words?

23 A.  To make sure that you have a cat when you're looking for

24 a cat, sure.

25 Q.  But then you're also -- the indexing site itself did not

1   create cat.torrent, generally, did it?

2   A.   No.

3   Q.   Cat.torrent got created by some person?

4   A.   A user on the internet, yes.

5   Q.   A user on the internet.  So all these torrents are

6   created by users all over the world?

7   A.   Um-hmm.

8   Q.   And then the indexing sites are just ways to get them all

9   together so people know where to go to get the torrents?

10  A.   Yes.

11  Q.   I could create a torrent, if I knew what I was doing,

12  right now called cat.torrent and get it on to some indexing

13  sites?

14  A.   Sure.

15  Q.   And I could put whatever I want in it, right?

16  A.   Um-hmm.

17  Q.   And one -- so now we've talked about how you find a

18  torrent.  You click on the hyperlink, and you've engaged the

19  torrent in a way that it's getting the files, right?

20  A.   Okay.

21  Q.   Those files are coming to your machine once you've

22  clicked on it?

23  A.   Those pieces, yes.

24  Q.   Those pieces of files are coming to your machine, and

25  they're getting rearranged, all with that click of a

1    hyperlink?

2    A.   Yes.

3    Q.   That's not how it used to work, right?  It used to be a

4    more intense process, but now --

5    A.   It still worked that way, but getting to that point was a

6    little harder, yes.

7    Q.   Now this is all happening in an automated fashion?

8    A.   Um-hmm.

9    Q.   Now, you talked about -- when you showed the jury like

10   what a torrent looks like on your PowerPoint, I believe I

11   heard you say it, but I want to reiterate, that's not what the

12   user sees, right?

13   A.   No.  You can if you want to, but users don't normally

14   look at the contents of torrent.

15   Q.   And I believe you used the word, this is after I

16   "decoded" the torrent, right?

17   A.   Lack of a better term, yes.

18   Q.   Okay.  So, generally speaking, a user doesn't decode the

19   torrent before they click on --

20   A.   No.

21   Q.   -- the torrent before the hyperlink that leads to the

22   torrent?

23        This is where you may respond to me that it depends on

24   the client application.  I understand.  But there are client

25   applications that will play the file from the client

1    application, the interface of the client application; is that

2    right?

3    A.   There are some clients that will, yes.  Once it gets

4    enough pieces to determine what it is, yes.

5    Q.   Let's just say it's got everything.  Cat.torrent has been

6    downloaded.  All the pieces are there.  The interface of the

7    client application can play the video or the JPEG?

8    A.   There are some clients who can, yes.

9    Q.   So for some of these clients, you don't have to go into

10   your download manager to find the file that's been downloaded.

11   It potentially could just start to play.  I don't know.  Does

12   that happen?

13   A.   I'm not familiar with any client that would do that, but

14   you'd have to take some action to get that file initiated.

15   Q.   Okay.  But the client application has a way, some of the

16   modern ones, to just play the video or look at the picture

17   while you're still within the client application?

18   A.   If the user activates it, yes.

19   Q.   And the client applications, again, are like a BitComet

20   or a uTorrent type thing?

21   A.   Correct.

22   Q.   This is -- I don't mean to insult you, certainly, because

23   I know you know all this stuff.  But just to be clear, the

24   clients are like a BitComet and a uTorrent, and then -- but

25   BitTorrent is overall protocol, right?

1    A.   Sure, yes.

2    Q.   So when you hear BitTorrent, it's just the over-arcing

3    network of the world where these files are being retrieved

4    from?

5    A.   It's the network, yes.  Protocol for that network, yes.

6    Q.   Now, when the file is viewed or played, wherever it's

7    viewed or played, after the client application has got the

8    files, the computer is playing the actual files as they are on

9    the machine, the local machine, correct?

10   A.   Yes, correct.

11   Q.   And a lot of -- that's similar to how Adobe would work as

12   well is that you've downloaded the PDF.  The helper

13   application, Adobe, comes into action and opens the PDF, which

14   is an actual file on your computer?

15   A.   Correct.

16   Q.   But you can't view it until you have all the pieces for

17   it?

18   A.   All the pieces for that particular file, yes.  Not

19   necessarily the whole container.

20   Q.   Right, right.  So the whole -- by "container" there,

21   you're meaning big metadata, all the --

22   A.   The whole container of all the files, because remember --

23   Q.   92 pieces, that's the whole thing?

24   A.   Sure.

25   Q.   But if you've got -- I think we saw 1 through 56 was one.

1    Well, 1 through 55, and then --

2    A.   And 56 was its own file.

3    Q.   -- 56 was one thing.  So you've if got 1 through 55,

4    you've now got the file?

5    A.   You've got one file.

6    Q.   But you need 1 through 55 to be rearranged before you can

7    watch it?

8    A.   And to be on that local machine to watch -- to look at

9    it, yes.

10   Q.   Okay.  I want to talk a little bit about the pieces and

11   how your machine -- if you click on the torrent, you click on

12   cat.torrent, it's activated.  Client application is doing its

13   thing.  Your computer's doing its thing.  It's going out to

14   try to retrieve the four files that are in cat.torrent.

15   A.   Okay.

16   Q.   If some of those pieces -- files or pieces -- are not

17   available, there's no way for you to get that file at the

18   time; is that right?

19   A.   Yes, correct.

20   Q.   But your machine doesn't just stop.  It's going to

21   continue to look for them, right?

22   A.   Um-hmm, yes.  Depending on the client software, of

23   course.  But yes.  Normally, yes.

24   Q.   So if we've got good old cat.torrent, who has four files,

25   and let's say -- I'm just learning this now.  The first one is

1  file zero?

2  A.   Yes, correct.

3  Q.   So we'll have file zero.  We'll have file 1 -- my

4  handwriting is terrible -- we'll have file 2 and file 3.

5  A.   Okay.

6  Q.   This is our goldfish JPEG.  So it will be pieces 1

7  through 4.  File 1, say, is 5 through 20.  File 2, we'll say

8  21 through 50.  And then file 3, we'll say 50 through 92,

9  because 92 is relevant to the case.

10      So let's say today I engage cat.torrent, and the only

11 thing available are pieces 1 through 20.

12 A.   Okay.

13 Q.   It's going to go get these pieces and, therefore, it's

14 going to get these two files, correct?

15 A.   Just to clarify, it's not going to get them.  It's

16 requesting them, and the other machines are sending it to that

17 client because I'm trying to make sure we don't have that

18 image of you reaching in somebody else's machine and pulling

19 stuff out.  That's not happening.

20 Q.   Right.  I got it.  Would "retrieve" work better?  It

21 retrieves them?

22 A.   It's sent to the client's machine.

23 Q.   Okay.  So with the caveat that we know the word retrieve

24 means request and get --

25 A.   Right.  I'm requesting it.  The other machine is sending

1   it to me.

2   Q.   The machines have conversation without us, and you end up

3   with it?

4   A.   There you go.

5   Q.   If only 20 pieces are available, you're just going to get

6   file zero and file 1?

7   A.   That's correct.

8   Q.   If, tomorrow, somebody logs in that's got 21 to 50, and

9   you log in, without you doing anything more, your machine is

10  going to go look and get 21 to 50?

11  A.   Depends on the client software.  If it's set to continue

12  to look for it, yes, it will.

13  Q.   And then if one month from now is the first time file 3

14  becomes available, it will go get that file and get it to your

15  machine through the process of the machines talking?

16  A.   Correct.

17  Q.   Likewise, if this, the directory for the two first files

18  was going to be cat/white -- I'm going to confuse myself --

19  these two files will get put into that.  It will be

20  downloads/cat/white, and it will dump the two files in here if

21  that's what the torrent told it to do?

22  A.   Yes.  If that's what the torrent said, that's what it

23  will do.

24  Q.   A month from now, if it wanted this file to go to its own

25  folder, it will do that a month from now?

1    A.   If that's what the torrent said, it will have that folder

2    ready for it, yes.

3    Q.   And they even have a term for when you don't have seeds

4    available, and it's called a seeder promotion problem?

5    A.   Okay, yes.

6    Q.   You had testified about how even with a bad file name,

7    you always double check and see what's in it; is that right?

8    A.   I'm not sure what you mean.

9    Q.   I don't remember when it came up, but you had testified,

10   I believe it's in connection to you go and make sure that the

11   files downloaded are actually child pornography.

12   A.   Yes.

13   Q.   You don't just look at the file name?

14   A.   Absolutely not, no.

15   Q.   You just click on them?

16   A.   You could have a cat.jpeg and it could be something else.

17          MR. ECKES:  If we could pull up Exhibit 3.

18          THE COURT:  Is that the log?

19          MR. ECKES:  The log.

20          THE COURT:  All right, sir.

21   BY MR. ECKES:

22   Q.   So we see the name of your program up top, Torrential

23   Downpour; is that right?

24   A.   That's correct.

25   Q.   And this whole chart or timeline is created by the

1  software; is that right?

2  A.   That's correct.

3  Q.   You didn't type all that stuff?

4  A.   No, sir.

5  Q.   Now, the timing of when your machine exchanged handshakes

6  with the machine in question, you get the -- let's just call

7  it Mr. Moran's computer, the time that it exchanged handshakes

8  with Mr. Moran's computer is 12:59:17.

9  A.   Okay.  That IP address 64.250.174.175, yes.

10  Q.   Okay.  At that time, when the handshakes are exchanged,

11  Moran's machine had zero of 92 pieces.

12  A.   That's correct.

13  Q.   And that's what we see right here?

14  A.   Yes.

15  Q.   So Moran's machine has zero of 92 pieces so he's got none

16  of the files; is that right?

17  A.   Um-hmm, correct.

18  Q.   He doesn't have a single piece of any of the files?

19  A.   Not the file itself, no.

20  Q.   The first time he gets a piece is at 59:47; is that

21  right?

22  A.   That's correct.

23  Q.   And then there's a log of him getting pieces.  And these

24  pieces come in nonsequentially, which is expected, like we

25  talked about?

1   A.   Yes, sir.

2   Q.   Now, you have, and you can -- your machine can begin

3   taking pieces as soon as his machine has the pieces?

4   A.   A complete piece.

5   Q.   Not necessarily a complete file, but a complete piece?

6   A.   Correct.

7   Q.   And the long and short is you've got the pieces that make

8   up an entire file by 1:02:35?

9   A.   Okay.

10          THE COURT:  Let's than three minutes from the start?

11   You're mentioning the time.  I'm just --

12          MR. ECKES:  Yes.  I thought you were telling me I had

13   three minutes left.

14          THE COURT:  You can use more than three minutes if

15   you'd like.

16   BY MR. ECKES:

17   Q.   Okay.  So we see file 1 has been completely downloaded at

18   1:02:35?

19   A.   That's correct.

20   Q.   I'm going to say Torrential Downpour has file 1.  Is that

21   fair?

22   A.   Sure.

23   Q.   And it goes on for a little while longer, and you have

24   all 92 pieces and all four files, I believe, by 1:12 or

25   something along there.  Does that sound right?

1    A.   Yes.

2              MR. ECKES:  Judge, may I have a moment?

3              THE COURT:  You may.

4    BY MR. ECKES:

5    Q.   To be clear about the timing, this is in the middle of

6    the night, right?

7    A.   A little after midnight, yes.

8              THE COURT:  That would be Central time, correct?

9              THE WITNESS:  My time, yes.  Sorry, Central time.

10   BY MR. ECKES:

11   Q.   Okay.  So I'm going to do my demonstration one last time

12   before I wrap things up.

13        Let's assume again that this is cat.torrent.  It contains

14   four files.  The first file, file zero, I guess is what it

15   would be, it has four pieces, and it's a JPEG of a goldfish.

16   Follow me?

17   A.   I do.  But you said we have four files, then you said we

18   have four pieces.  I want to be sure I'm clear on what we're

19   talking about.

20   Q.   So file zero is a picture JPEG of a goldfish.  We have

21   four files, but this one has four pieces.

22   A.   So what's in your hand is one file?

23   Q.   Kids puzzles only have with a few pieces.  I didn't mean

24   to make this confusing.

25   A.   That's all right.

1    Q.   Sometimes I make things up as I go.  This is cat.torrent,

2    hypothetically, or metaphorically, and it's going to go get

3    the JPEG of the goldfish piece by piece, like we've already

4    demonstrated.  But I want to add your part of this.

5         So let's call this -- say my machine.  I'm downloading,

6    through a peer-to-peer network, so I've engaged the torrent,

7    cat.torrent.  It's pointing to all the pieces, and my machine

8    has collected two of them.  You now have the ability to get

9    these two pieces, correct?

10   A.   From your computer?

11   Q.   Yes.

12   A.   Yes.  Those two pieces.  Well --

13   Q.   And I want you to assume that what you're using is your

14   software.

15   A.   Okay.

16   Q.   So Torrential Downpour can take those two pieces now,

17   correct?

18   A.   Yes.

19   Q.   Then if I get one more piece, can take that -- retrieve

20   that piece through the peer-to-peer machines talking?

21   A.   I can request that piece, and your machine can send it to

22   me.

23   Q.   You can request that piece --

24   A.   Yes.

25   Q.   -- and you can ultimately get all of them?

1      Now, if it wasn't your machine, those could be going to

2 other places already, right?

3 A.   No.  I don't share on my machine.

4 Q.   If it was another machine, they would be?

5 A.   If it was another client on the network, that's right.

6 Q.   But your machine doesn't let the pieces go anywhere but

7 your room that's locked?

8 A.   That's correct, yes.

9 Q.   And my machine now, as your machine's been doing its

10 thing, rearranges these pieces and puts them together.  And

11 then now, however the viewer happens, I can view my JPEG of

12 goldfish, right?

13 A.   As long as you have all the pieces, yes.

14 Q.   As long as I have all the pieces to file number zero, I

15 can look at this picture of a goldfish?

16 A.   As long as -- well, yes.  You're not specifying whether

17 it was in the client or outside, but yes.  You can see that as

18 a complete file.

19 Q.   If I look at this picture and say, "I didn't want a

20 picture of a goldfish, I wanted a picture of a cat," and I

21 delete that on my machine, you've still got it, don't you?

22 A.   I will still have the pieces I obtained from that

23 machine, yes.

24 Q.   You still have the picture of the goldfish?

25 A.   Correct.

1        MR. ECKES:  No further questions, Judge.

2        THE COURT:  Redirect.

3                    REDIRECT EXAMINATION

4   BY MS. LEONHARD:

5   Q.   Detective Couchman, at one point during Mr. Eckes'

6   cross-examination, he said that the machines are having

7   conversations, and you just end up getting it.  It's a little

8   bit more complicated than that, isn't it?

9   A.   Yes.  I'm not sure which part you're talking about.

10  Sorry.

11  Q.   Computers aren't autonomously or independently operating

12  to go out and get the data or files?

13  A.   The user input has to initiate it, yes.

14  Q.   Let's talk about some of the user input.  We had a couple

15  of demonstrations involving a .torrent file that was labeled

16  cat that ended up being a goldfish, correct?

17  A.   Yes.

18  Q.   In this case and in similar cases that you've worked

19  with, people who are transacting in child pornography don't

20  typically use words that have common and ordinary meanings, do

21  they?

22  A.   Not necessarily.  Not to a common lay person, no.

23  Q.   So, for example, in the files, the four files that you

24  downloaded from the defendant's computer, the file names

25  themselves, and if we can bring up -- we actually still have

1    the log details up on the screen.  Right here, I've circled

2    the file names for files zero and one.

3    A.   Yes.

4    Q.   Many of those words in that file don't mean much to

5    somebody who doesn't know what they're looking for, correct?

6    A.   There's a few words that are obvious, but the rest of the

7    initials probably won't, no.

8    Q.   Give the jury some examples of some words or acronyms

9    that would have no meaning to somebody like you and me.

10   A.   PTHC, unless you knew what you were looking for.  I'm

11   assuming you would know what you're looking for with that kind

12   of acronym.

13   Q.   And, again, PTHC stands for what?

14   A.   Preteen hard core.

15   Q.   Do you know what OPVA stand for?

16   A.   I'm not familiar with it.

17   Q.   The rest of the file name, "2014 real father fuck his

18   13 YO daughter in the basement" --

19   A.   Correct.

20   Q.   -- that's a combination of words that somebody

21   specifically has to seek out?  That's not content that -- in

22   this case, that's not content that's misleading.  The file

23   name is very accurate for the information of the file that it

24   depicts?

25   A.   Yes, it could.

1    Q.   And in this case, this wasn't a situation where your

2    machine only got certain pieces of a file from the defendant's

3    computer.  You got all 92 pieces, correct?

4    A.   Yes.

5    Q.   All 92 pieces that made up the four files that we

6    previously discussed, the two JPEGs and the two video files,

7    correct?

8    A.   Correct.

9    Q.   And, again, unlike the characterization that Mr. Eckes

10   did, the demonstration isn't where you were pulling pieces

11   from multiple users.  You were only pulling them from the

12   defendant, correct?

13   A.   That's correct.

14   Q.   You were only making the request?

15   A.   I wasn't pulling.  His machine was sending it to my

16   machine.

17   Q.   Because he had it to offer, correct?

18   A.   Correct.

19        MS. LEONHARD:  Your Honor, may I have one moment?

20        THE COURT:  You may.

21   BY MS. LEONHARD:

22   Q.   Detective Couchman, Mr. Eckes also sort of alluded to the

23   fact that the computers are having this interaction and

24   implied maybe that it's devoid of any user input.  That's not

25   the case, is it?

1   A.   No.  There has to be some user input in order to find

2   whatever you're looking for.

3   Q.   And, again, some of these acronyms in some of these

4   files, unlike cat or fish, mean something particular, correct?

5   A.   Yes.

6   Q.   And in this case, some of these acronyms, like PTHC, mean

7   things that are particular with respect to images or files

8   depicting minors engaged in sexually explicit conduct, right?

9   A.   Yes.  Child exploitation, yes.

10          MS. LEONHARD:  Your Honor, those are all the

11   questions I have.

12          THE COURT:  Any recross, limited to the redirect?

13          MR. ECKES:  Yes, Judge.

14          THE COURT:  All right, sir.

15                        RECROSS-EXAMINATION

16   BY MR. ECKES:

17   Q.   So "index 0: NEW PTHC," is that the name of the one of

18   the files?

19   A.   Yes.

20   Q.   So there's levels to get there.  We've got a hyperlink

21   that you click on to get to the torrent, right?

22   A.   If that's how this was obtained.

23   Q.   If that's how you obtain it.  Generally speaking, you can

24   obtain torrents through a hyperlink on an index site?

25   A.   That's one possibility, yes.

1  Q.  Underneath that, there is a torrent name which, in our

2  example, was cat.torrent; is that right?

3  A.  In your given example, yes.

4  Q.  In my hypothetical?

5  A.  Yes.

6  Q.  And in my hypothetical, file names are what the

7  torrent -- are what is described by the torrent in the

8  metadata, correct?  The file name may come along when you get

9  the file, but when you're working at the torrent level, you

10  don't see the file name?

11  A.  You may not, no.

12  Q.  That's what we were talking about earlier when I said

13  decoding the torrent, and you said a normal user wouldn't do

14  that.

15  A.  Right.

16  Q.  So the file name could have been goldfish.jpg, but that

17  doesn't mean I knew I was getting a goldfish if I clicked on

18  the hyperlink that eventually led me to cat.torrent, right?

19  A.  That's fair.

20          MR. ECKES:  No further questions, Judge.

21          THE COURT:  May this witness be finally excused?

22          MS. LEONHARD:  Yes, sir.  Thank you.

23          THE COURT:  Without objection, you may be excused,

24  sir.

25          THE WITNESS:  Thank you, sir.

1          THE COURT:  Ladies and gentlemen, we're going to

2     break for the evening.  During the overnight recess, don't

3     discuss the case.  Don't do any research on your own.  Keep an

4     open mind until the evidence has been submitted to you and

5     I've given you the instructions.  That will be either probably

6     late tomorrow or Wednesday.

7          I did look at your counties.  We've got and some jurors

8     from Gallatin, jurors from Pendleton, jurors from Mason, so I

9     understand that some of you may be more than an hour to get

10    here.

11         Is 9:00 too early?  I know that's when you were here this

12    morning.  My preference would be to start at 8:45, but if you

13    think 9:00 is a better time collectively, would you prefer

14    9:00?

15         UNIDENTIFIED JUROR:  Yes.

16         THE COURT:  Try to get here right on time so we can

17    get started.  I hope you all have a good evening.  Thank

18    you.

19    (The jury exited the courtroom at 5:07 p.m.)

20         THE COURT:  The jury has left the courtroom.  We have

21    a draft set of instructions for you to look at them.  I

22    realize we're still relatively early in the game, but if we do

23    wrap up tomorrow, I could always instruct late tomorrow and

24    then come back Wednesday morning and argue.

25         So anything you all need to take up with me?

1          MR. ECKES:  No, Your Honor.

2          MS. LEONHARD:  Nothing.  Thank you.

3          THE COURT:  Very well.  Felisa will give you a copy

4     of the draft instructions, then.

5          We'll have you back here at 8:30 in the event there's

6     anything to take up.  I'll be available at that time for

7     anything we need to discuss.  If there's nothing to discuss,

8     you can just let the CSO know, and we'll have you back here at

9     9:00.

10          We'll be in recess.

11          (Proceedings adjourned at 5:08 p.m.)

12                              - - -

13

14                   C E R T I F I C A T E

15          I, LISA REED WIESMAN RDR-CRR, certify that the
      foregoing is a correct transcript from the record of
16    proceedings in the above-entitled case.

17

18    _\s\ Lisa Reed Wiesman_              _____August 1, 2018_____
      LISA REED WIESMAN, RDR-CRR           Date of Certification
19    Official Court Reporter

20

21

22

23

24

25

1                                    INDEX

2      **GOVERNMENT'S WITNESSES**

3      ROBERT COUCHMAN
       Direct Examination............................... Page 24
4      Cross-Examination................................ Page 74
       Redirect Examination............................. Page 107
5      Recross-Examination.............................. Page 110

6
                                   - - -
7

8      **GOVERNMENT'S EXHIBITS**

       | Exhibit | Description | Identified | Admitted |
       | --- | --- | --- | --- |
9      | 1 | PowerPoint created by Detective Couchman, demonstrative only | 35 | -- |
10
11     | 2 | CD containing downloaded files | 63 | 63 |
12     | 3 | Log details of downloaded files | 66 | 67 |
13

14
       **DEFENSE EXHIBITS**
15

16     | Exhibit | Description | Identified | Admitted |
       | --- | --- | --- | --- |
17     | 1A | Goldfish Puzzle No. 1, demonstrative only | 88 | -- |
18     | 1B | Goldfish Puzzle No. 2, demonstrative only | 88 | -- |
19

20
                                   - - -
21

22

23

24

25