1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
2                   NORTHERN DIVISION at COVINGTON
                              - - -
3
   UNITED STATES OF AMERICA,      : Docket No. 16-CR-43
4                                 :
                       Plaintiff, : Covington, Kentucky
5                                 : Tuesday, November 28, 2017
                                  : 9:00 a.m.
6    versus                       :
                                  : **Jury Trial Day 2 of 3**
7    BRANDON MORAN,               :
                                  :
8                    Defendant.   :

9                              - - -
                         **REDACTED TRANSCRIPT**
10                             - - -
                       TRANSCRIPT OF TRIAL
11                   BEFORE DAVID L. BUNNING
           UNITED STATES DISTRICT COURT JUDGE and a jury
12                             - - -

13   APPEARANCES:

14   For the United States:      ELAINE K. LEONHARD, ESQ.
                                 WADE THOMAS NAPIER, ESQ.
15                               U.S. Attorney's Office
                                 207 Grandview Drive
16                               Suite 400
                                 Ft. Mitchell, KY 41017
17
     For the Defendant:          ERIC G. ECKES, ESQ.
18                               Pinales Stachler
                                 455 Delta Avenue
19                               Suite 105
                                 Cincinnati, OH 45226
20
     Court Reporter:             LISA REED WIESMAN, RDR-CRR
21                               Official Court Reporter
                                 35 W. Fifth Street
22                               Covington, KY 41011
                                 (859) 291-4410
23

24
         Proceedings recorded by mechanical stenography,
25   transcript produced by computer.

1          (Proceedings commenced at 9:00 a.m.)

2               THE COURT:  The jury's not in the courtroom.

3          Is there anything we need to take up before we bring the

4     jury down?

5               MS. LEONHARD:  Nothing from the United States.

6               MR. ECKES:  No, Your Honor.

7               THE COURT:  Go ahead and bring them in, please.

8          (The jury entered the courtroom at 9:02 a.m.)

9               THE COURT:  Mr. Napier, you may call your next

10    witness.

11              MR. NAPIER:  The United States calls Jeff Craycraft.

12              JEFF CRAYCRAFT, GOVERNMENT'S WITNESS, SWORN

13              THE COURT:  Good morning, sir.

14              THE WITNESS:  Good morning.

15              THE COURT:  You may proceed.

16                          DIRECT EXAMINATION

17    BY MR. NAPIER:

18    Q.   Good morning, sir.  Would you please state your full

19    name.

20    A.   Jeff Craycraft.

21    Q.   Mr. Craycraft, where do you work?

22    A.   I'm employed by Standard Device Company, vice president

23    and treasurer.  We own and operate Limestone Cable Vision.

24    Q.   What do you do specifically for Limestone Cable?

25    A.   Basically, anything financial, legal, customer

1    complaints.  I'm the last person people get to talk to if

2    they've got a problem, basically.

3    Q.   Okay.  How long have you worked there?

4    A.   Since 1985.

5    Q.   What services does Limestone Cable provide?

6    A.   We're a cable and internet provider.

7    Q.   When Limestone Cable has a subscriber for internet

8    service, how does that application process unfold?

9    A.   Have to come to the office with a picture ID and proof of

10   residence, sign a contract stating that they'll abide by a

11   whole list of things that we have on our contract.  They're

12   provided a modem free of charge, and then they tell us what

13   service packages they want.

14   Q.   If a subscriber subscribes to internet services, are they

15   assigned an IP address?

16   A.   Everyone is assigned a dynamic IP address unless they

17   specifically ask for a static IP.  Mainly, businesses use

18   static IPs.

19   Q.   Just explain to the jury, what is an IP address?

20   A.   IP address is like your Social Security number.  It is

21   unique to your computer, your residence.  Could be a router or

22   whatever.  It's what -- the internet knows to route it back to

23   your computer at home.  Without that, it wouldn't know where

24   to send the information you're requesting.

25   Q.   Now, does Limestone Cable maintain a record of IP

1   addresses in the regular course of their business?

2   A.   We contract a third party out of Atlanta, because of the

3   sheer volume.  Every time someone's IP address renews, which

4   we do every 24 hours, that is logged by the MAC address of

5   whatever device is connected to our modem and also the modem

6   MAC address.  If they disconnect or somebody connects, that is

7   also logged.

8   Q.   So is the record of the IP address created at the time of

9   the application?

10  A.   At the time they -- when we provision the modem, telling

11  it what speed we want to give that customer, that is logged.

12  And then any time the IP address is renewed or changes, that

13  is logged.

14  Q.   Okay.  And is that record kept in a secured computer

15  database?

16  A.   Yes.

17  Q.   Now, I want us to turn specifically to this case.  Were

18  you contacted by law enforcement in this case regarding an

19  account located at ███ ██████ ██████ in Maysville, Kentucky?

20  A.   Yes.

21  Q.   Do you recall who contacted you?

22  A.   Kentucky State Police.

23  Q.   And were you served with a subpoena for records?

24  A.   They called us on the phone, and we require all subpoenas

25  to be hand delivered.  It was delivered by the local law

1    enforcement, and then we forward that information on to the

2    company we contract with.  They look up the information,

3    return it to me, and then I return it to the requesting

4    agency.

5    Q.   And was that subpoena delivered to you because you're the

6    custodian of records --

7    A.   Yes.

8    Q.   -- for Limestone?

9         Do you recall when that was?

10   A.   June of '16.

11   Q.   And what information was law enforcement seeking through

12   the subpoena?

13   A.   They wanted any information pertaining to that IP

14   address, who it belonged to at that time period.  And then, if

15   it belonged to one of our customers, name, address, package,

16   that kind of stuff.

17   Q.   And did you provide that information?

18   A.   Yes.

19   Q.   I'd like to show you now what's been marked as

20   Government's Exhibit 14.

21            MR. NAPIER:  Your Honor, may I approach the witness?

22            THE COURT:  You may.

23   BY MR. NAPIER:

24   Q.   Do you recognize that document?

25   A.   Yes.

1    Q.   What is it?

2    A.   That was the email that I received back from the company

3    in Atlanta with the specific information for that IP address

4    at that specific time.

5           MR. NAPIER:  Your Honor, I move to admit Government's

6    Exhibit 14.

7           THE COURT:  Any objection?

8           MR. ECKES:  No objection.

9           THE COURT:  Let it be received without objection.

10        You may publish.

11          MR. NAPIER:  Thank you.

12   BY MR. NAPIER:

13   Q.   Mr. Craycraft, you should be able to see that on your

14   screen.  What does this record show?

15   A.   Well, the top is the date that was requested and the time

16   stamp that was requested and then the IP address that was

17   requested.  And they always give me three to four times, a

18   couple of minutes before, a couple of minutes after, because

19   it may not be exactly that time, and so you can see there's

20   four times for that IP address.

21        The first line says that it's a DHCP IP address, which

22   means it's a dynamic, not a static, and it was assigned to the

23   MAC ID.  That is the MAC ID of whatever piece of equipment was

24   attached to our modem.  Could be a router, a computer.  We

25   have no way of knowing.

1    And then it says "through modem."  That is the modem we

2    provide the customer.  So that is the MAC address of that

3    modem.  That's how we provision the modems and know who has

4    that modem.

5    Q.  And so this record shows that there was an active IP

6    address on June the 6th of 2016; is that correct?

7    A.  Yes.

8    Q.  And can you just tell the jury what the IP address is?

9    A.  64.250.174.175.

10   Q.  And was there a name associated with this particular

11   account?

12   A.  James Fite.

13   Q.  And the address?

14   A.  ████ ██████ ███████, Maysville.

15        MR. NAPIER:  Thank you, Mr. Craycraft.  No further

16   questions.

17        THE COURT:  Any cross?

18        MR. ECKES:  No, Your Honor.

19        THE COURT:  Very well.  May this witness be finally

20   excused?

21        MR. NAPIER:  Yes, Your Honor.

22        MR. ECKES:  Yes, Your Honor.

23        THE COURT:  Thank you, sir.

24      Next witness, please.

25        MR. NAPIER:  The United States calls Detective Brian

1    Cooper.
2                THE COURT:  All right.
3                 BRIAN COOPER, GOVERNMENT'S WITNESS, SWORN
4                THE COURT:  Good morning, sir.
5                THE WITNESS:  Sir.
6                THE COURT:  You may proceed.
7                          DIRECT EXAMINATION
8    BY MR. NAPIER:
9    Q.   Good morning, sir.
10   A.   Good morning.
11   Q.   Please tell the members of the jury your full name.
12   A.   Detective Brian Cooper.
13   Q.   Detective Cooper, where do you work?
14   A.   The Kentucky State Police.
15   Q.   To which post are you assigned?
16   A.   Post 8 in Morehead.
17   Q.   In what county is Morehead?
18   A.   Rowan County.
19   Q.   How many counties does Post 8 cover?
20   A.   We have 11 counties.
21   Q.   Is all of this territory located within what's considered
22   the Eastern District of Kentucky?
23   A.   Yes, sir.
24   Q.   How long have you worked for the Kentucky State Police?
25   A.   16 years.

1    Q.   And what do you do for them?

2    A.   I am the Internet Crimes Against Children detective at

3    Post 8.

4    Q.   And what are your general duties in that capacity?

5    A.   I do peer-to-peer investigations, I do -- set up certain

6    types of stings for predators, investigate child pornography

7    on social media, jack-of-all-trades.

8    Q.   Are your current duties mostly related to crimes against

9    children?

10   A.   Yes, sir, mostly.

11   Q.   What other roles have you had within KSP?

12   A.   Basically everything.  Work the road, traffic

13   investigations, general detective.  I've worked on homicides,

14   I've worked street level drugs, interdiction.  Just about

15   everything that there is to do.

16   Q.   Has most of your -- have you been at the Morehead post

17   exclusively with KSP?

18   A.   Yes, sir.

19   Q.   Do you have any other previous law enforcement

20   experience?

21   A.   Before KSP, I worked two years with the Montgomery County

22   Sheriff's Office as a deputy, and one year before that I was a

23   park ranger at Blue Licks Battlefield.

24   Q.   In total, how many years have you been in law

25   enforcement?

1    A.   18.  Actually, I guess it's close to 19 now.

2    Q.   And how many child exploitation cases have you worked?

3    A.   I've been the Internet Crimes Against Children detective

4    for approximately three years, and probably 20 to 30 over the

5    past three years.

6    Q.   Tell the jurors a little bit about your educational

7    background.

8    A.   Just graduated high school from Lewis County High School.

9    Then I went to Department of Criminal Justice training in

10   Richmond for 16 weeks when I was 21.  And then after that, I

11   went to the Kentucky State Police Academy for -- that was 22

12   weeks.  I've also had some college, some classes.

13   Q.   How about training specific to computers or internet

14   crimes?

15   A.   When I was on the ICAC task force, I was sent to several

16   ICAC trainings just for child exploitation.  I went to

17   California for one week.  I went to Minnesota for a week.  I

18   was in Florida for two weeks.  Went to Washington, D.C., for a

19   week.  Several weeks in just the ICAC task force training.

20   Q.   Did that include training on peer-to-peer networks?

21   A.   Yes, it did.

22   Q.   And why is that?  Why would you need training in that

23   area?

24   A.   Just basically gives you a basic understanding about --

25   each peer-to-peer network is different, and it works

1    different.  You have to go -- BitTorrent has its own training,

2    Ares has its own training.  Every peer-to-peer network has its

3    own training to be certified to do those investigations on

4    that peer-to-peer network.

5    Q.    And what is a peer-to-peer network?

6    A.    It's a network where everyone that is on that network

7    shares information.  In order for you to receive information,

8    you have to share that information with everyone else that's

9    on the network.

10   Q.    Finally, with regard to your background, have you

11   received any awards or commendations?

12   A.    I was Detective of the Year last year.

13   Q.    And are you the primary detective on this case?

14   A.    Yes, sir.

15   Q.    How did you first get involved in the investigation of

16   this case?

17   A.    Through the ICAC website, I observed an IP address that

18   showed me that there was someone with an IP address in my 11

19   counties.  I just look for the counties that I actually work

20   in.  And there was an IP address that showed up in Maysville,

21   Kentucky, that had been downloading known child pornography.

22   Q.    Okay.  Can we back up and just explain to the jury, when

23   you say you accessed the ICAC website, how is that set up in

24   your post?

25   A.    Once we go to the ICAC training, and we're on the task

1    force, we get access to a website that it -- when someone

2    downloads child pornography, could be someone in Oklahoma or

3    California or wherever, but if they're downloading, everyone

4    gets to see where that child pornography was downloaded and

5    the IP address and the general area of where the IP address is

6    located at.

7    Q.   And how often do you log into the ICAC website?

8    A.   It depends.  Actually, just depends on how busy I am or

9    if I'm working on another case, working on something else.

10   But I generally try to do it at least once or twice a week

11   just to check out my 11 counties.

12   Q.   And just generally, in this case, did you work in

13   conjunction with any other law enforcement?

14   A.   Yes.  When I noticed the IP address said Maysville, it

15   also gives a list of any detectives or anybody else that's on

16   the task force that has downloaded those images from that IP

17   address, and I noticed that Detective Couchman actually had

18   received downloads from that IP address.

19   Q.   Okay.  And so did you contact Detective Couchman?

20   A.   Yes, I did.

21   Q.   And what information were you seeking from him?

22   A.   I needed to see the downloads and the logs and the

23   summary, and Detective Couchman encrypted the downloads and

24   sent them to me via his DropBox and then in another email sent

25   me his password so I could actually view and download what he

 1    had downloaded from the IP address.

 2    Q.   Okay.  And did this case and these downloads, did it

 3    involve a peer-to-peer network?

 4    A.   Yes.  BitTorrent.

 5    Q.   And do you have experience working cases with BitTorrent?

 6    A.   Yes, I do.  I have been to the BitTorrent training.

 7    Q.   How often do you see it in your cases?

 8    A.   It depends.  Really, it changes.  Sometimes I'll see it

 9    quite a bit in my area.  Sometimes I don't see it very much.

10    It just -- but at about any given time, I can log on to the

11    website and see someone in my area that has downloaded.

12    Q.   Okay.  Can you explain to the jury how BitTorrent

13    specifically works?

14              MR. ECKES:  Judge, objection.  May we approach?

15              THE COURT:  I suppose, since you're halfway to the

16    bench.

17       (Sidebar conference.)

18              THE COURT:  Let the record reflect we're at bench.

19       Yes, sir.

20              MR. ECKES:  Judge, in terms of expert disclosures,

21    I've received two of those for Detective Couchman and

22    Detective Viergutz so we're getting into a little bit, when he

23    asked the question how does BitTorrent work, it seems to be

24    expert/opinion testimony.

25       I mean, I understand he's been to these trainings, but

1    the rules, if this witness was going to be an expert, there

2    should have been a Rule 16 disclosure.

3              THE COURT:  Do you plan on using him as an expert or

4    explaining why he understands the evidence?

5              MR. NAPIER:  He's just giving his background, his

6    investigative techniques in this case.  I'm going to ask him

7    about BitTorrent.  I'm not going to delve into the specifics

8    of it as we did yesterday with Detective Couchman.

9              THE COURT:  I'm going to overrule the objection.  I

10   don't believe this witness is being offered as an expert.

11   There's going to be, actually, in cases like this, some

12   overlap.  He has to have a basis for explaining why he knows

13   what he knows.

14        I appreciate your objection, but I don't think it's well

15   taken here.

16        (Sidebar concluded.)

17              THE COURT:  Objection overruled.

18        You may proceed.

19   BY MR. NAPIER:

20   Q.   So, Detective Cooper, can you just explain to the jury a

21   little bit about how BitTorrent works?

22   A.   The best way that I can explain it is each person that

23   has that software downloaded on their computer, they're all

24   connected together.  And if, say, you want a picture, then you

25   search for that picture and it will give you -- it breaks it

1    up into like, say, 20 different little pieces.  It gives you

2    the ability to download it a whole lot faster than, say,

3    downloading from one person.

4         So you get a piece from a guy maybe in Oklahoma and a guy

5    maybe in Texas and a guy in Maysville and a guy from all over.

6    It downloads it all together, and it downloads it faster.

7    That's why it's "bit."  BitTorrent.

8         But the way the law enforcement tool works that we get

9    when we go the training, it only allows us to download from

10   one specific IP address so that way we know that it's only

11   coming from that one person, from that one address.

12   Q.  So on these specific four downloads that you received

13   from Detective Couchman, you were receiving it from one IP

14   address?

15   A.  Yes, sir.

16   Q.  Your understanding of BitTorrent, can you use it and opt

17   to not share?

18   A.  To not share?

19   Q.  To not share; to just receive?

20        MR. ECKES:  Judge, objection.  Same objection as

21   before.

22        THE COURT:  Overruled.  If you know, based on your

23   training and experience.

24        THE WITNESS:  Yes.  You can not share.  You have

25   what's called a share folder.  Say you download the picture

1    that you want and you get that picture and that video.  You

2    can take it out of your share folder, and you're not sharing.

3    I'm not sure how much that limits you to be able to receive

4    more because I know they have limits on what they will allow

5    to share.  But if you take that file out of your share folder,

6    then you're not sharing.

7    BY MR. NAPIER:

8    Q.   And do you recall the date you contacted Detective

9    Couchman about these downloads?

10   A.   I can't remember the exact date.  I don't have my --

11   Q.   Was it June 8 of 2016?

12   A.   That sounds right.  But like I said, I don't have it in

13   front of me.

14   Q.   And so did you receive the files from Detective Couchman?

15   A.   I did.

16   Q.   How did he send those to you?

17   A.   Through his DropBox.  They were encrypted with a separate

18   password so I could view those.

19   Q.   Okay.  Now, I'd like to show you what's already been

20   admitted as Government's Exhibit 3.

21            THE COURT:  The logs?

22            MR. NAPIER:  The log details, yes.

23            THE COURT:  Ladies and gentlemen, are your monitors

24   working?

25        Thank you.

1    BY MR. NAPIER:

2    Q.   Detective Cooper, do you see in front of you on the

3    screen?

4    A.   Yes, I do.

5    Q.   Do you recognize these log details from the four

6    downloads?

7    A.   It appears to be.  I don't see the names of actual files,

8    but that would be how I would recognize it more than what I'm

9    looking at here.

10   Q.   And did you discuss the images with Detective Couchman?

11   A.   Honestly, I don't remember if I discussed those images

12   with him or not.  I just remember he sent them to me.

13        Those, now I that -- yes, that is what he sent.  I see

14   the named files now.

15   Q.   Can you highlight it on the screen?

16             THE COURT:  It's kind of like a John Madden thing.

17   Kind of circle it and it will come up.

18        There we go.

19             THE WITNESS:  I remember those names distinctly.

20   BY MR. NAPIER:

21   Q.   Okay.  And did you actually review the images from the

22   ICAC website?

23   A.   Not from the website.  Actually, I viewed them from the

24   downloads that Detective Couchman sent me.

25   Q.   Okay.  And what did they depict?

1    A.   There was a young, prepubescent female performing oral

2    sex on a male.

3    Q.   So that was a video.  Were there also photos?

4    A.   There was the screenshots of that video.  And then there

5    was also another video of two prepubescent females that were

6    engaging in sexual contact with each other, naked.

7    Q.   Okay.

8    A.   And screenshots of that video as well.

9    Q.   I want to show you what's been admitted as Government's

10   Exhibit 2, and I don't think we need to show the video again.

11   Maybe we can show the images on your screen there.

12        Are these the images that you reviewed?

13   A.   Yes, sir, they are.

14   Q.   Now, Detective Cooper, how do you identify who is

15   associated with an IP address?

16   A.   I sent a -- first, I do what's called a "who is" search

17   using ARIN.  That's a website I can go to and type in that IP

18   address, and it will tell me who owns that IP address, like

19   the -- the internet provider that owns that IP address.

20        And then I do a subpoena to that company, which that

21   company was Limestone Cable Vision, I believe the name of it

22   was.  And I served that subpoena, and they give me the

23   information of who actually is in use of that IP address at

24   the time of the downloads.

25   Q.   Okay.  Now, you said you went to a website called ARIN.

1    Is that a website used specifically by law enforcement?

2    A.   I believe anyone can use that.  I think you just type it

3    in and -- I'm not sure about that, but I believe anybody can

4    just go do a search to find out.  It doesn't tell you who's

5    using that IP address currently, just who owns that IP

6    address.  Like who owns the phone number, like Verizon would

7    on a phone number or something.

8    Q.   And so you said you got a subpoena for Limestone Cable

9    records?

10   A.   Yes, sir.

11   Q.   Was that on or about June 13 of 2016?

12   A.   That sounds correct.  I don't have the exact dates in

13   front of me, but that sounds about correct.

14   Q.   Did you proceed to do that shortly after you reviewed the

15   images?

16   A.   It was either the same day or the next day.  I believe it

17   was probably the same day when I saw the images.

18   Q.   And did you personally serve the subpoena on Limestone

19   Cable?

20   A.   I did.  Most places you can send them, but Limestone

21   Cable wants you to hand deliver the subpoenas to them.  I

22   don't know why they do that, but they do.

23   Q.   So you did that?

24   A.   Yes.

25   Q.   And who did you serve; do you recall?

1   A.   I believe his last name is Craycraft, I believe.  I'm not

2   sure of his first name.

3   Q.   And what information did you receive from the subpoena?

4   A.   Within about an hour, I got a response by email that gave

5   me an address to a residence in Maysville.

6   Q.   Did you also have a name associated with the account?

7   A.   I did.  I don't have that in front of me either, but I

8   believe his last name was Fite.

9   Q.   Was it James Fite?

10  A.   Yes, it was.

11  Q.   Did you determine whether it was a residential plan or a

12  commercial plan?

13  A.   I did surveillance to the house.  I drove by the house

14  just to see if it was an apartment or if it was a house.  It

15  was just a white house there in Maysville.

16       Also, I used my phone just to make sure that there was no

17  open WiFi around anywhere in that location that somebody could

18  possibly have been using.  Every WiFi that I saw on my phone

19  was locked.  It had to have a password to get into them, to

20  the WiFi.

21  Q.   Okay.  Explain to the jury why you do that physical

22  surveillance first.

23  A.   One, just kind of want to see what vehicles are there,

24  trying to get an idea of who all lives there.  It's a safety

25  issue, really.  I need to know, you know, how many people I

1    want to take with me when I actually do the search warrant.

2        I want to see if it's, you know, maybe it's an open WiFi

3    that somebody could be setting at a parking lot using or

4    something like that that, you know, just for the benefit of

5    the doubt, really.

6    Q.   So you determined through your surveillance there were no

7    open networks at this address?

8    A.   Not that I saw.

9    Q.   Okay.  And when did you do that physical surveillance?

10   A.   That was right after I got the subpoena information.

11   Q.   And the fact that the WiFis were password protected, what

12   did that mean to you?

13   A.   It means that someone had to actually have that password

14   to be able to use that internet.  Somebody just walking down

15   the street couldn't be downloading that.

16   Q.   Okay.  So after you do the physical surveillance, what

17   did you do next?

18   A.   I went to the commonwealth attorney's office and began to

19   fill out my search warrant for the residence.

20   Q.   Is that the commonwealth attorney's office there in Rowan

21   County?

22   A.   Maysville.

23   Q.   Maysville?

24   A.   It's in Maysville, yes, sir.

25   Q.   Explain that process to the jury.

1    A.   I just basically, I normally do my own.  I have a

2    template for BitTorrent search warrants, and it's just kind of

3    a step-by-step.  I put in the reason for my search warrant,

4    you know, what I saw, where the residence is, a description of

5    the residence.  A lot of that is filled in for me about how

6    BitTorrent works.

7         Then I swear that -- you know, take an oath that I saw

8    the -- what I saw and the reason for the search warrant.  And

9    then the commonwealth attorney will sign it, and then we'll

10   take it to a judge, and the judge will sign it, and that gives

11   me my search warrant.

12   Q.   And so did you obtain a search warrant in this case?

13   A.   Yes, I did.

14   Q.   And when did you execute that warrant?

15   A.   Like I said, I don't have that date on there.

16   Q.   Okay.

17   A.   It was either that afternoon or the next day.  I can't

18   remember.  It takes me -- takes me a few minutes because we're

19   short-handed so I have to gather up a few people.  We have to

20   have at least one uniformed officer that goes with me, and I

21   have to have people secure the other people at the same time.

22   Q.   So we're going to turn now to the day the search warrant

23   was executed and discuss it kind of generally.

24        How long did that entire process take that day?

25   A.   Probably two to three hours, probably.  Just a rough

1    guess.

2    Q.   And what are some of the preliminary steps that you take

3    assembling your team, getting ready to execute the warrant?

4    A.   Normally, I try to make sure that I do everything

5    except -- because I'm the only person at post that's certified

6    on peer-to-peer and knows how to do that stuff.  So I usually

7    take enough guys with me that can secure the scene.  I usually

8    try to get everybody in the same room where we can keep an eye

9    on everybody, and then I'll try to take one person off at a

10   time and get them to show me where their room is, where their

11   computers are, and try to get a little bit of the knowledge of

12   what BitTorrent is.

13        Most people, you know, if I ask do you know what

14   BitTorrent is, you know, most of the time they'll look at me

15   like I have three heads.  But then usually the ones that say

16   yeah, I know what it is, they're the ones that I take a little

17   more interest in.

18   Q.   Okay.  So were other officers with you that day?

19   A.   Yes, there were.

20   Q.   How many?

21   A.   There was four or five.  Do you need to know who they

22   were?  I can tell you, I think.

23   Q.   If you know them, you can tell us.

24   A.   I think there was Sergeant Newt Robinson, Detective Toby

25   Gardner, Trooper Thurman Page and Trooper Jared Wagner, I

1   believe, were all present at the time.

2   Q.   And so did you first identify who was in the house at

3   ███ ██████ ██████?

4   A.   Yes, sir.

5   Q.   And who was present?

6   A.   I believe there was Mr. Moran, I believe his sister, a

7   nephew, and I believe their mother, I believe.

8   Q.   Okay.  You spoke earlier about wanting to take inventory,

9   so to speak, of the electronic equipment in the house.

10       How do you go about doing that?

11  A.   Usually, I'll go room to room.  I'll take a person, I'll

12  say, you know, is this your room, and they'll say yes, sir or

13  no.  And I'll ask them, you know, do you have any -- first

14  off, I want to know if there's any drugs in the house, just

15  for my own safety, for needles, and want to know where any

16  guns are.

17       Then I'll ask, you know, do you have any cell phones.

18  And most of the time, believe it or not, people's normally

19  pretty honest, and they'll show me where their phones are,

20  show me where the computers are.  And I'll just usually just

21  start talking to them about what their knowledge is on

22  computers.

23  Q.   Okay.  I want to go through that, who you talked with

24  that day.  Tell me who you interviewed, and we'll finish up

25  with the defendant.  So who did you talk with other than the

1  defendant that day?

2  A.   I talked to his sister.  I talked to -- I believe it's

3  his nephew, and I can't remember what his name is for the life

4  of me, but I spoke with him.

5       Mr. Fite, who the IP address actually came back to as

6  owning, wasn't there.  I believe I asked the sister if she

7  would call him and ask him if he would come there so we could

8  talk to him.  He ended up showing up later.

9  Q.   Okay.  I believe you also said earlier that the mother

10 was present at the house, the defendant's mother?

11 A.   I believe so, yes.

12 Q.   Okay.  Was she the actual homeowner; do you know?

13 A.   I honestly don't know that.

14 Q.   Okay.  Did you speak with her that day?

15 A.   I can't remember.  I remember them telling me that she

16 had Alzheimer's, and that's really -- I didn't speak with her

17 a whole lot, if any.  I didn't want to, you know ...

18 Q.   I understand.  Do you know where her room was located?

19 A.   It was in the back of the house.  I do remember there

20 was -- for some reason, there was a padlock on her door.

21 Q.   Okay.  Do you know whether she had any computer

22 equipment?

23 A.   I can't recall.  I can't recall if she did or not.

24 Q.   Was there any indication that she used computers at all?

25 A.   I believe in the interview with Mr. Moran, he said that

1    she used to have -- own the computer that he had, but it had

2    been like five years since she had used it.

3    Q.   Okay.  Let's next go to the defendant's sister.  Did you

4    speak with her?

5    A.   Yes, I did.

6    Q.   Did you find out that she also lived in the home?

7    A.   Yes.

8    Q.   Were you able to identify where her room was in the

9    house?

10   A.   She showed me where her room was, yes.

11   Q.   Okay.  Did she have any computer equipment?

12   A.   I don't believe there was any computer equipment in her

13   room.

14   Q.   Okay.  Did you ask her about whether she used BitTorrent?

15   A.   I can't recall if I asked her that or not, honestly.

16   Q.   Okay.  Let's next go to the nephew.  Do you recall

17   speaking with him that day?

18   A.   I do.

19   Q.   Okay.  Does he also live in the house?

20   A.   He does.

21   Q.   Did he have any computer equipment?

22   A.   Yes, he did.

23   Q.   And did you ask him whether he had any experience with

24   BitTorrent or peer-to-peer software?

25   A.   I did.  He said he did not.  I asked him -- I did ask him

1    if there was any child pornography on his computer, and he

2    said he didn't know.

3    Q.   Did you ask him specifically about BitComet, BitTorrent?

4    A.   Yes.  He said he didn't know what that was.

5    Q.   Okay.  And then I believe you earlier testified that

6    Mr. Fite later showed up at the residence.  Did you speak with

7    him as well?

8    A.   I did.

9    Q.   Was he living at the home at that time?

10   A.   No, he wasn't.  He stated that him and the girlfriend had

11   a fight, and he hadn't lived there in a few weeks.

12   Q.   Did you want to speak with him because he was the

13   subscriber?

14   A.   Yes.

15   Q.   Did you ask him about BitTorrent, BitComet?

16   A.   I did.  He said that he -- he said he didn't know what

17   that was either.

18   Q.   Detective Cooper, let's turn to your interaction with the

19   defendant that day.  Tell the members of the jury how that

20   came about.

21   A.   I asked him where his room was, and he stated that he

22   stayed in the basement was where his room was.

23        I asked him if he would take me and show me where his

24   room was, and he did that.  And on the table, there was a

25   laptop laying there.  I asked him if he knew what BitTorrent

1    was.  He said yes, that he did.

2        I asked him was -- had he been using BitTorrent on that

3    computer, and he said yes.  That was when I -- I had my audio

4    recorder with me, and I said, Well, let's step down here and

5    have a conversation.  And then I did an audio recording of

6    Mr. Moran.

7    Q.  Okay.  And so did you do that recording there in the

8    basement?

9    A.  Yes, sir.

10   Q.  Okay.  And we'll get to that a little bit later.

11       I want to show you what's been marked as Government's

12   Exhibit 5.

13            MR. NAPIER:  Your Honor, may I approach the witness?

14            THE COURT:  You may.

15   BY MR. NAPIER:

16   Q.  Now, Detective Cooper, did you take photographs while you

17   were at the scene that day?

18   A.  Yes, I did.

19   Q.  And do you recognize that CD I just handed you?

20   A.  Yes.  I saw it yesterday.

21   Q.  Okay.  So you have reviewed the images on that CD?

22   A.  Yes.

23   Q.  And did you initial it and date it after you reviewed it?

24   A.  Yes.

25   Q.  Do those photos fairly and accurately depict the scene

1   that day?

2   A.   Yes.

3   Q.   You personally took these photos, correct?

4   A.   I did.

5   Q.   Okay.  Did you later print or download these photos for

6   your file?

7   A.   Downloaded them to my hard drive on my computer.

8   Q.   And have they been in your custody since then?

9   A.   Yes.

10           THE COURT:  Is this Exhibit 4 or 5?  I have 4 on my

11  list.  You mentioned 5.

12           THE WITNESS:  This says 5.

13           MR. NAPIER:  Your Honor, that's my mistake.  It

14  actually is 4.

15           THE COURT:  Recording is 5?

16           MR. NAPIER:  Recording is 5.

17           THE COURT:  You understand Exhibit 4 is the photos,

18  sir?

19           MR. ECKES:  Yes.

20           THE COURT:  Any objection to 4?

21           MR. ECKES:  No objection.

22           THE COURT:  Let them be received without objection,

23  photographs taken during the execution of the search warrant.

24           MR. NAPIER:  Your Honor, may we publish these to the

25  jury?

1           THE COURT:  You may.

2    BY MR. NAPIER:

3    Q.   What I'd like you to do, Detective Cooper, is walk the

4    jury through the photos and tell them what they're seeing in

5    each of these photos.

6    A.   Okay.  This is Mr. Moran in the basement.  This is his

7    room in the basement.

8         That's the table where the laptop was laying that was

9    plugged in.

10        That is the laptop that he stated that was his that he

11   had BitTorrent on.

12   Q.   Can we just pause there for one moment?  I'm going to

13   show you what's been marked as Government's Exhibit 1.

14           MR. NAPIER:  Your Honor, may I approach the witness?

15           THE COURT:  You may.

16   BY MR. NAPIER:

17   Q.   Detective Cooper, is that the laptop that's depicted in

18   this photograph?

19   A.   It appears to be.

20   Q.   And what type of laptop is it?

21   A.   It's a Dell laptop.

22   Q.   And does it have a service code 14257649233?

23   A.   Yes.

24   Q.   And did you seize this laptop the day of the search?

25   A.   Yes, I did.

1    Q.   And did you seize it from this table here in the basement

2    that the jury just saw?

3    A.   Yes, I did.

4            MR. NAPIER:  Your Honor, move to admit Government's

5    Exhibit 1.

6            THE COURT:  Any objection to 1?

7            MR. ECKES:  No objection.

8            THE COURT:  Let it be received without objection.

9    BY MR. NAPIER:

10   Q.   While you have the computer, just explain to the jury

11   what you did with it next when you took it into custody.

12   A.   I just took pictures of it, filled out a 41, which is our

13   evidence collection form, and took it to -- took it to Post

14   and then actually took it to e-crimes to have the examiner

15   examine the laptop.

16   Q.   And did it remain in your custody at all times until you

17   took it to the e-crimes unit?

18   A.   Yes.

19   Q.   Let's continue on with your photographs here.

20        So this is the computer on the table there in the

21   basement, correct?

22   A.   Yes.

23   Q.   With what appears to be an iPod?

24   A.   Yes.

25   Q.   Okay.

1    A.   That's a picture, I believe I wrote "Brandon" on that so

2    I would -- wouldn't be confused on which room was which.

3    Q.   Okay.  And in these photos, any equipment that was there,

4    did you ask the defendant whether it was his?

5    A.   Yes, I did.

6    Q.   And what did he say?

7    A.   He stated that it was his.

8    Q.   Okay.  What's this, a picture of that laptop?

9    A.   Yes, it is.

10   Q.   This shows the service code?

11   A.   Yes.

12   Q.   Explain what's in this photo.

13   A.   There was a few -- there was some older computers there

14   underneath.  It was just some pictures of the room, just

15   trying to show the room.

16   Q.   Did you ask the defendant about these computers?

17   A.   I did.  He stated that they hadn't been used in quite a

18   while.

19   Q.   Okay.

20   A.   That's another computer.

21        That was another computer that he said he hadn't used in

22   a while.

23        That's the same computer.

24        That's just where the computer was plugged in.

25   Q.   Detective Cooper, these are all in the basement.  Was

1    there any other room in the basement?

2    A.   There was some separate rooms.  I think maybe there was a

3    laundry room in there too, if I can remember correctly.  It's

4    been a while.  Then I think there was another room that was

5    just like a room with a bunch of random stuff in there.

6    Q.   Was there anyone else who occupied the basement -- or

7    lived in the basement other than the defendant?

8    A.   No.  I asked him if he was the only one that lived there,

9    and he stated yes.

10   Q.   Okay.

11   A.   I believe these are pictures of the nephew's room, I

12   believe.

13   Q.   Okay.  So where was the nephew's room?

14   A.   It was upstairs.

15   Q.   Are these pictures from his room, then, the phone and the

16   flash drive?

17   A.   Yes, I believe so.

18   Q.   Okay.  I want to turn back to your interview with the

19   defendant that day.  Did you record the entire interview?

20   A.   Yes.

21   Q.   Is that your standard procedure?

22   A.   It is.

23   Q.   Did you tell the defendant that you would be recording

24   the interview that day?

25   A.   I did.  I read him -- told him he wasn't under arrest,

1    but I still read him his Miranda rights on the recording.

2    Q.   Okay.  And how did you -- what device did you use to

3    record it?

4    A.   It's just a little audio recorder that we get issued.

5    It's just a little digital audio recorder.

6    Q.   And how do you retain it as evidence in the case?

7    A.   Once I'm done with the interview, I just download that

8    to -- I just make a -- try to keep it organized the best I

9    can.  I'll make a file on my computer, and then I'll put that

10   case number with the subject's name.  And everything that I

11   do, I'll just start adding to that file.  I'll put pictures,

12   and I'll put audio interview with such and such investigation.

13        Sometimes I'll scan the copy of the search warrant in so

14   I'll have everything.  Stuff is known to get lost around Post

15   sometimes.

16   Q.   And has the recording been in your inventory since the

17   date that you conducted the interview?

18   A.   Yes.

19   Q.   Have you reviewed it since then?

20   A.   I have.

21   Q.   And you have in front of you Government's Exhibit 5.  Did

22   you initial and date that recording --

23   A.   Yes.

24   Q.   -- after you listened to it?

25   A.   Yes.

1    Q.   Does it accurately reflect the interview from that day?

2    A.   Yes.

3             MR. NAPIER:  Your Honor, move to admit Government's

4    Exhibit 5.

5             THE COURT:  Any objection?

6             MR. ECKES:  No objection.

7             THE COURT:  Let it be received without objection.

8         Is there a transcript of the interview at all?

9             MR. NAPIER:  Yes, Your Honor, there is a transcript.

10   I'd ask permission to provide the transcript as a testimonial

11   aid and also allow us to listen to the recording from that

12   day.

13            THE COURT:  Have you reviewed the transcript, sir?

14            MR. ECKES:  I have, Your Honor.

15            THE COURT:  Is it accurate?

16            MR. ECKES:  It is.

17            THE COURT:  Any objection to them using it as an aid

18   while listening?

19            MR. ECKES:  I do not.

20            THE COURT:  Okay.  I'm going to go ahead and allow

21   that.  I do need to give you an admonition.  I told you

22   occasionally, there might be some instructions before, during

23   and then after.  I do want to give you this.

24        You're about to hear a recording that has been received

25   into evidence, and I'm going to give you a written transcript

1   of that recording.  Keep in mind, though, that the transcript

2   itself is not evidence.  They're being given to you only as a

3   guide to help you follow what is being said.

4       The recording itself is the evidence.  If you notice any

5   differences between what you heard on the recording and what

6   you read in the transcript, you must rely on what you heard,

7   not what you read.

8       And if you could not hear or understand certain parts of

9   the recording, you must ignore the transcript as far as those

10  parts are concerned.

11      The transcript later, during deliberations, will not be

12  available.  It's not an exhibit itself like the recording is

13  so you won't have the transcript later.

14      We will go ahead and add an instruction regarding that to

15  the set, and that's Sixth Circuit 7.17.

16      You can pass those out.

17      Thank you.

18      Any objection to that admonition?

19          MR. ECKES:  No objection.

20      (Off-the-record discussion.)

21          THE COURT:  My court reporter is always keeping me

22  straight.  I would just ask that you not write anything on the

23  transcripts, because you won't get it back during

24  deliberations.  If you want to take a note on your notepad,

25  you can do that.  I had a jury later who wanted the transcript

1    because they'd made some notes in the margins, and we couldn't

2    give it to them.

3         How long is the recording, total?

4              MR. NAPIER:  Judge, I think it's less than 15

5    minutes.

6              THE COURT:  We'll listen to it and then wrap up any

7    direct before we take a break.

8         (Government's Exhibit 5 was played in open court.)

9    BY MR. NAPIER:

10   Q.   Detective Cooper, after listening to the recording, do

11   you recall the date that you executed the search warrant in

12   this case?

13   A.   Yes.  It was June 14.

14   Q.   June 14 of what year?

15   A.   2017.

16   Q.   Okay.  And do you recall the --

17              THE COURT:  2017, sir?

18              THE WITNESS:  '17 or '16?

19   BY MR. NAPIER:

20   Q.   2016?

21   A.   '16.

22   Q.   And what is the address of the house --

23   A.   '16.

24   Q.   -- sir?

25   A.   It's ███ ██████ ██████, Maysville, Kentucky.

1    Q.   And how did you conclude the search that day?

2    A.   Did we conclude the search?

3    Q.   Yes.

4    A.   Just took those -- took the computers into evidence, took

5    some phones into evidence, and then I placed Mr. Moran under

6    arrest.

7    Q.   And then once you took the computers into evidence, what

8    was your next step after that?

9    A.   Getting those to the e-crimes.  I believe the next day, I

10   took them to -- the next day or the day after, I'm not exactly

11   sure, I took it to Detective Viergutz, examiner for e-crimes,

12   to do a preliminary search on those -- on the computer.

13   Q.   So you personally took those --

14   A.   Yes.

15   Q.   And where is the e-crimes unit?

16   A.   Frankfort.

17   Q.   Does that include the Dell laptop that you showed the

18   jury earlier?

19   A.   Yes.  That's what he did the preliminary exam on.

20   Q.   Okay.

21   A.   Since --

22   Q.   Okay.  Did you provide him with a copy of the search

23   warrant in the case?

24   A.   I did.

25   Q.   And did Detective Viergutz later provide you with an

1  analysis of the forensics of the computer?

2  A.   He did what's called OS triage.  At the time, I wasn't

3  certified to do OS triage.  That's why I took it to him to do

4  that.  And on that, he found the file paths of the same name

5  that I saw from my files.

6  Q.   And when did he provide that triage to you?

7  A.   He gave me that, that day, the file path and -- that

8  matched up with the file path, the download names.  So ...

9  Q.   Go ahead.

10  A.   I'm not sure -- after he did the exam, I haven't seen the

11  report after the exam was done on the computers so I'm not

12  sure what all else he found on that computer, but I heard

13  there was more.

14  Q.   Okay.  Now, Detective Cooper, have you had the occasion

15  to interview multiple defendants in child exploitation cases

16  like this one?

17  A.   Yes.

18  Q.   Okay.  And what type of explanations do you get from

19  defendants as to why child pornography is located on their

20  devices?

21  A.   Get all kinds.  Get some that are totally honest that

22  just break down and say they can't help it, they've got a

23  problem.

24      Get some that say they must have been hacked into.

25      Get some that say, well, somebody else must have looked

1   at it, used my computer, and I didn't know about it.  All

2   kinds of excuses.

3   Q.   Do you get the explanation that malware was installed?

4   A.   I probably have heard it all.

5            MR. NAPIER:  Your Honor, may I have just a moment?

6            THE COURT:  You may.

7            MR. NAPIER:  Nothing further, Your Honor.

8            THE COURT:  Ladies and gentlemen, we're going to take

9   a recess prior to the cross-examination of Detective Cooper.

10  During the recess, continue to heed the prior admonitions of

11  the Court.  Don't discuss the case with each other.  Keep an

12  open mind until all the evidence is in and the case has

13  finally been submitted to you later for your consideration and

14  deliberation.

15      We'll collect the transcripts.  If you could put them on

16  your seat as you walk out, we'll pick them up.

17      We'll be in recess for 15 minutes.

18      (The jury exited the courtroom at 10:18 a.m.)

19           THE COURT:  The jury's left the courtroom.  Anything

20  we need to take up before our break?

21           MR. ECKES:  No, Your Honor.

22           MR. NAPIER:  No, Your Honor.

23           THE COURT:  Very well.  We'll be in recess for 15

24  minutes.

25      (Recess from 10:18 a.m. until 10:39 a.m.)

1          THE COURT:  The jury is not in the courtroom.

2   Anything we need to bring up before we bring the jury down?

3          MS. LEONHARD:  Nothing from the United States.

4          MR. ECKES:  No, Your Honor.

5          THE COURT:  Go ahead and bring them in, please.

6        (The jury entered the courtroom at 10:40 a.m.)

7          THE COURT:  Mr. Eckes, you may proceed with

8   cross-examination, sir.

9          MR. ECKES:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11  BY MR. ECKES:

12  Q.   Good morning, Detective.

13  A.   Morning.

14  Q.   So this special program that law enforcement uses that

15  you've testified about, you log in and you are able to see

16  that somebody in your jurisdiction had downloaded what was

17  likely to be child pornography?

18  A.   It's actually a website.

19  Q.   So you log into the website?

20  A.   Um-hmm.

21  Q.   And you're looking for people in your area that could

22  have downloaded child pornography?

23  A.   Yes.

24          MR. NAPIER:  Your Honor, I just want to clarify that

25  it would be shared, not downloading, is what his testimony was

1   earlier.

2          MR. ECKES:  Judge, his testimony was the exact word

3   of downloading.  So I'm just clarifying that.

4          THE COURT:  The jury will remember what the testimony

5   was, and you can clear up anything on redirect if you'd like,

6   sir.

7   BY MR. ECKES:

8   Q.  So you're looking to try to find out people that are

9   downloading child pornography; is that right?

10  A.  Or share -- it's sharing, but we are downloading from the

11  people that are sharing.  So ...

12  Q.  You're downloading from people that are sharing?

13  A.  Yes.

14  Q.  And you're looking for people in your jurisdiction that

15  would have done that?

16  A.  That are sharing, yes.

17  Q.  So your law enforcement programs or computers that

18  Detective Couchman has downloads things from other people?

19  A.  Yes.

20  Q.  And you can log in and see what it has downloaded?

21  A.  Yes.

22  Q.  And I believe your testimony was pretty much every day,

23  if you logged in, you would find somebody in your jurisdiction

24  that had done that?

25  A.  It depends.  Some days it is, and some days it's not.  It

1    just depends.  There's no rhyme or reason to it.

2    Q.  But quite often?  I mean, you said every day on direct.

3    How often --

4    A.  I have 11 counties.  So fairly often.

5    Q.  You knew that Detective Couchman's program had downloaded

6    files before Detective Couchman knew it, right?

7    A.  I'm not sure.  I'm not sure how often he looks at it.  I

8    really don't know.

9    Q.  Well, you had to call him to tell him about it, right?

10   A.  Well, he may have -- he may have seen that.  I don't

11   know.  It's not in his jurisdiction so I don't know if he

12   would have seen it or not.  I don't know.

13        He may have just -- because I see tons of them that may

14   say Paducah or may say Covington.  That's not my jurisdiction

15   that I would just look over.  I don't know if he saw it or

16   not.

17   Q.  Do you remember calling Detective Couchman to tell him

18   about this?

19   A.  I do -- I don't remember if it was a call or an email.  I

20   remember contacting him.

21   Q.  Was he aware at that time that those files were on his

22   computer, or did he have to go back and double check?

23   A.  I can't recall.

24   Q.  Okay.  But it's certainly possible that he didn't even

25   know he had those files at that point, right, because that

1    program's doing its thing without him?

2    A.   It's possible, yeah.

3    Q.   You also testified about how you are trained and you --

4    another subset of the cases you work on as an ICAC detective

5    are sting operations; is that right?

6    A.   Yes, sir.

7    Q.   You pose as a child on the internet and then try to lure

8    in, you know, potential predators?

9    A.   I have done those, yes.

10   Q.   Okay.  That has nothing to do with this case, right?

11   A.   No.

12   Q.   When did you learn that there were -- the file paths were

13   found on Mr. Moran -- allegedly found on Mr. Moran's computer?

14   A.   It was when I took the computer to e-crimes, to Detective

15   Viergutz.

16   Q.   You wrote a report in this case, right?

17   A.   I did.

18   Q.   Those reports, you realize those can be important, right?

19   A.   Yes.

20   Q.   People rely on those reports?

21   A.   Sure.

22   Q.   Prosecutors rely on those reports?

23   A.   Sure.

24   Q.   So today, you've testified that it was reported to you

25   that the file path was found on the computer, right?

1    A.   I believe that's -- I believe that's what I saw, yes.

2    Q.   But when you wrote your report, you wrote that the files

3    were found on his computer, didn't you?

4    A.   I'm not sure.  Like I -- I don't have the report.

5              MR. ECKES:  Judge, may I approach?

6              THE COURT:  You may.

7    BY MR. ECKES:

8    Q.   If you could review the highlighted portion on -- is that

9    your report, a copy of it?

10   A.   Yes.

11   Q.   Could you read the highlighted part?

12   A.   It says, "He stated that he had found the four files that

13   were indicated in the warrant on Brandon Moran's Dell

14   computer."

15   Q.   That's not true, is it?

16   A.   That may have been what he told me.  I'm -- I can't

17   recall the exact conversation.

18   Q.   But there is a difference between a file path and the

19   actual file, right?

20   A.   Yes.

21             MR. ECKES:  No further questions, Judge.

22             THE COURT:  Any redirect?

23             MR. NAPIER:  Nothing, Your Honor.

24             THE COURT:  All right.  May this witness be finally

25   excused?

1          MR. ECKES:  Yes, Your Honor.

2          MR. NAPIER:  Yes.

3          THE COURT:  You may step down.

4       Next witness.

5          MS. LEONHARD:  United States calls Detective Mike

6    Viergutz.

7          THE COURT:  All right.

8         MICHAEL VIERGUTZ, GOVERNMENT'S WITNESS, SWORN

9          THE COURT:  Good morning, sir.

10          THE WITNESS:  Good morning.

11          THE COURT:  You may proceed.

12          MS. LEONHARD:  Thank you.

13                          DIRECT EXAMINATION

14   BY MS. LEONHARD:

15   Q.  Good morning, Detective.  Would you please introduce

16   yourself to the jury.

17   A.  Detective Michael Klaus Viergutz with the Kentucky State

18   Police Electronic Crimes Branch.

19   Q.  Can you spell your name for the court reporter, please?

20   A.  Sure.  Viergutz.  That's V, as in Victor, i-e-r-g-u-t-z.

21   Q.  Detective Viergutz, how are you presently employed?

22   A.  With the Kentucky State Police.

23   Q.  Where with the Kentucky State Police?

24   A.  Oh, excuse me.  With electronic crimes branch in

25   Frankfort.

1    Q.   And what is your position with the KSP's electronic

2    crimes branch?

3    A.   I'm a detective with the electronic crimes branch, which

4    primarily does ICAC or Internet Crimes Against Children work.

5    Currently, we're active in the examination of digital

6    evidence.

7    Q.   Okay.  How long have you been a detective with KSP

8    assigned to the electronic crimes branch?

9    A.   Since 2005, so about 12 years.

10   Q.   And in that whole time, what has been your primary duty?

11   A.   The digital -- the examination of digital evidence; cell

12   phones, computers, GPS devices.

13   Q.   And prior to being a detective assigned to the

14   examination side, did you hold any other positions with KSP?

15   A.   I did.  I was a normal, a standard trooper, I guess you

16   could say, in the gray uniform patrolling Interstate 71 in

17   Henry County, Trimble County area and then progressed into the

18   electronic crimes branch, where I was assigned to the RCFL

19   there for a while.

20   Q.   What is the RCFL?

21   A.   RCFL is the Regional Computer Forensics Laboratory.  It's

22   the one based in Kentucky so it's the KRCFL, actually, which

23   examine digital evidence, but I also was the quality manager

24   there for a while and the interim director.

25   Q.   Okay.  Has all of your law enforcement experience been

1    with KSP?

2    A.   I did about four or five years with the Jefferson County

3    Sheriff's Office in a reserve capacity.

4    Q.   Okay.  All told, how many years of law enforcement

5    experience do you have?

6    A.   That would make it about 20 some odd years, I suppose.

7    Q.   Okay.  Can you tell the jury a little bit about your

8    educational experience?

9    A.   Well, grew up in Louisville, high school, and went

10   straight to the Marine Corps.  Did four years in the Marine

11   Corps.  Came out, went straight to the U of L, used the G.I.

12   Bill.  Focused on accounting and then computer science and

13   then also over to IUS, right over the bridge, to further on

14   with computer science.

15   Q.   What degree, specifically, do you have?

16   A.   I don't have a degree specific, but just numerous hours

17   of computer science.

18   Q.   Okay.  And you said IUS.  What does that stand for?

19   A.   Sorry.  Indiana University Southeast.  It's part of

20   Purdue.  It's kind of a sub-university.

21   Q.   Okay.  So how long have you been doing primarily and

22   exclusively forensic examinations?

23   A.   The RCFL started in 2006, and that's probably where I

24   really started.  The FBI trains you from the very beginning

25   all the way to full examiner.

1    Q.   Okay.

2    A.   And that takes -- the process can be anywhere from a year

3    to a year and a half or two years.

4    Q.   Do you obtain any kind of certification if you complete

5    that?

6    A.   We do.  The A-plus certification for the hardware stuff,

7    and then network-plus, in addition to a bunch of the FBI's

8    tools that they get to utilize for the examination of digital

9    evidence.

10   Q.   We've talked a little bit about your professional

11   experience, your education.  Let's talk now about some of the

12   specialized training that you have received not only in your

13   capacity as a forensic examiner but as an ICAC investigator as

14   well.  Can you tell the jury a little bit about that?

15   A.   Sure.  Quite extensive.

16   Q.   I have a copy of your resume.  Would it refresh your

17   recollection?

18   A.   It probably would be helpful.

19          MS. LEONHARD:  Your Honor, may I show Detective

20   Viergutz a copy of his resume?

21          THE COURT:  You may.

22          MS. LEONHARD:  Thank you.

23          THE WITNESS:  Thank you.

24   BY MS. LEONHARD:

25   Q.   Go ahead.

A.   Just kind of working backwards, more of the examiner type
roles, pretty much from 2006 to 2009, not only becoming a CART
examiner or a computer analysis and response team for the FBI,
did that for about eight years alongside being the quality
manager there for a good portion of those years as well.

Quality managers basically make sure that everybody's
doing their examinations properly, from noting what needs to
be noted as evidence comes in, to security within the lab.  A
lot of stuff.

In addition to while being there, going through a number
of training from FTK, which is forensic tool that we use to
examine evidence, to X-Ways, in addition to cellular devices,
which are examined a little bit differently than computers.

Q.   Okay.  What other types of training have you received?

A.   Excuse me?

Q.   What other types of training have you received?

A.   Being assigned to the electronic crimes branch, we're
primarily ICAC or Internet Crimes Against Children.  So we do
get a lot of training not just from the forensics side but
also for investigative as far as what to look for in
undercover chats.

I don't do that anymore, but in the earlier part of my
time with electronic crimes, I was the little boy or little
girl, basically putting myself out there online to see if I
would be approached by any bad people, so to speak.

1    Q.  Did you do that primarily in your time as an ICAC

2    investigator?

3    A.  Right.  But I don't do that much anymore.  Now just

4    strictly examinations.

5    Q.  Are there any other types of training there that you've

6    listed on your resume that you'd like to tell the jury about?

7    A.  The key ones are most of the forensic tools that we get

8    to utilize now, just making sure that they work properly and

9    just have the certifications and the proper training to use

10   those tools.

11   Q.  You mentioned FTK as being one of those tools; is that

12   correct?

13   A.  I did.

14   Q.  What are some of the other forensic tools that you have

15   at your disposal and that you've received training on?

16   A.  FTK kind of came in more with the RCFL or the computer

17   lab there in Louisville.  One of the more advanced tools is

18   X-Ways.  It's a little more going into the meat and potatoes

19   of the computer, versus looking at it in a more broad aspect.

20   X-Ways is probably one of the more advanced.

21       Also, Internet Evidence Finder, which is a fairly easy

22   application to use.  You kind of point that tool to your copy

23   of your hard drive, and it parses out the portions of the

24   drive that you're looking for.

25   Q.  Okay.  In the 11-plus years that you've been doing

1    forensic examinations, have you received any certifications?

2    A.   A number for FTK, to be an examiner using that tool.  The

3    CART certification, which covers a multitude of tools.  But

4    also, to be qualified as a CART, it's a whole process,

5    requires a lot of detail.  Leave it at that.

6         And then, of course, the A-Plus certification and X-Ways

7    and IEF, which is basically it's what you've learned and are

8    certified in.

9    Q.   Do you have any other certifications specific to being an

10   examiner that I've missed?

11   A.   The vehicle forensics, which really isn't relevant as

12   much in this case.  But we are doing examinations on vehicles

13   now for their infotainment systems, which is quite interesting

14   but not really relevant.

15   Q.   Okay.  Detective Viergutz, let's talk about the 11 or so

16   years that you've been doing forensic exams.  Can you give the

17   jury your best estimate of how many examinations you've

18   performed over the course of your career?

19   A.   It would be quite a few, being involved with, I would

20   say, hundreds or even thousands of examinations.  But as far

21   as the completed process to work, probably within the

22   hundreds.  Maybe three or four hundred.

23   Q.   Okay.  Let's start sort of on a micro level and work sort

24   of up.  In a month's time, how many examinations do you

25   typically perform?

1    A.   Four or five.

2    Q.   And is an examination specific to just one device, or can

3    there be multiple devices you're looking at as part of one

4    examination?

5    A.   Well, there lies a bit of the issue.  An examination

6    technically can be for one device.  But for a case that you

7    get, an examination is for all the devices within that case.

8         So you may have a cell phone, a GPS, and also a computer

9    or laptop.  Or you may just have a cell phone.

10        More often than not, it's an examination of suspect's and

11   a victim's or maybe even a witness's device to kind of put it

12   all together.

13   Q.   So I think your testimony was that you've conducted at

14   least hundreds of examinations, items of electronic evidence

15   during your career; is that fair?

16   A.   That would be fair.

17   Q.   Have you also had the occasion to testify, as you are in

18   this case, to offer opinion testimony about the examinations

19   that you perform?

20   A.   I have.  A couple of them have risen to the federal

21   level.  Probably more often at the state level, but I've

22   testified in a number of the Eastern District courts and also

23   in the west.

24   Q.   Okay.  Let's talk a little bit about KSP's electronic

25   crimes branch.  Where is it located?

1    A.   Currently located in Frankfort, Kentucky.  We are

2    actually working on -- we're considered part of a satellite of

3    the RCFL in Louisville, the aforementioned place.  And then we

4    are due to actually open up another lab in Eastern Kentucky.

5    Q.   Okay.  And how is KSP electronic crimes branch staffed?

6    Who works there?

7    A.   The electronic crimes branch actually, I guess, would be

8    split in two.  You have the investigation side of the house

9    and then the examination side of the house.

10        Investigations, we have basically three per area; east,

11   central and west.  And then on the forensics side of the

12   house, we have one sworn officer at the RCFL and then myself

13   in Frankfort, and then we have an additional five civilians, I

14   believe.

15   Q.   Okay.  So you as an examiner and the other folks at the

16   electronic crimes branch who do examinations, are you doing

17   examinations on the items that the investigator seized?

18   A.   That's correct.  And not just for the state police, but

19   we also have cases from all agencies across the state.

20   Barbourville PD doesn't have an examination staff.  They have

21   to send their stuff to the state police.  We do theirs.  We

22   get stuff as far as Paducah, Pikeville, even Northern

23   Kentucky.

24   Q.   Can you tell the jury about the types of items that you,

25   as an examiner, examine?

1    A.   The what of items?

2    Q.   The types of items that are brought to you for

3    examination.

4    A.   Potentially, anything that contains digital evidence or

5    could contain digital information.  The aforementioned vehicle

6    forensics, the infotainment, your car being synchronized to

7    your infotainment system in your phone.  We get skimmers taken

8    from gas stations that may contain credit card data that you

9    could use to go back and hopefully prosecute the bad people

10   that put it there.

11        More often than not, it's cellular phones and laptop and

12   desktop computers with the inclusion of the occasional GPS

13   device or even a surveillance system.

14   Q.   How are examinations assigned within the electronic

15   crimes branch?

16   A.   They pretty much come in daily, and they go into a queue.

17   Unfortunately, the queue's a little long right now.  But it's

18   potentially who's next up and who's qualified to do the

19   examination.  If it contains a Macintosh computer versus a

20   Windows computer, we would have to go to an examiner that is

21   certified or qualified to examine Macintosh computers.  If

22   it's a cell phone, they have to be certified or qualified for

23   that.

24   Q.   So the examiner's proficiency, for lack of a better word,

25   factors into the assignment?

1   A.   Absolutely.

2   Q.   Does how complex an investigation or an examination may

3   be, does that factor into the assignment?

4   A.   Absolutely.  We're getting more encryption, encrypted

5   devices.  If we have an examiner that's more focused on the

6   encryption, it would probably go to them and allow somebody

7   else to keep chugging on with the regular evidence.

8   Q.   What I want to do now, Detective Viergutz, is to go

9   through the process you follow in conducting an examination.

10  We're going to talk sort of in general terms.  After we do

11  that, we'll move into what you specifically did in this case.

12       So let's just talk hypothetically now.  An investigator

13  on KSP's side of the house or somewhere else in the

14  Commonwealth of Kentucky gives you an item to forensically

15  examine.  What do you do?

16  A.   Absolutely.  When we receive digital evidence from any

17  law enforcement agency across the state, we require, of

18  course, the legal authority, which would be your search

19  warrant or court order or even a signed consent form, in

20  addition to the KSP 26, which is the service request for this

21  is who I am, and I want this examined for these type of items.

22  So it kind of helps the examiner kind of, okay, are we carving

23  for digital evidence?  Do we have -- what's the scope or the

24  focus on the examination?

25  Q.   I think you said the first step of the process is

1    verifying that you actually have the authority to do what the

2    investigator's asking you to do, correct?

3    A.    Correct.

4    Q.    And that usually comes in the form of a search warrant,

5    you said?

6    A.    Most often.

7    Q.    Sometimes individuals will sign consent forms that give

8    you the authority to forensically examine their item?

9    A.    Yes, ma'am.

10   Q.    Okay.  So after you've sort of verified that you're

11   allowed to do what you've been asked to do when you've

12   verified the documentation, the KSP 26 from the investigator

13   who seized it, what do you do next?

14   A.    Upon receiving the evidence, we label it and identify it

15   so that it can be tracked, basically, through the lab and in

16   the evidence control.

17        It's assigned an examination number so that we can follow

18   that with the exhibit number so you can always track it

19   wherever it is.

20        Once it's in evidence, the case file or the folder and

21   the request just kind of goes into queue, depending on its

22   need to get through the court system.

23   Q.    Okay.  As part of that process, that verification

24   process, do you make sure that the item that you have

25   physically in your possession is, in fact, the same item that

1    was seized by the investigator?

2    A.    Part of the 26 or the legal authority process is making

3    sure that your serial numbers are matching up to what has been

4    seized and what's requested to be examined is also covered by

5    your legal authority.

6    Q.    Okay.  And after you've done all that, you said the item

7    goes in queue until it's ready to be examined?

8    A.    Yes, ma'am.

9    Q.    Physically, where does it go?

10   A.    We have an evidence -- basically, it's a vault in our

11   facility there in Frankfort.

12   Q.    Who has access to that?

13   A.    All examiners and supervisory personnel at the electronic

14   crimes branch.

15   Q.    So let's move forward and say it's time to examine an

16   item.  Tell the jury a little bit about how that process goes.

17   A.    Ideally, you received your examination folder.  You go,

18   you take it, you go to the evidence control, take it off the

19   shelf and you sign some necessary paperwork just for chain of

20   custody purposes.

21         Take the evidence out.

22         The next step is normally to photograph, to make sure

23   that you have the evidence in basically its purest form as far

24   as how you got it.  If it's filthy, dirty, disgusting, smells

25   like cigarette smoke, that's what you're going to get.  If

1    it's clean or brand new, that's what you'll see.

2         We take pictures of that.  We take pictures of serial

3    numbers, identifying marks, or characteristics of the device

4    itself.  And with that, you're starting a paperwork process.

5    Q.   Okay.  Is there anything else that's part of that

6    paperwork process?

7    A.   You're noting conditions of the computer.  Pictures may

8    not always do it justice.  You may say it smells like cats or

9    whatever.  Something, whatever.

10        And you're documenting exactly everything you're doing to

11   the device.  You're taking the hard drive out, you want to

12   document that you're taking the hard drive out and taking

13   pictures of it and labeling the hard drive just so it's

14   traceable back to its original evidence.

15   Q.   So in this hypothetical examination that I've asked you

16   to describe, let's assume, for the sake of the discussion,

17   that we're talking about a laptop computer.  After you've done

18   all of your paperwork, then what's the next step?  What do you

19   do physically with respect to the computer?

20   A.   With the paperwork process, taking the hard drive off or

21   copying it, the hard drive, on to another hard drive.  That's

22   part of the forensic process of examination.  You don't

23   actually want to touch the original hard drive any more than

24   you have to.

25        The focus is to basically get that drive write protected

1   so we're not going to change any evidence on that hard drive

2   and copy it over.

3        We have tools that do this to make sure that not a single

4   one or a single zero can be changed from the beginning of the

5   process to the end of the process.

6   Q.   When you say one or zero, what do you mean by that?

7   A.   What it all comes down to, the internet or data moving

8   around, it's a series of ones and zeroes and items like that.

9   It's really just digital evidence, the way to best encapsulate

10  it.

11  Q.   Okay.  So as part of your examination process, it

12  involves actually taking the hard drive out of, in this case,

13  the laptop computer, correct?

14  A.   Yes, ma'am.

15  Q.   And I think you testified your job is to make a forensic

16  copy of that?

17  A.   We make a forensic copy and everything we do.  From that

18  point, we're working off of that copy so we're not messing

19  with the original evidence.  We don't want to change it

20  anymore.  It goes back into original evidence, and we're

21  working from a copy.

22       And ideally, before you process that copy, you've made

23  another copy just in case that first copy goes sideways or

24  bad.

25  Q.   Just in case, maybe, that first copy is later or

1    subsequently not available for your use?

2    A.   Correct.

3    Q.   Okay.  So the original hard drive that comes out of the

4    laptop computer, after you make a forensic copy, you put it

5    back into the laptop computer, correct?

6    A.   Correct.

7    Q.   And then from there on out, you're just working off of

8    your forensic copy?

9    A.   Yes, ma'am.

10   Q.   Can you tell the jury a little bit about how you make a

11   forensic copy?  What tools or software do you use?

12   A.   It's really not all that complicated as some people may

13   think.  But once you have the hard drive out, you're attaching

14   it to a device where it will only read data.  It will not

15   write back to the device.  From that, you're copying the data

16   that's contained on that device over to another platform or

17   another device.

18        When that process is occurring, there's a lot of

19   calculations going on to make sure that what's on the original

20   does not get changed from what's on the end or what's being

21   copied.

22   Q.   And I think you mentioned this earlier, but what are the

23   different types of forensic tools that you have at your

24   disposal to make forensic copies?

25   A.   Anything from the aforementioned FTK.  FTK Imager is one

1   we've utilized at RCFL and electronic crimes.  Also X-Ways is

2   a pretty good tool as well.

3   Q.   Between the two, FTK and X-Ways, do you have a preference

4   just in terms of the tool you like to use as part of your

5   examinations?

6   A.   Probably more so X-Ways.

7   Q.   Why is that?

8   A.   It's a little more lighter weight and easier to use.

9   Q.   Okay.  I think you also previously testified that during

10  this process of making a forensic copy, you use software that

11  essentially makes sure that data is basically only coming in

12  one direction and not the other way.  What is that called?

13  A.   A write blocker.

14  Q.   Explain to the jury what a write blocker is and what it

15  does and why you use it.

16  A.   There's a number of ways that you can write block your

17  digital evidence as far as the way this one was done.

18  Actually, a physical box that has a ribbon or an IDE, so it

19  looks like a computer cable of sorts attached to the small

20  box, and you're running another wire, whether it be fire wire

21  or one of the cables that you may have seen and attach it to

22  your examination.

23       Once you've made that copy, you're utilizing that.

24       The other ways to write block are also there's software

25  write blockers, and there's also mounting the drive, which is

1   a little more -- I wouldn't say complicated, but you can also
2   mount the drive as read only so the computer knows not to
3   write anything to it.
4   Q.   And in as simple terms as you can sort of convey, why is
5   it important for you as a forensic examiner to write block
6   when you're making a forensic copy of a hard drive and a
7   laptop?
8   A.   Sure.  I mean, this is original evidence and you don't
9   want to change anything from the very beginning.  What you're
10  working with is going to be your evidence that you're
11  referring to for the rest of your examination.
12      So it may be necessary that you cannot do a write block
13  and you just -- you can articulate that.  But ideally, you
14  always want to use that write blocker and have it in place
15  just so you're using the most pristine copy.
16  Q.   Is it important, from your perspective, to do that to
17  protect the integrity of the evidence?
18  A.   Absolutely.  Just keep it basically unadulterated from
19  the very beginning.
20  Q.   From the time that it was seized, essentially?
21  A.   Yes, ma'am.
22  Q.   Is there anything else that you do, in addition to using
23  this write block software, in making the forensic copy?  Is
24  there anything else that you do to verify that the forensic
25  copy that you made is identical to the hard drive that you

1   removed from the laptop?

2   A.   There is a calculation that I had mentioned that goes on.

3   The process happens fairly quickly in the overall.  As you're

4   copying the drive, the data's going over.  Once it has the

5   data, it starts to run calculations on it, and it gives it an

6   MD5 hash.

7   Q.   What is an MD5 hash?

8   A.   MD5 hash, some would say it's a thumbprint or a

9   verification that this item is unique.  That there's less

10  likely than, I think, than DNA that it's going to be

11  replicated any other way possible.

12       The file can be hashed, a drive can be hashed, but the

13  only way that digital evidence and the examiners that we use

14  or the tools that we use can make sure that nothing's been

15  changed from the very beginning.

16       So you hash your original copy, you get that MD5 hash,

17  the calculation that all the files on there are -- this is

18  what they are.  You work with your copy, and then you get

19  another hash.  And after your finished product, they should be

20  the same.  And if they're not, there can be reasons, but we

21  would probably start the process over if that were the case.

22  Q.   Yesterday, we heard some testimony from Detective

23  Couchman about -- I think it was SHA1 hashes.  Is that another

24  type of hash value?

25  A.   It's a little -- I guess it's a few more characters.

1    SHA1, just it's a more advanced hash than you could say the

2    MD5 hash.  MD5 is generally accepted within the forensic

3    community as a way of saying this is a unique copy.  SHA1 is

4    also the same.  There's SHA1, there's SHA5, I think.  There's

5    a couple other versions of that as well.

6    Q.   Okay.  But during the examinations, you basically verify

7    that your forensic copy is identical to the original hard

8    drive by using the MD5 hash?

9    A.   Correct.

10   Q.   You say you make sure the hash values are the same for

11   every file on that hard drive?

12   A.   We verify actually -- we actually do get MD5 hashes of

13   files that are found on the drive.  When we hash, we actually

14   are hashing a much larger amount of data.  So it's more in the

15   chunks that it's being copied over.  But equivalent -- to the

16   equivalent, it's about the same as far as like each and every

17   file and the entire drive.

18   Q.   Okay.  After you've gone through that verification

19   process, what's your next step?

20   A.   Well, we have a forensic copy of the hard drive now.  Now

21   it's time to basically process it and look at the service

22   request and legal authority to see if there's any specifics

23   that are being requested for the examination.

24   Q.   Okay.  Go ahead.

25   A.   In this particular case, the concern was for primarily

1    some files that had been downloaded from Detective Couchman,

2    if they were still resident on the computer itself, basically

3    to see if those were still there.

4    Q.   Okay.  Is there anything else, before we get into the

5    examinations you conducted in this case, is there anything

6    else just generally about your examinations that you'd like --

7    A.   This examination was specific to those files.  In

8    general, if it's for child exploitation or child pornography

9    type cases, it will say, you know, we want any and all child

10   pornography that may be on this computer.

11        There can be a tremendous amount, or there may not be

12   any.  So we use a number of tools, one of them being the

13   X-Ways or FTK.  In this case, we also used NetClean or it's

14   called Griffeye now.  Griffeye basically will take the EO1 or

15   the copy of the hard drive and search for any type of pictures

16   and videos that are resident on the hard drive itself.

17   Q.   Can you spell Griffeye?

18   A.   I believe it's G-r-i-f-f-e-y-e.

19   Q.   Okay.  And you said that was just one of the other tools

20   that you have at your disposal to basically start to sort

21   through and process the forensic copy that you've made,

22   correct?

23   A.   Correct.

24   Q.   And is the NetClean or Griffeye, is that a particular

25   tool that you'll use when you're looking for a particular type

1    of evidence?

2    A.   The focus for Griffeye or the former NetClean is

3    primarily pictures and videos.  It can also be used for other

4    file types.  But for our purposes, the child exploitation

5    stuff, it's an easier way and a much faster and efficient way

6    to identify what may be child exploitation or not.

7    Q.   And does that particular tool in these types of cases, is

8    it helpful in sort of directing you, as a forensic examiner,

9    to -- as a good place to start looking?

10   A.   Absolutely.  These hard drives nowadays are not just the

11   80 and 120 gig hard drives of when I first started in 2005.

12   They're now three terabytes, six terabytes, which is a

13   tremendous amount of data to have to go through.

14       So when the suspect or possible bad guy, when they go and

15   seize all these hard drives, our job is still to make those

16   forensic copies, those EO1s, the digital copies, but be able

17   to search those terabytes and gigabytes of data as quickly as

18   you can, because you have a lot more examinations to get to

19   once you finish this one.

20   Q.   And so the way that you do that are using the tools

21   you've explained like X-Ways and NetClean.  Are there any

22   other tools that you use in conducting your forensic

23   examinations?

24   A.   There are.  That NetClean, once it starts identifying

25   pictures, it will probably direct you to where they're most

1    commonly stored, whether it be in the downloads folder or in a
2    My Documents type folder.  But from there, we can start
3    digging a little bit further into what's going on.
4        Another tool that would be utilized is Internet Evidence
5    Finder or IEF.
6    Q.   What is that primarily designed to do?
7    A.   That allows us to basically search the hard drive also
8    for various types of data that may have been used, whether it
9    be -- it will look at previous searches within the internet or
10   on the internet, what applications are being utilized on the
11   computer.  It's just kind of -- it makes it a little bit
12   easier for the examiner to go over a large amount of data.
13       It still has to be verified with more particular tools to
14   make sure you're getting what you're supposed to be getting,
15   but it's just an easier way to narrow down the focus.
16   Q.   Okay.  So, Detective Viergutz, what I'd like to do at
17   this point is move into what you did as part of your
18   examination in this case.
19       Is it fair to say, did you follow the process that you
20   just told the jury about?  The process that you just
21   described, did you follow that same process in this case?
22   A.   Yes, ma'am.  The removal of the hard drive, the NetClean,
23   and also more specifically with the X-Ways forensic tool.
24           MS. LEONHARD:  Your Honor, may I approach the court
25   clerk?

1           THE COURT:  You may.

2           MS. LEONHARD:  May I approach the witness?

3           THE COURT:  You may.

4   BY MS. LEONHARD:

5   Q.    Detective Viergutz, you have in front of you what's

6   already been admitted as Government's Exhibit 1.  Do you

7   recognize that?

8   A.    I do.

9   Q.    What is it?

10  A.    It's Exhibit 2 that was submitted for our examination for

11  the electronic crimes branch regarding ECD16-0163.

12  Q.    So does that exhibit bear all the markings that you

13  described that you make as part of your intake process?

14  A.    Yes.

15  Q.    The exhibit sticker?

16  A.    Yes, ma'am.

17  Q.    So is that the laptop you examined in this case?

18  A.    Yes.

19  Q.    And receiving that laptop, who did you receive it from?

20  A.    Actually, Detective Brian Cooper, state police trooper or

21  detective from Post 7.

22  Q.    And so that laptop came up in the queue, and it was

23  assigned to you for examination, correct?

24  A.    It did come up in the queue.  Actually, this was -- I

25  don't want to say expedited.  It was pulled a little quicker.

1    The examination started that day, just for the sake of

2    eliminating suspects in the house.

3    Q.   Okay.  So you actually performed an examination the day

4    that you received that device?

5    A.   Started the examination.

6    Q.   Was it a full examination, preliminary examination?  What

7    was your goal in doing that sort of first examination of that

8    computer?

9    A.   Once the pictures had been taken, as we described

10   earlier, the hard drive removed, placed on to a write blocker,

11   it can be copied while at the same time I can also look at

12   that hard drive.  And I'm looking for, specifically, the terms

13   that were in regard to the file being downloaded by Detective

14   Couchman.

15   Q.   Okay.  How long did it take you to do that preliminary

16   examination?

17   A.   I don't have the exact dates.  It was basically just

18   describing or trying to figure out, because another person --

19   there was another person in the house at least that we wanted

20   to say that this person was utilizing this computer, and this

21   person was utilizing another computer.

22   Q.   Okay, very good.

23        So let's talk more about the in-depth examination that

24   you performed in this case.  We have the laptop in front of

25   you.  Where did you start?  I think initially, when you were

1    testifying about your general process, you said you start with

2    basically your legal authority to search that.  Did you do

3    that in this case?

4    A.   Yes.  Yes, ma'am.  And that's where I would get a lot of

5    the terms as far as the file names and also the IP address

6    that's kind of led us -- or led to this examination.

7    Q.   So as part of your examination, did you have at your

8    disposal Detective Cooper's affidavit in support of the search

9    warrant where the files were described and the IP address from

10   which the files were downloaded?

11   A.   Yes, ma'am.

12   Q.   So otherwise, you would be basically shooting in the

13   dark, correct?

14   A.   We'd probably go directly to the NetClean process or the

15   Griffeye, where we're examining the entire hard drive to see

16   what we have on there.

17   Q.   So essentially, correct me if I'm wrong, you're looking

18   for evidence of the files that were downloaded by Detective

19   Couchman?

20   A.   Yes, ma'am.

21   Q.   Were there words, letters, unique portions of the file

22   names that you were looking for in doing that preliminary

23   examination?

24   A.   There were.  Through the forensic tool and with the

25   original evidence, after the copy is being made, we can also

1    run search terms on that EO1.

2         And it's not really looking so much for the term itself,

3    but the series of letters or numbers that we search for.  And

4    the more unique, the easier it's going to be to narrow down

5    the focus.

6         In this particular case, I believe OPVA was something

7    that was referenced within the file name, and so I basically

8    just set it up to look for OPVA within the contents of the

9    hard drive.

10   Q.   From your background and experience in these types of

11   investigations, do you know what OPVA stands for?

12   A.   It's been a little bit, but I believe it's Onion Pedo

13   Video Archive.

14   Q.   Onion Pedo Video Archive?

15   A.   Right.  And "Onion" refers to the Onion router or Tor.

16   The Onion router, which is more of the -- I don't want to say

17   the dark web, because that's probably not the right name, but

18   a deeper web.  A Tor allows you to surf in areas of the

19   internet that you wouldn't normally go.

20        This is in reference to -- the OPVA is reference to a

21   portion of that, I guess you could say, like the archive,

22   Onion, pedo for pedophile or pedo or prepubescent, video

23   archive.  It's a collection, I suppose.

24   Q.   So prior to starting your examination, you basically knew

25   what you were looking for in terms of the file names that

1    Detective Couchman had downloaded from a particular IP

2    address, correct?

3    A.   The file names that were contained within the downloads.

4    They were provided, and I believe even hashes were provided at

5    the time, but unsuccessful.

6    Q.   Okay.  So let's talk about, with that information, what

7    you did with it in trying to find evidence of it.

8    A.   Well, the four -- the request was basically for the four,

9    and then any additional child exploitation that may be found

10   on the drive.

11   Q.   When you say "the four," what do you mean?  The four

12   what?

13   A.   The four files that were downloaded for Detective

14   Couchman.

15   Q.   By Detective Couchman?

16   A.   Yes, by him, and the complaint or the download was then

17   given to Detective Cooper.

18   Q.   Okay.  So what did you do as part of your examination to

19   try to confirm or verify whether there was evidence of those

20   files being on the computer that you were searching?

21   A.   Just basically exhaust any kind of searches that would

22   lead to us where those files may be or may have been within

23   the contents of the hard drive.

24   Q.   What did you find?

25   A.   We did not find the files themselves.  But as with a lot

1    of Windows machines, you'll find pointers.  Pointers are -- or

2    link files.  Basically, where something was.  A lot of

3    computer stuff is not so much where the file is but how to get

4    to it very quickly.

5        So this was basically a pointer of where something was.

6    It had had a history within the C drive -- I'd have to look at

7    the report -- of where those four files were at one time of

8    the computer, but they were not anymore.

9    Q.   Okay.  So you were able to find file paths but not the

10   actual files themselves?

11   A.   Yes, ma'am.

12   Q.   And you indicated that from the pointers that you used

13   that you were able to at least glean some information about

14   where the files once were, which was the c:\downloads folder?

15   A.   Yes.  Yes, ma'am.

16   Q.   Okay.  So it's fair to say at this stage of your

17   investigation, you confirmed that the four files that

18   Detective Couchman were no longer -- is "residing" the right

19   term -- residing on the computer?

20   A.   They were no longer in existence.  They were most likely

21   deleted or carved over.  Unfortunately, the digital evidence

22   is there until not only deleted but partially written over or

23   written over.  It usually can be recovered via forensic tools.

24       One of the other things that we did search for were the

25   use of an application or BitTorrent tool.

1    Q.   Okay.

2    A.   The BitComet, I believe.

3    Q.   We'll get to that momentarily.

4         So was there anything else about the file paths or that

5    little bit of history that you were able to glean about where

6    they once were?

7    A.   I knew that they were within the C drive, and I believe

8    possibly the downloads, in a downloads area.  And I don't

9    recall if they were within the user profile or just on the C

10   drive.

11   Q.   Okay.  The rest of that information, did that tell you

12   whether those files that were no longer there had been saved

13   to any other part of the computer prior to being deleted?

14   A.   That didn't tell me if it's been moved or saved anywhere

15   else.  It just says at one point in time, the computer was

16   referencing those via a pointer that that's where they

17   resided.

18        Another way to basically verify these type of cases, we

19   get an affidavit from the -- for the search warrant, and we

20   also reference an IP address that also kind of helps us know,

21   you know, this is where we're talking about and when we're

22   talking about.

23   Q.   So is it fair to say, then, you're not only looking for

24   specific content in this case, the four files that Detective

25   Couchman downloaded, you're also looking for other evidence

1    that leads you to the conclusion that that computer is, in

2    fact, the computer that was used, say, in this case to

3    distribute the files to Detective Couchman?

4    A.   That's correct.

5    Q.   And one of those things that you were looking for was

6    evidence of the IP address, correct?

7    A.   That is correct.

8    Q.   Did you find evidence of the IP address that was used to

9    connect the computer that was sharing these files on the

10   internet to Detective Couchman?  Did you find evidence of that

11   same IP address on Government's Exhibit 1?

12   A.   I did.

13   Q.   Okay.  Was there anything else unique or any other type

14   of digital evidence that was important?  We heard some

15   testimony earlier today about a MAC ID.  Did you find any

16   evidence that that same MAC ID was on that computer?

17   A.   I have not been requested to identify the MAC ID.  But I

18   could -- I could probably do it physically.  But, well, I

19   don't know.  It kind of depends on the computer.

20        But that was eventually brought up, and I -- I have not

21   done a search of that on the computer itself.

22   Q.   Did you do it, though, prior to your testimony here

23   today?

24   A.   We eventually did do that.

25   Q.   Okay.

1   A.   If I may?

2   Q.   Sure.

3   A.   But there were -- I think the three things, if I'm not

4   mistaken, the IP address that was mentioned or requested, the

5   four files that were downloaded, and then also the application

6   itself, the BitComet.

7   Q.   So those three things that you just mentioned, those were

8   three things that you were primarily searching for in your

9   forensic examination of the computer?

10  A.   On the initial, preliminary, yes.

11  Q.   And correct me if I'm wrong, you found evidence of all of

12  those things on that computer?

13  A.   Yes, ma'am.

14  Q.   Okay.  If you wouldn't mind just turning Exhibit 1 over,

15  turning it upside down.  Is there -- or, sorry, you have it in

16  front of you.  Is there evidence on the computer itself about

17  where it's made or manufactured?

18  A.   On this shell itself, it does say Made In China.

19  Q.   Okay.  And is that something that you process and make

20  note of when you're taking all your photographs of the

21  evidence?

22  A.   That's usually why we do take the photographs, just so we

23  don't have to go back to the original evidence and look at all

24  the different parts.  That does help identify that with the

25  serial numbers and service codes and stuff.

1   Q.   Very good.  So, in this case, your initial task was to

2   find evidence related to or specific to the downloads that

3   Detective Couchman did on June 6 of 2016, and you found some

4   of that evidence, correct?

5   A.   Yes, ma'am.

6   Q.   What was your next step as part of conducting your

7   forensic examination of that computer?

8   A.   Well, per the request, any other evidence of child

9   exploitation on the computer, whether it be videos or

10  pictures.

11       So we then fed it through NetClean or Griffeye to look

12  for pictures and videos.

13  Q.   Because your legal authority in this case, the search

14  warrant gave you the authority to look for not only the

15  evidence of the downloads by Detective Couchman but any and

16  all other illegal images that were on that computer, correct?

17  A.   Yes, ma'am.

18  Q.   So that's your next task?

19  A.   Yes, ma'am.

20  Q.   And what tool did you say you employed to do that?

21  A.   At the time, it was NetClean, but it has since now --

22  it's called Griffeye.  But NetClean was the tool I used.

23  Q.   So hypothetically, let's say in a hypothetical

24  examination, you're looking for additional child pornography

25  on a laptop computer.  Let's say you find it.  What are some

1   of the types of questions then that you're seeking to answer

2   for an investigator about that child pornography?

3   A.   The next question that we would normally want to ask

4   ourselves or even the case agent or detective in this case.

5   So if there is child exploitation on that computer or on that

6   hard drive, how did it get there?  Was it downloaded from the

7   internet?  Was it produced?  Did the suspect possibly have

8   hands-on access to a child?  That's the number one.

9        More often, it is that it was downloaded from the

10  internet or traded on the internet.

11       And then, basically, we want to see what may have

12  happened from that point.  Is it in a shared folder?  Is it in

13  just a downloads folder?  Is it in a personal folder where

14  they may be storing it, or is there evidence it may have been

15  transferred off on to another drive?

16  Q.   Is it important to you, when you're doing a forensic

17  examination, to look for -- and this might be the wrong

18  phrase, so I apologize -- anti-forensic software?

19  A.   We do ideally just kind of keep our eyes open for it.  It

20  can basically advise the examiner or give the examiner some

21  kind of idea of what you're going to see or possibly not see.

22       There are forensic tools out there that basically allow

23  you to either -- once you delete something, it will then write

24  over that area, as I had mentioned.  Some things -- it's

25  usually on the computer until you delete it and empty the

1    trash can and it gets written over.  Otherwise, it's still

2    recoverable by forensic tools.

3        There are a lot of tools out there that will do it.

4    CC Cleaner is one of them.

5    Q.  Did you look for and find any type of that software on

6    Government's Exhibit 1?

7    A.  I don't recall putting that in my notes if CC Cleaner was

8    in there or not.  But we do just a cursory look but not go out

9    of the way.

10   Q.  You indicated that during your preliminary examination,

11   the three things that you were looking for was evidence of the

12   four files downloaded by Couchman, the IP address that was

13   used during those downloads, and then evidence of the

14   peer-to-peer software that was used.  In this case, it was

15   BitComet; is that fair?

16   A.  Yes, ma'am.

17   Q.  During your forensic examination, is it fair to say that

18   that's a fluid process?  I mean, once you do your examination

19   and you write a report, is the case closed?  Is it done?  Or

20   do you continually, at someone's request, whether it's my

21   request or the defense attorney's request, are you continually

22   doing more examination?

23   A.  It really depends.  You want to work with your detective

24   or your case agent to see if you are running into photos that

25   don't appear to have already been from the internet or to have

1    come from the internet.  If the suspect may have had access to

2    a child, then we potentially may have a production case, in

3    which we have a bigger problem.

4        If it does appear that they're coming from the internet,

5    where you see search terms and stuff like that, it's a little,

6    I guess, less or lower key.

7        But you basically just want to find how much child

8    exploitation content are we looking at and then work with the

9    detective to possibly make them a NCMEC -- NCMEC is the

10   National Center For Missing and Exploited Children.  They keep

11   the database of the known children that are being exploited

12   out there.

13   Q.  And is that also part of your duty as a forensic

14   examiner, when you're examining an item and you do come across

15   videos or images of minors engaged in sexually explicit

16   conduct, is it part of your duties to then send those images

17   off to see if those minors have ever been identified?

18   A.  It's, I would say, more our responsibility to make sure

19   that the case agent or the detective or the trooper gets the

20   disk or that data.  We personally don't send it.  We can.  But

21   it's really the case agent's responsibility to make sure that

22   that's followed up on.  Not necessarily the examiner.

23   Q.  Thank you for that clarification.

24       As part of your examination in this case, did you have

25   the occasion to meet with Mr. Eckes and a forensic examiner

1    that he brought down to the electronic crimes branch?

2    A.   Yes.  Fairly early on, because of the content that was

3    located on the initial assessment of the evidence, Special

4    Agent Kimberly Kidd was kind of brought in or involved along

5    with -- I think we already found that the suspect had retained

6    counsel, Mr. Eckes, and they had met at the electronic crimes

7    branch to discuss what exactly are we looking at.  I didn't

8    think there were any live victims, per se.  It was just a

9    matter of if it was downloaded, was it traded, that kind of

10   stuff.

11        So per the request of Mr. Eckes, I did include the

12   BitComet, because we knew the tool that was used for -- from

13   Detective Couchman to -- Detective Cooper, and we knew the

14   tool was on there.  But just basically requested information

15   as far as the default settings, as far as was it just

16   something that was installed and let go, or was it something

17   more specific and user involved.

18   Q.   So as part of your examination in this case, did you at

19   the defense's request install the version of BitComet that was

20   installed on the defendant's computer?

21   A.   I did, for the sake of basically seeing how it would look

22   for the user, what they would see as far as the boxes that you

23   click on and where it goes.  I had created kind of a

24   PowerPoint of sorts, a diagram of all the boxes that you see

25   and all the ones that you go through as far as where it's

1    going to be installed on your computer and where the files

2    would reside.

3              THE COURT:  That was done at the defense attorney's

4    request?

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  And that wasn't on this, the duplicate

7    copy of the hard drive you made.  That was just more for

8    demonstrative purposes?

9              THE WITNESS:  Correct.

10             THE COURT:  Okay.  Just wanted to make sure everybody

11   understood that.  Thank you.

12             THE WITNESS:  Thank you, Your Honor.

13             MS. LEONHARD:  Your Honor, may I approach the

14   witness?

15             THE COURT:  Sure.

16   BY MS. LEONHARD:

17   Q.   Detective Viergutz, you indicated that you went through

18   this installation process and created a PowerPoint of this

19   process, correct?

20   A.   That is correct.

21   Q.   We've gone surprisingly low tech.  We've actually put

22   that PowerPoint into a PDF; is that fair?

23   A.   Yes.

24   Q.   Is that what I've just handed to you?

25   A.   Yes, ma'am.

1          THE COURT:  What exhibit is this?

2          MS. LEONHARD:  Government's Exhibit 16.

3          THE COURT:  This will be just for demonstrative

4    purposes as well?

5          MS. LEONHARD:  Yes, I believe.

6          THE COURT:  Do you have a copy of this, Mr. Eckes?

7          MR. ECKES:  I do, Your Honor.

8          THE COURT:  Very well.

9          MS. LEONHARD:  Your Honor, may I approach the

10   witness?

11         THE COURT:  You may.

12         MS. LEONHARD:  Thank you.  Detective Viergutz, I'm

13   going to retrieve that from you.

14   BY MS. LEONHARD:

15   Q.  So, Detective Viergutz, what was the first step that you

16   took in installing the version of BitComet that the defendant

17   had on his computer, installing that on -- where did you

18   install it?

19   A.  We had a -- basically, it's a working forensic -- not a

20   forensic machine, not an examination machine, but a machine

21   for UC or undercover purposes.

22   Q.  That's where you installed it?

23   A.  Yes, ma'am.

24   Q.  How did you go about doing that?

25   A.  Basically trying to keep it as forensic and as exact as

1    possible, establishing what version that the suspect was using

2    and the one that was also referenced with Detective Couchman.

3    I believe there was 1.39 was the version, and they may have

4    progressed up since then.  It kind of depended.  I wanted to

5    get the exact version that was used in the investigation.

6    Q.   And where did you go to get software that you downloaded?

7    A.   It appears that I went to BitComet.com.

8    Q.   Okay.  And does this first slide essentially just -- what

9    does it show?

10   A.   Where you can go to get BitComet.  If you look at the URL

11   or the address up top, it does show archive.  So I had to go

12   to, basically, an earlier investigation.  The current

13   investigations were 1.44, 1.43, and I needed to go a little

14   further into the process to 1.39.

15          THE COURT:  You used 1.39 because that's what was

16   installed on the defendant's computer?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Thank you.

19   BY MS. LEONHARD:

20   Q.   We're going to move to the second slide.  What does this

21   show?

22   A.   Basically indicating that what I wanted to show was when

23   you download something from the internet, such as an

24   application, you want to make sure it is authentic and you're

25   not getting a copy that may have viruses or the various

1    software.

2         So what they'll do is provide you that MD5 hash that I

3    mentioned earlier, a hash of that.  So once you download that

4    application, whether it be BitComet or something else, you can

5    MD5 hash it yourself and verify that that is the intended

6    application that you wanted to receive.

7    Q.   Why did you do that in this case?

8    A.   Just basically to keep that, yes, this is the application

9    that I wanted to get and this is the application that I did

10   get.  As you can see, they do a MD5 hash and also a SHA256.

11   Q.   So were you able so verify through the hash for the

12   software that the software that you installed was, in fact,

13   the same software that was on the defendant's computer?

14   A.   That's correct.

15   Q.   Okay.  So what does the next slide show?

16   A.   Basically just showing that, yes, I did get the MD5 hash

17   that I was expecting to get from the download.  Up top, you

18   can see the BitComet underscore 1.39, and there's a 64

19   processor.  Basically, what I downloaded is what I got, and

20   the verification over to the right side kind of basically

21   explains I did get what I was requesting.

22   Q.   Very good.  Let's move on to the next slide.  What does

23   this next slide show?

24   A.   It's starting the installation process for 64-bit.

25   BitComet 1.39.

1  Q.  Okay.

2           THE COURT:  I take it you would click on "next."  I

3  know the Court, perhaps jurors are familiar with how you

4  download something, you have to hit next and eventually, I'm

5  sure, there's one that says finish.  I'm presuming that

6  because I'm familiar with some of this.

7           THE WITNESS:  Eventually, Your Honor.

8           THE COURT:  Go ahead.

9  BY MS. LEONHARD:

10 Q.  So after you hit that "next" button, then what comes up?

11 A.  Of course, the ever-verbose BitComet agreement, that

12 you're agreeing to use their tool the way that they see fit, I

13 suppose.

14 Q.  Okay.  After the licensing, then what do you have to

15 navigate through?

16 A.  Then privacy policy.

17          THE COURT:  I take it if you don't click on "I agree"

18 or "next," it doesn't allow you to complete the download; is

19 that right?

20          THE WITNESS:  It would most likely just stop the

21 process.

22          THE COURT:  Thank you.

23          THE WITNESS:  The installation, yes.

24 BY MS. LEONHARD:

25 Q.  After we get through the preliminary matters of the

1    privacy policy, are we into the installation process?

2    A.   We are.  It gives you options of if you want a desktop

3    shortcut, do you want it in your programs files, that kind of

4    information.

5    Q.   I want to be clear about something.  Were you -- in doing

6    this installation, what were you trying to show?  Did you --

7    that was a bad question.

8         Did you just install this version of BitComet and all of

9    the default settings, or did you make any changes?

10   A.   Just, per the request of Mr. Eckes, just the install of

11   how it would look if a person just used the default settings.

12   I didn't change or add any click marks, other than to advance

13   to the next slide.

14   Q.   Okay.

15   A.   These are all windows that pop up, and I was capturing

16   those to show.

17   Q.   So these multiple windows that we see on this particular

18   slide, these would come up one at a time, sequentially?

19   A.   Yes, ma'am.

20   Q.   So obviously, that's the first one?

21   A.   Yes, ma'am.

22   Q.   So what does that show?

23   A.   Where you would like the icons for your install.  If you

24   would like it integrated into your browser.  If you're using

25   Firefox or Chrome, you may include this application within the

1    browser itself for user experience.

2    Q.   And all of those have check marks by them, meaning they

3    were part of the default setting, correct?

4    A.   That is correct.

5    Q.   What does the next slide show?

6    A.   Exactly where it's going within the program files or

7    where it's being installed.

8    Q.   My apology.  The visual is just not great.  Does that

9    help?  Can you tell where the default destination folder is?

10   A.   C:\program files and BitComet is the directory.

11   Q.   Okay.  What does the next slide show?

12   A.   The first one, copying from the .exe that was downloaded

13   and installing it into the necessary directories.

14   Q.   And what is the next slide right here?

15   A.   When you are searching for something within the

16   application, it will advise or want you to use the default

17   browser, more than likely.  So if you're searching for an

18   album or show, it takes that search and puts it in your

19   default browser.  And this one here, I guess the default for

20   Google.  But it's a subdivision of Google, but it is Google.

21           THE COURT:  So if you were to put "fish" or "cat" in

22   there -- there's been some discussion about fish or cat

23   yesterday.  If you were to put "fish" or "cat" in there for a

24   search, what would happen once it's installed?

25           THE WITNESS:  Once it's installed, because you're

1     actually searching within the application of BitComet, if you

2     typed in cat, it would basically take cat and put it in the

3     browser for you and go search.

4             THE COURT:  That's where you would insert -- all

5     right, very well.

6             THE WITNESS:  Basically setting it up for you in the

7     meantime.  If you wanted to use something else, like Yahoo

8     search or something else, you could utilize that.

9             THE COURT:  Didn't mean to steal your thunder,

10    Mr. Eckes.  You may have asked him about cat or fish on

11    cross-examination.  Since you used those analogies, I thought

12    I would.

13    BY MS. LEONHARD:

14    Q.   Again, these are default settings in this version of

15    BitComet; is that correct?

16    A.   That's correct.

17    Q.   Does this last slide pretty much show the same thing?

18    A.   It does.

19    Q.   Okay.  What does that slide show?

20    A.   Just basically that this version of BitComet has been

21    installed in your computer.  If you want to run it, it's ready

22    to do that.  If you wanted to see the read-me, which by

23    default we don't want to read it because most people don't

24    want to read the read-me, you could.  Then just finish.

25    Q.   Okay.  Is it fair to say at this point now, BitComet

1    version 1.39 is installed on the machine that you installed it

2    on?

3    A.    I would say so, yes.

4    Q.    Let's go to the next slide.  What does that show?

5    A.    The user interface of the application of BitComet for the

6    user.  Just all the folders that are available on the

7    left-hand side.  If there's something downloading currently,

8    which there wouldn't be until you searched for something, some

9    that are completed, some that are active, and additional

10   search availability.

11   Q.    Okay.  What's shown in these slides?

12   A.    This is -- because there are internal settings as well,

13   you have your default installation, but you also have settings

14   that you can control as a user.  And just for representation

15   of how it is installed, I took screenshots of all the setting

16   windows.  It's been a while since I've made this, but it can

17   be quite particular.  But there's a lot of settings within

18   here.

19   Q.    So as part of your installation of this version of

20   BitComet, you went through all of the default settings that

21   would apply as well?

22   A.    Correct.

23   Q.    And that's what these slides show?

24   A.    Yes.

25   Q.    And they're a little bit small so what I'm going to do is

1    start at the top and move forward, and I'll try to zoom in on

2    each one to get a little better view.

3        So that's the first sort of window of default settings,

4    correct?

5    A.   Yes, ma'am.

6    Q.   Okay.  So what does it show?  What types of things does

7    it show?

8    A.   The availability of -- and I believe I selected the item

9    on the left-hand side up top, and that's going to show the

10   connection.  So in the blue, on the far left, it should say

11   connection.  And then on the right, your options within the

12   connection.

13       If you wanted to limit how much you are sharing or

14   downloading or uploading, you can limit your amounts, your

15   upload rates right there.  By default, it's unlimited.

16   Q.   Both the max download rate and max upload rate are by

17   default set at unlimited?

18   A.   Correct.  Further down, you have what port it's listed on

19   for incoming or potentially outgoing by default, I'm guessing

20   it's 17011.  Some people may be particular about what port you

21   want to have open.  This is just for security reasons,

22   usually.

23   Q.   What else is shown on that particular slide?

24   A.   If you wanted to do port mapping, which has to do with

25   more firewall stuff, and then the availability of MAC and

1    firewall.  If you have an internal network and you don't want

2    people to see what's going on in the network or just to be

3    more particular about how you want to set this up, you could

4    do that within the network wizard.

5    Q.   Move on to the next slide.  What is displayed in this

6    slide as relates to the default settings?

7    A.   Working our way down to the left-hand side there,

8    directory, and then basically your default download directory.

9    This is where it would go if you decided to change it or if

10   you wanted to put your files that are being downloaded

11   somewhere else.  By default, it's the C drive downloads

12   folder.

13   Q.   What's the next setting that you worked through?

14   A.   Proxy setting.  If you have a proxy or you're going

15   through a VPN, which is a little more advanced, but if you

16   didn't want your internet service provider to know that you're

17   doing some stuff, you could actually set it up to go through a

18   virtual private network.

19   Q.   Okay.

20   A.   That's a little more advanced.

21   Q.   Let's move on to the last slide.  What does it show?

22   A.   Task tags, a default directory.  I guess you could add

23   other directories if you wanted your videos in one location,

24   your software in another.

25   Q.   If you want to tag certain files, these are the default

1    tags that they allow you to provide to them?

2    A.   Correct.

3    Q.   Okay.  Move on to the next default setting you worked

4    through.  What does this show?

5    A.   More tasks as far as adding the tags and whatnot.  If you

6    wanted to play a sound, once your download was complete so you

7    would be alerted, you could adjust that there, if necessary.

8    More schedulers, task schedulers.  If you were to download a

9    lot of stuff, you could limit it or set it for how many items

10   to be downloading at one time.

11   Q.   Okay.  Move on to the next slide.  What does that show?

12   A.   More specific stuff to the BitTorrent network stuff as

13   far as adding history to torrent files.  That's not something

14   I'm overly familiar with as far as all the little particulars

15   that you can do with the torrent protocol and network.

16        And then there's the seeding rules as far as like if

17   you're going to -- once you download a file, you're now able

18   to share it.  You can also put limitations on that as far as

19   how long you want to share it or what makes it available and

20   then potentially how much -- if you're uploading, if you have

21   a tremendous amount of software or pictures or videos on your

22   computer, you may not want everybody coming to get your stuff

23   at once so you would basically tell them only two of you can

24   have stuff coming up, because it's going to slow your

25   connection down a little bit.

1   Q.   Let's move on to the next slide.  Does that show anything

2   in particular?

3   A.   I guess more specific to eMule.  And the eMule is just

4   another portion of the BitTorrent network, and you can do some

5   plug-ins with that.

6   Q.   And what's depicted on that last slide?

7   A.   Then if you're using HTTP or FTP -- like standard

8   internet is HTTP.  FTP is for file transfer protocol if you're

9   moving big files from one to another.  That's just another

10  setting.

11  Q.   The first one really, if anything, that is displayed just

12  shows that it automatically creates a BT task, which I assume

13  stands for BitTorrent, after downloading a torrent file.

14  That's checked?

15  A.   By default, it is checked.

16  Q.   Okay.

17  A.   And apparently, if you would go back to that -- I had not

18  noted that before, but if you are using sites that may have

19  torrents that require a username and password, you could

20  include that in there.

21  Q.   Okay.  Let's move on to the next default setting with

22  this version of BitComet.  What's shown on the first slide?

23  A.   This is for long-term seeding.  Seeding is when you're

24  making the file available for others to partake in.

25  Q.   What does that second slide show?

1   A.   More -- well, settings for the Windows, the integration

2   of it into Windows.  If you want to easily add like a right

3   click copy, right click paste for the clipboard, appears

4   that's just an availability, an option for the integration

5   into Windows.  And then just more settings or if you wanted to

6   install it in the Firefox or Chrome.

7   Q.   Okay.  What does the next default setting show?

8   A.   Appearance of how the interface would look for the user.

9   What's going to come up when you launch it.  Just more

10  settings.

11  Q.   Okay.  And then, finally --

12  A.   Of course, with a number of these type of sites or

13  involved things, you always have the ability -- the potential

14  of getting a virus or some nefarious type software involved so

15  you can have it scanned as it's coming into your computer.  So

16  this is just a way to set that up.

17  Q.   Okay.  And in this case, in the default settings, that's

18  not checked?

19  A.   Correct.

20  Q.   Okay.  We'll try to zip through.  I think we're nearing

21  the end of the default settings.  Is there anything in

22  particular that's shown on this slide?

23  A.   Appears it was just a service, but it's always checking

24  for updates.  If you have a new version of BitComet out, you

25  may want the more updated version just for user experience.

1       And then you've got some other settings.  There's

2    port 40, which most people aren't utilizing, but it's

3    available.

4    Q.   Now, we're still in the default settings, some of the

5    more advanced settings.

6    A.   It is.  And this is just where -- apparently, this is how

7    things are set and you can change that if necessary.

8    Q.   These are all default settings that come up by default;

9    is that correct?

10   A.   That is correct.

11   Q.   On this particular sort of bevy of advanced settings, we

12   see down at the very bottom that there's at least an option

13   preview any file, is that right, down here?

14   A.   Yes.  I can see what it says right before preview.  It's

15   blurry.  But preview any file.  That's a default.

16   Q.   So that's not engaged or not enabled during these default

17   settings, correct?

18   A.   Correct.

19   Q.   What does the next slide show?

20   A.   This is for disk cache.  You may only want a certain

21   amount of data to be utilized for your application so you can

22   set your restraints, how little or how much space is available

23   for it.  And then you can also shrink it or cache it

24   periodically for the purposes of your computer use.

25   Q.   Okay.  What does this last slide show?

1    A.   Scheduling.  You can enable it or disable it.  And then

2    also if you want to set it up for downloading while you're not

3    at home, that way you're not bogging down your internet while

4    you want to use it for other purposes or what have you.

5    Q.   Okay.  I think we have come to the end of some of the

6    default settings in this version of BitComet that you

7    installed.  What does this slide show?

8    A.   Enable remote download.  Just if for some reason you

9    wanted to have it set up so you wanted to execute your

10   downloads, I suppose it would be done from there.

11   Q.   In this case, that is not checked?

12   A.   That is correct.

13   Q.   And then the final slide, what do we see there?

14   A.   Looks like you're back to the main user screen in regard

15   to the interface that the user would see or have the

16   availability of use as far as your torrent sites and exchange

17   and whatnot.

18   Q.   So when you were finished with your completion of this

19   version of BitComet, that's what you saw?

20   A.   That is correct.

21   Q.   Okay.  In addition to going through this installation

22   process at the defense's request, did you also do some

23   additional research on BitComet?

24   A.   I did, basically just through the FAQs on the BitComet

25   site or the frequently asked questions about how is it

1    sharing, do you have an option to share or not share, that

2    kind of stuff.

3    Q.   And did you put that information as well on slides for

4    defense counsel as well?

5    A.   I did.

6    Q.   We're just going to show those are the last -- again,

7    these came from the BitComet website under the frequently

8    asked questions, correct?

9    A.   Correct.  And I only highlighted the portions that are

10   highlighted blue, but they're highlighted, just because that

11   was per request.

12   Q.   Okay.  So, essentially, what do the frequently -- the

13   information provided in the frequently asked questions from

14   BitComet advise somebody?

15   A.   Well, in regard to downloading or when you're downloading

16   and uploading, they basically say pretty clearly that you're

17   not going to be able to download if you don't have files to

18   upload.  The way that BitComet works, it needs to have that

19   two-way traffic.  And if you don't have anything to offer,

20   you're going to have fewer items -- well, you'll have items

21   available, but you may not be able to get them very quickly.

22   So it really kind of squelches or controls your uploading and

23   downloading.

24   Q.   And I think that's what memorialized right there,

25   correct?  What does that say?

1    A.   "You can configure your client not to upload."  But right

2    after that, it's not highlighted, "doing so will cause your

3    download speed to drop to approximately zero."

4              MS. LEONHARD:  Your Honor, I'll certainly defer to

5    the Court, but this seems like a natural stopping point.

6              THE COURT:  I was going to try to break at a good

7    time, and sounds like this is a good time.

8         So ladies and gentlemen, what we'll do, we'll be in

9    recess until 1:15.  During the recess, continue to heed the

10   prior admonitions of the Court.  I appreciate your patience.

11   This is somewhat technical testimony.  I guess after lunch,

12   we'll get to more specifics about the search that was

13   conducted.

14        But at any rate, we will see you at 1:15.  Remember to

15   heed all the prior admonitions of the Court.

16        (The jury exited the courtroom at 12:08 p.m.)

17             THE COURT:  Jury's left the courtroom.  Anything we

18   need to take up before our break?

19             MS. LEONHARD:  Nothing from the United States.

20             MR. ECKES:  No, Your Honor.

21             THE COURT:  Very well.  We'll be in recess until

22   1:15.

23        (Recess from 12:08 p.m. until 1:15 p.m.)

24             THE COURT:  Jury's not in.  Anything we need to take

25   up before we bring the jury down?

1          MS. LEONHARD:  Your Honor, nothing really now, but in

2    terms of issues of technology, one of the disks that I created

3    for an exhibit is a BluRay disk, and the court clerk just

4    verified that there's no BluRay player in the courthouse.  We

5    have one at our office.  So when it comes time for

6    deliberations -- or Mr. Eckes has one, so we'll make sure we

7    use that.

8          THE COURT:  Impressive, Mr. Eckes.  Johnny on the

9    spot.

10          MR. ECKES:  There we go.

11          THE COURT:  All right.  Well, whatever you need to do

12    to have the technology to allow us to view evidence, feel free

13    to use whatever technology is available.

14          MS. LEONHARD:  Thank you.

15          THE COURT:  Anything else on your side?

16          MR. ECKES:  In terms of scheduling, Judge, I would

17    anticipate Detective Viergutz to be up there quite a while.

18    Is it likely that we'll close in the morning?  Is that how the

19    Court --

20          THE COURT:  My thought process is to finish up the

21    proof today.  I'm making some -- I noticed a couple of typos

22    in the instructions that we gave you last night that just

23    escaped my attention that my law clerk is making those changes

24    now, but my anticipation would be to finish up the proof and

25    then have an instruction conference and then, depending on the

1    time of day, go ahead and read the instructions to the jury,

2    allow you to make any objections you have to the set that has

3    been circulated, and then come back in the morning and close.

4        So that was my thought.  If we get too late, and there's

5    a lot of verbiage in these instructions that I have to read

6    that are lengthy and not in my regular repertoire of words so

7    my preference would be to read them today, if possible, so I

8    don't have to read them before the closings.

9        Depending on timing, if we finish up the current witness

10   by 3:00, 3:30, we should have time to take care of the rest of

11   that today.

12            MR. ECKES:  Understood.

13            MS. LEONHARD:  Thank you.

14            THE COURT:  Go ahead and bring the jury in, please.

15       And if you would let me know when you want me to read

16   this stipulation.

17            MS. LEONHARD:  Very well.

18       (The jury entered the courtroom at 1:18 p.m.)

19            THE COURT:  Ms. Leonhard, you may continue.

20            MS. LEONHARD:  Thank you.

21   BY MS. LEONHARD:

22   Q.   Detective Viergutz, I think when we broke, we were just

23   about to get into what the results of your forensic exam of

24   the defendant's laptop, which has been admitted as Government

25   Exhibit 1, what those results are.

1      And I think during the first part of your testimony, you

2   said when it comes to this sort of the stage of the

3   examination when you're looking for other images of child

4   porn, you're trying to figure out where it came from, where

5   did it go, if there was any evidence of production; is that

6   fair?

7   A.   That is correct.

8   Q.   Are there parts of the computer that you're specifically

9   interested in; for example, internet related data?

10  A.   There are.  One of the tools that we use in the process

11  of the examination that I had mentioned, Internet Evidence

12  Finder, potential of any kind of activity that's involved with

13  the internet.

14      And also, some goings on that are with the computer

15  itself.  Registry files are extremely important as well.

16          THE COURT:  What is a registry file?

17          THE WITNESS:  Registry files, I guess the easier

18  termination or -- you could say it's directions for the

19  computer, but it's going to keep information about the user

20  that the user has put into the computer.

21      Maybe a certain setting that you want.  When your

22  computer boots up, you may want your desktop to be a certain

23  way.  Those are the instructions of telling it where to get

24  that desktop photo, or could be a number of things.  Registry

25  settings, instructions for the computer.

1           THE COURT:  Okay.

2    BY MS. LEONHARD:

3    Q.   In addition to internet related items, in this case, were

4    you also specifically interested in any peer-to-peer software

5    that was installed on the computer?

6    A.   That's correct.  The BitComet, the version 1.39 is what

7    we were focused on.

8    Q.   What did you find in examining the defendant's computer?

9    Were there multiple types of computer software installed on

10   it?

11   A.   In the process of going through and finding child

12   exploitation, one of the means of either receiving or sending

13   or distributing child exploitation, you could have

14   peer-to-peer.  And the one that we were kind of focused ones

15   with BitComet, but there were also a couple others, I think

16   Azureus.  I'm not sure if I'm pronouncing that correctly.  But

17   BitComet, Azureus, and uTorrent were some of those involved.

18           MS. LEONHARD:  For ease, there are several exhibits

19   I'm going to admit through Detective Viergutz.  Can I approach

20   with all of them?

21           THE COURT:  Sure.

22           MS. LEONHARD:  Great.  Thank you.

23   BY MS. LEONHARD:

24   Q.   Detective Viergutz, I just handed you sort of a stack of

25   exhibits, and I'm going to walk through each one, what they

1    are and how you know what they are.  A number of these

2    exhibits, you made at my request, correct?

3    A.   That is correct.

4    Q.   And sort of just in summary fashion, many of the exhibits

5    that we're going to talk about and look at today are things

6    that were extracted or taken from the defendant's computer or

7    other parts of your forensic report prepared, correct?

8    A.   That is correct.

9    Q.   So let's start with -- we'll go in sequential order.  Can

10   you look at what's been marked for identification as

11   Government's Exhibit 6.

12   A.   Okay.

13   Q.   Does that disk contain the files from the defendant's

14   computer that were downloaded on May 5th -- excuse me,

15   May 15th, 2016?

16   A.   It does.

17   Q.   Do you know that because your handwriting is actually on

18   that?

19   A.   It is.

20   Q.   Okay.  And just sort of as a practical matter, those

21   files and some of the files that we're going to look at are

22   child pornography, correct?

23   A.   They are.

24   Q.   So it's contraband, cannot be -- it can't be sort of

25   dealt with like typical types of evidence; is that right?

1    A.   That's correct.

2             THE COURT:  Ladies and gentlemen, I'll just tell you

3    as a matter of law, you don't really need to know the statute,

4    but 18, U.S. Code, Section 3509(m) is the section that talks

5    about child pornography not being able to be reproduced

6    legally in any form.

7         So that's why you heard earlier, I think today or

8    yesterday, that Mr. Eckes and his consultant had to go to

9    Frankfort to review the evidence because it can't be just

10   reproduced and sent to a disk because that would be the

11   redistribution of child pornography.

12        So as a matter of law, that's why it's treated

13   differently.

14        So go ahead.

15        Any objection to that?  I just thought they might --

16            MR. ECKES:  No, Your Honor.

17            THE COURT:  -- care to know that.

18   BY MS. LEONHARD:

19   Q.   You made Government's Exhibit 6, correct?

20   A.   That is correct.

21   Q.   Let's move on to what's been marked for identification as

22   Government's Exhibit 7.  Does that particular CD contain the

23   files from the defendant's computer that were downloaded on

24   June 12, 2016?

25   A.   It does.

1    Q.   Again, do you recognize that because it bears your own

2    handwriting?

3    A.   It does.

4    Q.   Let's move on to what's been marked as Government's

5    Exhibit 8.

6             THE COURT:   These are all CDs?

7             THE WITNESS:   I believe they're CDs, DVD, and maybe a

8    BluRay disk in there.

9    BY MS. LEONHARD:

10   Q.   Does that contain all the files of child pornography that

11   were extracted from the defendant's computer after you

12   examined it?

13   A.   They were child exploitation.  They appear to be child

14   exploitation, but we don't want to necessarily want call them

15   child pornography unless there's a CMEC report that goes with

16   it.  But most of the majority of the files, if not all of

17   them, were what appear to be child exploitation.

18   Q.   Can you look at what's been marked for identification as

19   Government's Exhibit 9.  Is that a disk that contains a

20   spreadsheet, sort of a large spreadsheet that contains all of

21   the information about all of those files that were -- that are

22   on Government's Exhibit 8?

23   A.   That is correct.

24   Q.   Let's move on to Government's Exhibit 10.  That should be

25   one disk that bears two exhibit stickers, Government's

1    Exhibit 10A and 10B.  Does that disk contain, as Government's

2    Exhibit 10A, a spreadsheet that was included in your forensic

3    report that details the BitComet My History on the defendant's

4    computer?

5    A.   That is correct.

6    Q.   And then does 10B, also on that same disk, does that

7    contain, again, another spreadsheet that was taken from your

8    forensic report that lists the BitComet My Shares?

9    A.   That is correct.

10   Q.   If I could have you take a look at what's been marked for

11   identification as Government's Exhibit 11.  Is that disk

12   labeled "FrostWire Spreadsheet"?

13   A.   It is.

14   Q.   Is that another sort of piece of your forensic report

15   that we've extracted to show to the jury?

16   A.   It was.

17   Q.   And what does it contain?

18   A.   It's my portion from the evidence finder.  I requested

19   Internet Evidence Finder to find information about torrents

20   and whatnot.  This is basically the aggregation of it put on

21   to a disk, into a fancy spreadsheet, I suppose.

22   Q.   I think those are all of the disks I handed you.  Are

23   there also hard copy exhibits that I handed you?

24   A.   Yes, ma'am.

25   Q.   Do you see Government's Exhibit 13?

1      Are those just some screenshots that you captured from

2   the defendant's computer showing some incoming torrent files?

3   A.   Yes, ma'am.

4   Q.   Again, that's something you created, correct?

5   A.   Derived from my forensic tool and placed into a format

6   which would be readable.

7   Q.   Okay.  Thank you.  And I think there should be one more,

8   Government's Exhibit 15.  Again, is that also just a

9   PowerPoint that we've sort of just printed out the slides that

10  show additional screenshots from the defendant's computer?

11  A.   Yes, ma'am, it is.

12  Q.   Okay.

13          THE COURT:  Is 12 not being admitted?

14          MS. LEONHARD:  Correct.  Your Honor, at this time I

15  would moved admission of Government's Exhibit 6, 7, 8, 9, 10A

16  and 10B, 11, 13, and 15.

17          THE COURT:  Any objection to that?

18          MR. ECKES:  No objection.

19          THE COURT:  Let them all be received.

20          MS. LEONHARD:  Your Honor, may I approach the witness

21  to retrieve the --

22          THE COURT:  You may.

23          MS. LEONHARD:  Thank you.

24  BY MS. LEONHARD:

25  Q.   Detective Viergutz, this might seem counterintuitive, but

1    I want to start sort of at the end and work backwards in terms

2    of what you found.

3        In examining the defendant's computer, did you find

4    approximately 200 images -- or 200 files, I should say, videos

5    and images that depict minors engaged in sexually explicit

6    conduct?

7    A.   I did.

8    Q.   And we'll take a look at some of those files in a minute,

9    but I think what I want to start with first is the spreadsheet

10   that was part of your forensic report that sort of just

11   provides all of not the images themselves, the information

12   about the files.  And that would be --

13              THE COURT:  9?

14              MS. LEONHARD:  Government's Exhibit 9.

15              THE COURT:  All right.  What we're looking at are

16   things you created; is that right?

17              THE WITNESS:  It's a derivative from the report I

18   created, yes.

19              THE COURT:  So the information in the spreadsheet is

20   from the forensic examination that you conducted of the

21   computer?

22              THE WITNESS:  Yes, Your Honor.

23              THE COURT:  All right.

24   BY MS. LEONHARD:

25   Q.   So Detective Viergutz, what I want to do, with Special

1    Agent Kidd's help, is sort of just go across what all the
2    columns on this spreadsheet, what they show.
3        So let's just start over here with column A.  What does
4    "binary copies" mean?
5    A.   Basically, a copy of the exact file.  Basically, if
6    there's one binary copy, that one position.  If it's two, it's
7    the same exact file with the same hash value.
8    Q.   So if there's a 2, does that mean there were duplicate
9    files?
10   A.   Yes.
11   Q.   Okay.  Good enough.
12       Column B, "created date," what does that denote?
13   A.   Created date is indicative of when the file actually is
14   placed on that volume or on that service or that media.
15   That's when it was created for that computer.
16   Q.   Column C is labeled "deleted?".  What were you -- what
17   does that column mean?
18   A.   Interpretation of deleted is, in the generic sense, it's
19   what's been put in the recycle bin.  It's something that's
20   been deleted.  If it's still available for the user, it can be
21   retrieved out of the recycle bin.  So deleted is deleted.
22   It's not considered part of the computer yet.  It's just still
23   in the recycle bin.
24   Q.   Okay.
25            THE COURT:  Would that have required an affirmative

1    act to delete it?

2            THE WITNESS:  It usually would -- yes, it would

3    involve an action of the user to right click and delete or

4    throw it in the trash bin.

5            THE COURT:  Okay.

6    BY MS. LEONHARD:

7    Q.  Let's move over then to column D, which is the directory

8    path.  What does all that information tell us?

9    A.  The directory path, basically the path at which --

10   that's where the evidence files were located.  When you see

11   Exhibit 2, that's just the name of the -- that forensic copy

12   of this hard drive that's right here, .eo1 is the format.

13   That's what it's in.

14       OS is the operating system.

15       NTFS, just the file format that's -- or the file table

16   that's being used or typed.

17       And then we have the path that you would normally see on

18   your computer.  Like the Users\Sherry\AppData, these are

19   basically folders within the folders that contains the data

20   that applies to the investigation.

21   Q.  Okay.

22   A.  Or the examination, excuse me.

23   Q.  So that sort of introductory part of the directory path,

24   the Exhibit_2.e01\OS, and the rest of that, that's going to be

25   the same for all of these because all of these images were

1    lifted off of Government's Exhibit 1, which was the Dell

2    laptop, correct?

3    A.   That is correct.

4    Q.   What won't be the same is the remainder of the directory

5    path, which is the indicative of where you found these

6    particular files?

7    A.   That's correct.

8    Q.   So can we just scroll down just a little bit and see some

9    of the rest of those directory paths?  So we see at this point

10   that several -- tell the jury some of the directory paths

11   where these files were saved.

12   A.   The file path that's mainly out here is the Users\Sherry.

13   So let's say if there was another user on the computer, like

14   you may have other people in your house that may log on,

15   that's going to be a different user.

16        So, in this case, we're focused on the Sherry profile.

17   Once you go into that profile, Sherry has her own downloads

18   location.  Within that downloads folder, she may have another

19   folder or even another directory of data that she has put

20   there or whoever the user is has put there.

21        And this goes on.  These are basically the directories,

22   the folders.  They're not the files themselves.  As we move

23   over, you're going to see the file name.

24   Q.   Very good.  Right now, what we're focusing on is the

25   directory where the files were found.  We do see a couple of

1    instances where the file directory is not the

2    Users\Sherry\Downloads folder but, instead, it's the recycle

3    bin, correct?

4    A.    Correct.  If a user has possibly maybe downloaded it and

5    then discarded it or put it in the recycle bin, it could be

6    there.  Or if the whole folder was deleted before, then it

7    would also possibly be in the recycle bin.

8    Q.    Okay.  Can we go down a little further in that particular

9    column.

10        Now, as we start with row number 48, continuing down to

11   row 56, we see a different directory path, correct?

12   A.    That's correct.

13   Q.    And what is this one?

14   A.    Sherry\AppData\Roaming\AppleComputer\MobileSync\Backup,

15   and then a series of letters or numbers.

16   Q.    Okay.

17   A.    And --

18   Q.    Go ahead.

19   A.    To describe that, early in the iOS time frame, like when

20   iPods first came out or iPod and Apple devices, if you plugged

21   your device into your computer, it automatically was assuming

22   that you wanted to back it up.

23        Sometimes, whether you told it to or not, sometimes it

24   would still back it up and put that backup there.  So it's a

25   way of safeguarding your data for you, and that appears that's

1  what those file paths are.

2  Q.   Okay.  We can go down a little bit further in that

3  particular column.  Again we see the Users\Sherry\Downloads\

4  WebCollection.  Then it looks like item 66 through 68, there's

5  a different file path, correct?

6  A.   Correct.

7  Q.   What is that?

8  A.   This would be more so at the root of C or not so much

9  focused on your profile or within that profile, but it may be

10 available for others that may use the computer.  But it's at

11 the C drive.

12      So, basically, the folder of the C drive, there's a

13 downloads folder, and that's where web video collection,

14 HJKI\preteen, that's where that folder had resided.

15 Q.   If we scroll down further, is that a similar file path

16 for rows 82 through 93?

17           THE COURT:  The rows are kind of off.

18      (Off-the-record discussion.)

19 Q.   In the middle of the screen we're looking at now, do you

20 see a similar file path to the one you just described?

21 A.   Yes, ma'am.

22 Q.   What is that?

23 A.   Downloads\newfolder\Vine\V20\V20\dawhorenextdoor_0976.

24 Q.   That file path, is that similar to the one that you just

25 described?  Based upon that information, does it look like the

1   root was the C drive of the computer?

2   A.   Can you rephrase that?

3   Q.   The files we looked at previously had a different file

4   path.  It was a straight download?

5   A.   That's correct, from the downloads folder to the root of

6   C at the beginning of the C drive.

7   Q.   Is that similar for this group of files as well?

8   A.   Yes, ma'am.

9   Q.   In this case, it went to the root of C and downloads, but

10  a new folder was created; is that right?

11  A.   Correct.

12  Q.   Let's scroll down a little bit further to check out some

13  of the other file paths.  Let's start beginning at row 105,

14  sort of the second half of that screen.

15  A.   Downloads\cpack1_newfag_happiness\bibigon.

16  Q.   Okay.  And, again, does that file path, is that similar

17  to the one we previously just looked at that would lead you to

18  believe that it came from the root of C, the C drive?

19  A.   Yes, ma'am.

20  Q.   Let's go down a little bit further.  Again, we see more

21  files that have the files that have the Users\Sherry\AppData.

22  That looks different, though, that file path, doesn't it?

23  A.   It does.  On, for example -- I'm guessing it's 119.  I

24  only see a 19.

25  Q.   Correct.

1    A.   Scrolling over, about halfway through,

2    Users\Sherry\AppData\Local\Microsoftwindowstemporaryinternet

3    files\content.  That usually would indicate that as you're

4    surfing the internet, a lot of these files get cached as far

5    as they get brought down and placed in your computer

6    temporarily so if you get brought back to that page, it will

7    load faster.  So that's usually what temporary internet files

8    will do for you.

9    Q.   Very good.  Scroll down a little bit further just to see

10   if there's any other file paths.  Again, it looks like all

11   these are downloads on the C drive, correct?

12   A.   That is correct.

13   Q.   Okay.  Let's talk about the last -- excuse me, sorry.

14        If we can start right there, let's talk about entries 193

15   through 203.  192 or 198 in particular, those have yet another

16   different file path, the Users\Sherry\Pictures.  Do you see

17   that?

18   A.   Yes, under basically users and then the profile, the

19   Users\Sherry, and then pictures.  So basically, it would be a

20   folder within the Sherry's profile directly.

21   Q.   So that's different than the Users\Sherry\Downloads,

22   correct?

23   A.   That's correct.

24   Q.   Right underneath that, we have entries 199 -- rows 199 to

25   203, and those have yet another different directory path.

1   What can you tell us about this?

2   A.    The file path, v:\16-0163_Cooper\Ex2_carved_index_files.

3   Part of the process of a usual examination, after you've

4   looked for your logical images or pictures or videos that are

5   already on the computer, you may carve for deleted stuff.

6        And to get -- to be clear about the carved, if you put

7   something in the recycle bin and you empty the recycle bin,

8   that's when it's no longer available for the user.  They don't

9   actually possess it anymore.  It would take an advanced tool

10  to probably get it back for them or maybe even a restore of

11  the system.

12       But so it's actually been deleted, put in the recycle

13  bin, and then the recycle bin is emptied.  With the forensic

14  tool, I can carve.  I can look for pictures that were there at

15  one point in time.  With various pointers, I'm able to carve

16  out a picture of what used to be there.

17  Q.    Very good.  Thank you.  Let's go down a little bit

18  further to see if there's any other directory paths.  And

19  again, we see a couple more that have the directory path of

20  Sherry\downloads\webvideocollection.

21       Can we scroll over to the next column, column E.  Again,

22  this is just more information about the files that were found

23  on Government's Exhibit 1.  What does column E tell you?

24  A.    The file name of each of the files within those

25  directories.

1    Q.   Okay.  And let's just start with the first entry

2    underneath file name, which is a long series of numbers ending

3    in -- long series of letters and numbers ending with the

4    extension .zcat.  What kind of file is that?

5    A.   A file that's been determined as potential child

6    exploitation.

7         I don't know if you can change that, the resolution, so I

8    can see more of the data.  Just within that directory, right?

9    Q.   That's okay.  Let just look at some of those file names.

10   We can scroll down just a little bit.  Where do you get these

11   file names from?

12   A.   File names are determined by whatever is provided to it.

13   If it's a file that's been transferred or downloaded from the

14   internet, it may already possess a file name, but a user can

15   rename it to something else.

16   Q.   All right.  Let's start with row number 15.  What is the

17   file name for that particular file?

18   A.   In parenthesis, you have "pthc," and then close

19   parenthesis "kelly8yo-sucking&trying fuck.avi."

20   Q.   What about the file name directly beneath it?

21   A.   Parenthesis "pthc," close paren.  In parenthesis,

22   "hussyfan."  And then in parenthesis, "kingpass,"

23   k-i-n-g-p-a-s-s.  And then in parenthesis "Vicky," V-i-c-k-y,

24   and then open parens Lord of -- let me spell that.

25   L-o-r-d-o-f-t-h-e-r-i.mpg.

1    Q.   In all the times you've been doing these types of

2    investigations, are you familiar with the acronym PTHC?

3    A.   I am.

4    Q.   What does it stand for?

5    A.   PTHC most commonly is known as preteen hard core.

6    Q.   And do we see that acronym repeated again on --

7    A.   It's in a number of files.

8    Q.   Row number 19, for example, contains the same acronym?

9    A.   Yes.

10   Q.   Row number 20 contains the same acronym, correct?

11   A.   It is.

12   Q.   What about row number 22.  What's the file name of that

13   file?

14   A.   In parenthesis, "pthc_kim8yobj.avi."

15   Q.   The file directly under that, what's the file name?

16   A.   "Seebaby 7-3yogirleatcum(2M44S).mpg."

17   Q.   What about the file name for row 25?

18   A.   "(Kleuterkutje)4yo_Ashley_sucks_&_swallows.mpg."

19   Q.   We'll scroll down a little bit further.  We see that

20   acronym, PTHC, repeated a number of times, a number of times

21   in the file names for these files, correct?

22   A.   That's correct.

23   Q.   Also, when you see, not only as a forensic examiner, when

24   you were a detective doing these types of cases, when you see

25   the letters "yo" or "yr" preceded or followed by a number,

1   does that usually mean?

2   A.   Indicating an age.  Like one example, line 42,

3   "pthc_ptsc," for preteen soft core, and then a space

4   "Jenny_9yo," for 9 years old, "daughteraskingforcum,

5   nude.avi."

6   Q.   Go down just a little bit further.  Are you also

7   familiar, based upon your training and experience doing these

8   types of cases, sometimes do the file names contain the names

9   of the victims, the minors who are depicted in the images?

10  A.   Sometimes they can.  Often, they do, on known series.

11  Vicky and Tara are two that were located in this particular

12  examination.

13  Q.   And those are series of files that have been determined

14  to be known child pornography, correct?

15  A.   That is correct.

16  Q.   All right.  I think we can move on from the file names.

17  What else does this spreadsheet tell us if we go over and look

18  at the rest of the columns?  What other information did you --

19  did you report detail about these particular files?

20  A.   Well, we have file size, just determining what size it

21  is, and the hash value, just kind of for comparison purposes.

22  If it's an exact copy, that would be helpful.  And also last

23  access, and then visual copies.

24       Now, the difference between a visual copy and a binary

25  copy, visual, they look the same but they have actually

1    different hash value.  They can be like a different size or

2    the color may be messed with or something and called it a

3    different MD5 hash.

4    Q.   What does "last accessed" mean to you as a forensic

5    examiner?

6    A.   The last time that that file was actually accessed.  It

7    could have been clicked and looked at.  It wouldn't have been

8    changed.  It's just a matter of it's been accessed.

9    Q.   Now why, for some of these files, the first ones in

10   particular -- I think these are sorted by date.  Why do we

11   have a last accessed date of January 1, 1970?

12   A.   Unfortunately, with some computer forensics, if it's

13   given a value that the computer doesn't understand, it will

14   put it back to what sometimes computer people refer to

15   beginning of time.  Not really the beginning of time, but in

16   computer thinking, January 1, 1970 is when the clocks actually

17   started for the purposes of the computers.

18   Q.   Very good.  I think we can finish with that particular

19   exhibit.  Let's go ahead and look at Government's Exhibit 9,

20   which are the actual -- excuse me, 8, which are the actual

21   files that were found on the defendant's computer.

22        Now, you created this disk, correct?

23   A.   That is correct.

24   Q.   Did you sort them by pictures and videos?

25   A.   I did.

1    Q.   Let's go ahead, and we'll start with some of the

2    pictures, and we'll just start with the second one.  What does

3    it look like is being depicted in that?  That looks to be a

4    compilation of images; is that correct?

5    A.   That is correct.  Also, a collage of what appears to be a

6    minor female with an adult male member.

7    Q.   Okay.  Let's move on to what does the next --

8    A.   The name of the collage or collection of pictures, "anal

9    girl man PTHC sound Tara.mp4."  This is more than likely an

10   example of what a video is going to be if you were to download

11   the video.  Gives you other specs on top as far as the size of

12   the video and the length of the video.

13   Q.   Okay.  What's depicted in this again looks to be like a

14   compilation of images.

15   A.   It is another compilation.  The name on the upper left,

16   "analfalkogirlmanoralpthcsoundteach_me_to_fuck toys.wmv."  And

17   then more particular stuff about the video underneath that.

18   Q.   Again, does that appear to be screenshots in terms of

19   still images that were lifted from a video?

20   A.   Correct.  A prepubescent female, appears to be, and a

21   male penis engaged in oral sex.

22   Q.   Okay.  We'll just do one more.  What is the file name,

23   and what is depicted in this particular file?

24   A.   Also a collage or collection of the snippets of a video.

25   Name on the caption, upper left corner, "cumshot falko girl

1    man pthc.wmv."  And then particulars about the video, 38

2    megabytes and how long.  The pictures are a minor female,

3    prepubescent female and an adult male penis engaged with

4    possibly oral sex.  Kind of a blurry photo.

5    Q.   Okay.  I think that's all we'll go through for that.

6         Detective Couchman, so that spreadsheet that we looked at

7    and those pictures and videos, that's sort of the sum total of

8    what you found on the defendant's computer, correct?

9    A.   That's correct.

10   Q.   So let's talk specifically about what you said you tried

11   to do as part of your forensic exam if you do locate images of

12   these type.  You want to try to find out where they came from

13   and where did they go, right?

14   A.   That's correct.

15   Q.   In this case, as part of your forensic exam, did you

16   determine whether any images of this type were downloaded and

17   received on the defendant's computer?

18   A.   We were able to determine that basically through the

19   downloads folder.

20   Q.   Okay.

21   A.   And through the BitComet application.

22   Q.   Okay.  So let's talk about that.  Should be Government's

23   Exhibits 6 and 7.  Let's just start with Government's

24   Exhibit 6.

25        And how many -- there are 13 items in this particular

1   folder, correct?

2   A.   That is correct.

3   Q.   So does that mean that 13 items were downloaded on the

4   defendant's computer on that day?

5   A.   That have been collected for this purpose.

6   Q.   Okay.  Let's just go ahead and look at the first one.

7   What is the file name of this particular file?

8   A.   In the upper left corner, the name on the file or the

9   caption on the file is "bibigoncumshot girl man oral pthc

10  vidforlast4min.mp4."

11  Q.   Okay.  We can close that out.  The downloads you were

12  able to find from the defendant's computer on May 5, 2016,

13  were all of those files found -- were they all found within

14  one torrent file?

15  A.   I'd have to look at the spreadsheet to say for sure on

16  that.

17  Q.   Okay.

18  A.   But I don't know if you have that available.  Sorry.

19  Q.   Yeah, we can actually pull Government's Exhibit --

20            THE COURT:  9.

21            MS. LEONHARD:  Yes, thank you.

22  BY MS. LEONHARD:

23  Q.   Government's Exhibit 9 back up.  This is sorted by date

24  so if we scroll up to the day we're talking about, which is

25  May 15 of 2016 --

1          THE COURT:  Is that column, if you go to the top, is

2    that the date last accessed?  Is that what that is?

3          Created date, okay.  Thank you.

4    BY MS. LEONHARD:

5    Q.  Again, what does that mean to you as a forensic examiner?

6    A.  When it was basically written to that computer, when it

7    landed on that computer.

8    Q.  For that particular date that we're talking about those

9    13 files that we just looked at, is that them?

10   A.  That is correct.

11   Q.  And first question, were those files still on the

12   computer when you did your forensic exam?

13   A.  They were.

14   Q.  So they were not deleted?

15   A.  That is correct.

16   Q.  And I think the initial question that triggered bringing

17   this spreadsheet back up, were you able to tell, were these 13

18   files all contained within one torrent file?

19   A.  They do appear to be within the one torrent file, yes.

20   Q.  And based upon your forensic examination, do you have an

21   opinion about whether the files were downloaded to the

22   defendant's computer via use of the internet?

23   A.  More than likely, that would be the case to get on to

24   that computer.

25   Q.  Is the use of -- to get a torrent file, you have to use

1    the BitTorrent network, which is peer-to-peer software, which

2    requires internet, correct?

3    A.   That is correct.

4    Q.   Let's talk about Government's Exhibit 7, which is -- were

5    you able to find additional evidence of additional downloads

6    to the defendant's computer on a different day?

7    A.   We were.

8    Q.   What date was that?

9    A.   I believe June the 12th.

10   Q.   Okay.  June 12, 2016?

11   A.   2016, yes.

12   Q.   And are these the files that were downloaded to the

13   defendant's computer on that day?

14   A.   Yes.

15   Q.   And this time we have, looks like, 42 items; is that

16   right?

17   A.   That is correct.

18   Q.   Let's go ahead and look at the first one.  What is the

19   file name for this particular file?

20   A.   Can I give you the caption instead of the file name?

21   Q.   Sure.

22   A.   "Bibigon girl lesbian man oral pthc sound vid6cut1.avi."

23   Q.   And what's depicted in that particular image?

24   A.   Prepubescent female engaged in oral sex with an adult

25   male.

1    Q.   I think that's all we have to look at in those particular

2    files.  Can we toggle back to the spreadsheet just to get some

3    more details about those files.  There were 42 files

4    downloaded on that day, correct?

5    A.   That is correct.  Well, within the child exploitation

6    process of that.

7    Q.   Thank you for the clarification.  So we see that starting

8    here with the created date, all of those files --

9    A.   That is correct.

10   Q.   -- landed on, as you would say, landed on the defendant's

11   computer on that date, correct?

12   A.   Yes, ma'am.

13   Q.   And some of these file names look similar to the files

14   that were downloaded on May 15; is that correct?

15   A.   Yes.

16   Q.   But we have additional ones as well, right?

17   A.   We do have additional ones.  This is more than likely the

18   part of the -- within the torrent, there are additional files

19   that may not have been opened.  Torrent, as we know with the

20   cat/fish analogy or what have you, contains a lot of other

21   files.

22        There are also, within that torrent, there can be another

23   dot-zip, a zip file that contains more files that had been

24   opened in this one which were not prior to.

25   Q.   So the downloads that occurred on June 12th of 2016, some

1   of them are the same files that were downloaded on May 15,

2   correct?

3   A.   That is correct.

4   Q.   But we have some additional ones as well; is that right?

5   A.   That is correct.

6   Q.   Can we scoot over just a little bit and see -- you

7   referenced -- we have here some additional zip files.  What

8   are zip files?

9   A.   Basically, one file that contains other files that uses a

10  little bit of compression in there as well just to make it

11  easier for transporting or moving across the internet.

12  Q.   Okay.  And I think the disk that had all the images from

13  that particular day, there were 42 different files that were

14  downloaded to the defendant's computer on June 12, 2016,

15  correct?

16  A.   That's correct.

17  Q.   Okay.  So it looks like, and correct me if I'm wrong, was

18  part of the same torrent file downloaded on June 12th as was

19  downloaded previously on May 15?

20  A.   It appears that, or maybe not all of it was opened at the

21  same time.

22  Q.   Can we move down a little bit further and look at some of

23  the other files that were downloaded that day?

24       Detective Viergutz, these files that I've highlighted

25  that end with the extension "rar," what are those?

1   A.   Rar is similar to like zip files.  It's basically more

2   files contained -- a bunch of files contained within one file.

3   Just another way of doing like a zip type thing.

4   Q.   Very good.  And all of these files that were downloaded

5   to the defendant's computer on June 12 of 2016, were they done

6   in much the same way as the previous ones?

7   A.   Yes, ma'am.

8   Q.   Via use of the internet?

9   A.   Yes, ma'am.

10  Q.   All of these files still resided on the defendant's

11  computer at the time you did your forensic exam, correct?

12  A.   That is correct.

13  Q.   All right.  I think that's all we have for that.

14       So let's move into some of the things that you found when

15  you examined the BitComet software on the defendant's

16  computer.  Was that one place that you were particularly

17  interested in when you were doing your exam?

18  A.   Per the request of the case agent, Detective Cooper, the

19  four files that we were focused on or that started the

20  investigation was using BitComet.  Therefore, I wanted to kind

21  of zoom in on that.

22  Q.   Okay.  Great.  So let's go ahead and move to Government's

23  Exhibits 10A and 10B, which is the My History and the My

24  Shares that you were able to pull from the BitComet that was

25  installed on the defendant's computer.

1      Again, is this another spreadsheet that was prepared as

2   part of your forensic report?

3   A.   This spreadsheet was included in my forensic report but

4   not generated by me.  It was actually created by BitComet.  So

5   it's a file that actually BitComet generates by itself.

6   Q.   So BitComet actually generated this file, but you were

7   able to extract it or access it?

8   A.   Extract it off it.  It was, I believe, in an Excel

9   format, an xls.

10  Q.   Let's go to -- explain to the jury what this spreadsheet

11  shows.

12  A.   Well, on the second line down, it's just -- there's the

13  captions to the spreadsheet columns, and then it has just

14  particulars that may -- that are basically information about

15  this version of BitComet and the user's input to it or the

16  user's interaction with it.

17  Q.   Okay.

18  A.   For example, in column C, the third one over,

19  MyHistory/bt/ -- BitTorrent -- @addtime.  Now, that number

20  right there is actually a time, but I didn't change it.  It's

21  actually epoch time.  And those are -- if I'm correct, it's

22  the number of seconds since January 1st, 1970.  And if you

23  added up all those seconds and did the mathematical

24  calculation, it would give you an actual date and time.

25  Q.   Okay.  Very good.

1          THE COURT:  You would think that someone who would

2     create something like this would make it a little more user

3     friendly.

4          THE WITNESS:  You would hope so, Your Honor.

5          THE COURT:  Without a calculator.  Thank you.

6     BY MS. LEONHARD:

7     Q.   Does that same principle apply to column E, which is /My

8     History/bt/@createtime?

9     A.   That's correct.

10    Q.   So, again, those numbers are expressing a date, just in

11    epoch time?

12    A.   Time and date, yes.

13    Q.   And epoch is not e-p-i-c.  It's a different acronym,

14    correct?

15    A.   Some people say epoch.  E-p-o-c-h time.

16    Q.   What does it tell us about the files that were in the

17    BitComet My History folder?

18    A.   Just describes what the file was, whether it be a video,

19    a picture, or possibly even software.

20    Q.   Very good.  Let's scroll over.  What does column F show?

21    A.   The hash value for the file that's being referenced in

22    the earlier columns.

23    Q.   So BitComet is actually keeping a record or a log of the

24    hash file for the particular file that has been downloaded to

25    the defendant's computer via BitComet?

1    A.   That does appear to be the case.

2    Q.   Okay.  Scroll over a little bit further.  What does

3    column G show you?

4    A.   My History/Bt, or BitTorrent, and then @private.  I don't

5    know what the @private is.  There is one that indicates it's

6    true.  As opposed to being kept private, maybe it's a possible

7    download they want to retain but not make public.  I would

8    have to infer that.  I don't know for a fact.

9    Q.   Let's go over and check out column H.  What does column H

10   tell you?

11   A.   The /My History/bt -- for BitTorrent -- @save path.  This

12   is where these files were saved to upon receipt through the

13   BitTorrent network.

14   Q.   If we go down, at least the first few we look at, the

15   path is the same, it's the C drive downloads folder, correct?

16   A.   That is correct.

17   Q.   Can we scroll down a little bit further?  It appears that

18   the c:\downloads folder is where all these files were

19   downloaded, correct?

20   A.   These files in particular.

21   Q.   Okay.  Very good.  Let's see.  Is there any other

22   information -- are there any other columns?  What does

23   column I tell us?

24   A.   The size of the file that's being referenced earlier on.

25   Q.   Okay.  What does column J tell us?

1    A.   @task.  It's My History/bt -- for BitTorrent --

2    @task_finished.  I'd have to infer that it did finish the

3    download of that file with the earlier information as far as

4    the time and date.

5    Q.   Okay.  We can just scroll down just a little bit to look

6    at some of the other -- where some of these tasks that were

7    finished.

8        So we see the note true, meaning, I guess, the inference

9    that the task was indeed finished.

10       Can we scroll down a little bit further?

11       We can stop there.

12       I want to talk specifically about that one, the one on

13   line 40.  Based upon your training and experience and --

14   training and experience doing these types of investigations,

15   are you familiar with files with the words "siberian mouse" in

16   them?

17   A.   I have run into a number of child exploitation or

18   exploitive files where siberian mouse is referenced, almost

19   like a pthc or pd or pedo.  I'm not sure what the siberian

20   mouse stands for, but it's usually indicative or related to

21   the child exploitation side.

22   Q.   What's the rest of the file name?

23   A.   "Siberianmouse-Tonya 13 old - blowjob.wmv."

24   Q.   If we could go down a little further, ask you about web

25   video collection.  Are you also familiar with that particular

1  file name?

2  A.   I am familiar with that primarily just from this

3  examination.  That's where a number of the videos that were

4  referenced in the -- I want to say receipt.  It may have just

5  been on the possession.  Within that collection, the total of

6  it.

7  Q.   And, again, we see more siberian mouse.  Go down a little

8  bit further.  Are these -- I'm assuming this is column K.  Are

9  those the file names?

10  A.   Yes.

11  Q.   Okay.  And those are the names of all the files that were

12  within the My History folder in BitComet?

13  A.   I think actually it may be directories, just by on

14  row 86, or it might be 186.  MMM1, I believe that was a folder

15  located.  And further up, there was also another folder that's

16  in reference.  So a lot of those are files or videos, per se,

17  but I believe they also may be a directory or another folder

18  itself.

19  Q.   Okay.  Detective Viergutz, was there a similar

20  spreadsheet you were able to pull from the defendant's

21  computer from the BitComet that shows his My Shares?

22  A.   That's correct.

23  Q.   Let's go ahead and take a look at that.

24           THE COURT:  12B?

25           MS. LEONHARD:  10B.

1      THE COURT:   10B, excuse me.

2   BY MS. LEONHARD:

3   Q.   Is that what this spreadsheet depicts?

4   A.   That's correct.

5   Q.   It has a lot of the same columns as the prior

6   spreadsheet; is that right?

7   A.   It does.  It references the time, create time and

8   category.

9   Q.   Okay.  If we can go over a little bit further, again,

10  column E shows the hash value for the file being shared?

11  A.   That's correct.

12  Q.   Column F shows the path that the file was saved to; is

13  that right?

14  A.   That is correct.

15  Q.   What does column G tell us?  Column G just tells us the

16  size of the file; is that right?

17  A.   Correct.

18  Q.   What does column H tell us?

19  A.   The description of the column itself

20  /MyShares/bt/@task_finished, and then a number of columns have

21  a true value.

22  Q.   Okay.  And then does the final column just show the title

23  of the file?

24  A.   Appear to be the title of the file or the data --

25  Q.   Okay.

1   A.   -- that's being referenced.

2   Q.   Okay.  Can we scroll down to see what some of the file

3   names are?

4        So, again, Detective Viergutz, these files, this

5   information was pulled from the BitComet My Shares folder on

6   the defendant's computer; is that correct?

7   A.   That is correct.

8   Q.   Let's go ahead and move to Government's Exhibit 11.  As

9   part of your investigation, you were focused in on

10  peer-to-peer software, correct?

11  A.   That is correct.

12  Q.   And we've gone through the information that you were able

13  to pull from the BitComet client on the defendant's computer.

14  Were you also able to pull -- or did you create a section in

15  your report that was labeled FrostWire?

16  A.   I did.

17  Q.   And what was that -- what was contained in that part of

18  your report?

19  A.   The FrostWire, the portion of the report that you're

20  talking about was an excerpt from IEF or Internet Evidence

21  Finder.  Basically, I'm requesting information for IEF to seek

22  out any information about BitTorrent or any kind of torrent

23  utilities.  It did locate -- it identified it as FrostWire,

24  and basically searches for references within FrostWire or

25  within that application that may describe the torrents that

1  are located.

2  Q.  And we'll conclude with you just, to assist the jury and

3  sort of move through this a little bit quickly, did you pull

4  some -- that FrostWire spreadsheet in your report was pretty

5  voluminous, correct?

6  A.  That's correct.

7  Q.  And the whole thing has been admitted as evidence for the

8  jury to consider, but did you pull just basically, to assist

9  in the review of the evidence here in court today, did you

10  pull some screenshots from that?

11  A.  I did.

12  Q.  From that spreadsheet?

13  A.  I did.

14  Q.  Okay.  We'll look at that at the end of your testimony.

15      Likewise, did you also pull some screenshots just from

16  the defendant's computer about how it showed how the folders

17  specifically, the file share -- the PTP folders were set up?

18  A.  Correct.

19  Q.  What I first want to start with, I want to publish what's

20  been previously admitted as Government's Exhibit 13.  This

21  is -- again, we're going surprisingly low tech, but this was

22  essentially a screenshot that you grabbed from the defendant's

23  computer, correct?

24  A.  That is correct.

25  Q.  And then you put it in the form of a PowerPoint that I

1   expertly printed.

2        What were these screenshots that you grabbed?

3   A.   Well, the upper left portion of the screen, you'll

4   actually see the directory that you would normally see if

5   you're on a Windows machine.  You'll have a directory in your

6   explorer, like file explorer.  I purposely was going and

7   selecting the Users\Sherry\AppData\Roaming.  In this

8   particular case, another file sharing program for Azureus,

9   A-z-u-r-e-u-s, I believe, and then torrents.  These were the

10  torrents that were located within that application or that

11  AppData.

12       The cloaked-in version or the really part that's hard to

13  read is basically the contents of that torrent, all the files

14  that are within that torrent.  So I copied and kind of blew it

15  up for the lower portion of this exhibit or slide so it would

16  be a little bit easier to read.  And it just gives you some

17  file names or the contents of what that torrent is going to

18  have within it.

19  Q.   And that was an incoming torrent file that was incoming

20  to the Azureus\torrents folder, correct?

21  A.   Correct.

22  Q.   Did you do the same thing for BitComet?

23  A.   We did.  Or I did.

24  Q.   Okay.  And is that what this screenshot shows?

25  A.   It is.  The two selected files and the names of the files

1    are over on the right.  I think one was xxx6.2.torrent torrent

2    and the other one is CP.torrent.  Two other torrent files that

3    were referenced and then the contents of -- kind of looking,

4    but the application itself actually showed the user

5    potentially what's inside of that torrent file.

6    Q.   Okay.  And then did you also just grab some screenshots

7    that showed basically how the defendant's computer was

8    configured or set up?

9    A.   We did -- or I did, excuse me.  BitComet files.  And it's

10   not 455 sharing files.  It's actually a culmination of a lot

11   of files within folders.  It will be more clear here when we

12   go to the next slide.

13   Q.   Very good.  And what we're publishing is what's admitted

14   as Government's Exhibit 15.  So that first slide just showed

15   the entirety of that folder.

16   A.   Correct.  What actually is being shared within the

17   AppData\Roaming\BitComet share is approximately 200 files.

18   Q.   Okay.

19   A.   The torrent name is right there.

20   Q.   And, again, what does this show?

21   A.   The list of the torrent files that were available for

22   being shared within that directory.

23   Q.   Okay.  What's shown in that?

24   A.   Contents of a particular torrent itself.  So if you were

25   to get -- the contents of the torrent itself may contain these

1    items that we have listed here.

2    Q.   Did you also basically grab screenshots of the primary

3    places on computer where some of these images were located?

4    For example, the Users\Sherry\Downloads?

5    A.   That is correct.

6    Q.   Is that what this slide is depicting?

7    A.   A screenshot of how I see it through the forensic tool.

8    Users\Sherry\Downloads, and contents of the downloads folder.

9    Within the column of type, it shows if it's a movie, video,

10   picture, or another torrent.

11   Q.   Okay.  Very good.  I think one of the last things you did

12   in this case was just pull, like I said, just for ease of

13   reference, some screenshots with the FrostWire spreadsheet

14   that was part of your forensic report and some other items of

15   interest so let's go through those, if you don't mind, now.

16             THE COURT:  Is this 11?

17             MS. LEONHARD:  We're going to use these as

18   demonstrative aides, Judge.  The full spreadsheets have been

19   admitted.  These are pieces we're picking out to highlight.

20   BY MS. LEONHARD:

21   Q.   Detective Viergutz, what does this show?

22   A.   This is one of the reports that the Internet Evidence

23   Finder had basically generated from the scan of the suspect's

24   computer.

25             MR. ECKES:  Judge, may we approach?

1           THE COURT:  Very well.

2        (Sidebar conference.)

3           MR. ECKES:  What's up there right now is not from

4    FrostWire, the admitted exhibit.  This is slightly different.

5    This is from the parsed search queries from his actual report.

6           MS. LEONHARD:  That's true.

7           THE COURT:  Then clear that up, if it's something you

8    can testify the witness saw.

9           MR. ECKES:  He did rely on it for his opinion, and

10   I'm going to go over some of it too, but I want it to be clear

11   that it's not admitted, and the jury is not going to be able

12   to search for this and find it anywhere in their exhibits.

13          THE COURT:  Why don't you clear that up.

14          MS. LEONHARD:  I can.  Thank you.

15       (Sidebar concluded.)

16   BY MS. LEONHARD:

17   Q.   Detective Viergutz, I spoke -- the first slide we're

18   going to look at first, this was part of your report, your

19   forensic report.  Did you create -- did you extract what you

20   labeled to be parsed search queries?

21   A.   Yes, requested the Internet Evidence Finder, the tool

22   itself, to basically search for anything that the user may

23   have searched for within the computer.

24   Q.   And as part of your forensic report, were there pages and

25   pages of parsed search queries?

1    A.   There were a voluminous amount.  This was just a search

2    for -- within all of those results from Internet Evidence

3    Finder, there was a search for pedo, p-e-d-o.  And then what

4    had come back, we had just the three references from

5    August 2nd of 2015.

6    Q.   And to be clear, this was a search that you performed

7    within the parsed searching query -- parsed search queries in

8    your report?

9    A.   That's correct.

10            THE COURT:  What does that mean, the search term,

11   "pedo forums"?

12            THE WITNESS:  Not necessarily through -- most people

13   search through Google.  This search was actually conducted

14   through Bing, which is Microsoft's search engine.  So if I

15   wanted to know about the forums of pedo or of anything -- cat,

16   fish -- I could search within that, and that's what this would

17   be relevant for.

18            THE COURT:  So the date -- are you saying that based

19   upon your report, you found on that date, using this URL

20   bing.com --

21            THE WITNESS:  Correct.

22            THE COURT:  -- someone searched "pedo forums"?

23            THE WITNESS:  Correct.

24            THE COURT:  All right.  Thank you.

25   BY MS. LEONHARD:

1    Q.  Very good.  And to be clear -- never mind.  We'll go to

2    the next slide.

3         Why did you highlight this information from your forensic

4    report?

5    A.  The bulk of the child exploitation that was found within

6    the computer, most of it did land in the downloads folder,

7    which goes with -- if it was being captured or being brought

8    down through a torrent process, through the downloads, we'd

9    have seen that it had gone into the C -- the root of

10   c:\downloads folder or even within the profile of

11   Sherry_downloads or Sherry\downloads.

12        But what I've gotten on these, they're not in either one

13   of those.  They were actually located in a directory that was

14   not downloaded at all.

15        So given -- we're trying to show a user interaction,

16   which we -- the files themselves, they're probably not where

17   they came from initially.

18        We basically click -- I could see that these on

19   Sherry\Pictures, which was not the downloads folder, of

20   course, had occurred, and I just amplified the dates and times

21   which were generated for those particular files.

22   Q.  Based upon your training and experience in doing forensic

23   examinations and your review of the defendant's computer,

24   including the default settings that he had set up in his

25   BitComet, what does this tell you?  Do you have an opinion,

1   from a forensic examiner standpoint, about whether some

2   affirmative action was taken with respect to these files to

3   put them into this particular folder?

4           MR. ECKES:  Judge, objection.

5           THE COURT:  Overruled.

6           THE WITNESS:  It does -- it just does appear that

7   these files were purposely put there, as opposed to being

8   directly into the downloads folder by the default settings.

9   BY MS. LEONHARD:

10  Q.  Very good.  Let's go to the next slide, please, and we

11  can sort of zoom through these next -- the next few slides

12  show, just depict those seven files that were not

13  Sherry\Downloads or downloads folder, correct?

14  A.  That's correct.  There appear to be some collages, or

15  this is a standalone photograph.  But those appear to be a

16  collage of a video and has the name in the upper left.

17  Q.  And those were seven files that you found during your

18  forensic examination that were found in the

19  Users\Sherry\Pictures folder?

20  A.  That is correct.

21          MS. LEONHARD:  Your Honor, may I have one moment,

22  please?

23          THE COURT:  Very well.

24          MS. LEONHARD:  Can we pull up Government's

25  Exhibit 10B, please.

1    BY MS. LEONHARD:

2    Q.   Detective Viergutz, your forensic exam in this case

3    pretty much started with the four files that Detective

4    Couchman downloaded from the defendant's computer, correct?

5    A.   That is correct.

6    Q.   Were you able to find evidence of one or more of those

7    files in the BitComet My Shares?  And we've pulled up the My

8    Shares spreadsheet.  Does that same --

9    A.   It does appear that you have the OPVA on line 33 that

10   says "new pthc opva2014."  I don't recall specifically what

11   the four files were.  I believe there was mention of OPVA.

12   I'd have to see the report to say specifically.

13             MS. LEONHARD:  May I approach?

14             THE COURT:  You may.

15   BY MS. LEONHARD:

16   Q.   Detective Viergutz, these are the log details already

17   admitted into evidence from the downloads that were done by

18   Detective Couchman.

19        Show you page 5 of those log details.  Do you see the

20   name of one of the files that Detective Couchman downloaded

21   there?

22   A.   I do.

23   Q.   Is that the same file name at least that you found

24   evidence of in the defendant's BitComet My Shares folder?

25   A.   Can we bring the screen back up?  The name on the screen

1    or on the spreadsheet is "new pthc opva2014."  The name on the

2    file that referenced from Detective Couchman, "new pthc

3    opva2014."

4         And there's actually more on this one.  "Real father fuck

5    his 13 yo daughter in the basement.mpg."

6              MS. LEONHARD:  Your Honor, those are all the

7    questions I have for Detective Viergutz.

8              THE COURT:  Cross-examination.

9              MR. ECKES:  It will take a bit to set up.  I don't

10   know if now is a good time for a break.

11             THE COURT:  We'll take a five-minute break, ladies

12   and gentlemen.  Remember to heed the prior admonitions of the

13   Court.

14        (The jury exited the courtroom at 2:34 p.m.)

15             THE COURT:  Jury's left and Mr. Eckes has left so I

16   take it there's nothing to take up.

17        (Recess from 2:34 p.m. until 2:38 p.m.)

18             MR. ECKES:  Judge, if I can make a brief record on my

19   previous objection.

20             THE COURT:  Your previous objection?

21             MR. ECKES:  Detective Viergutz stated that opinion to

22   the reasonable degree of scientific certainty.

23             THE COURT:  Go ahead.

24             MR. ECKES:  Judge, I wanted to clarify what my

25   objection exactly is, and that's that I received a summary of

1  what Detective Viergutz would testify to, but at no point have

2  I received any Rule 16 disclosure that that specific opinion

3  was going to be offered that there's a folder on Mr. Moran's

4  machine that, to a reasonable degree of scientific certainty,

5  Detective Viergutz believes that files were purposely moved

6  there.

7  I believe I would be entitled to know that that opinion

8  was going to come into this trial because it's, one, subject

9  to a *Daubert* analysis, and it's a far more specific opinion

10  than the general summary of what his testimony was going to be

11  about.

12  THE COURT:  Would he have been able to say, since

13  it's not in a download file, it would have had to have been

14  moved?  I think a jury could have concluded that without his

15  testimony.  If it's not in the download file, by virtue of the

16  fact it's not there, it would have had to have been moved

17  somewhere by someone.

18  MR. ECKES:  I don't think that's true.

19  THE COURT:  Why not?

20  MR. ECKES:  Because I think things can be downloaded

21  to wherever.  They don't necessarily go to your downloads

22  folder.

23  THE COURT:  Ms. Leonhard?

24  MS. LEONHARD:  As it relates to the Rule 16

25  objection, the disclosure that the United States provided

1     indicated that Detective Viergutz would be testifying to the

2     entire contents of his forensic report.

3              THE COURT:  Was this something in his report?

4              MS. LEONHARD:  All the information about those files

5     was in the spreadsheet that was provided to defense counsel.

6              THE COURT:  Are you saying that every last item that

7     he needs to testify to has to be in a report, or he can't

8     testify to it?

9              MR. ECKES:  No.  I'm saying that if an expert is

10    going to testify to a very particular opinion to a reasonable

11    degree of scientific certainty, "I believe these files were

12    purposely put in this folder," that that needs to be disclosed

13    to me because that needs to be talked about with my expert.

14    That needs to be subject to a *Daubert* analysis that I need

15    time to prepare for that opinion if that specific opinion's

16    going to come in to this trial.

17             THE COURT:  It has come in.

18             MR. ECKES:  Well, after objection, it came in.  So

19    that is what my objection was, that I never was provided

20    anything about that specific opinion.  The first time I heard

21    it is today.

22             MS. LEONHARD:  Your Honor, I think what it came down

23    to is after going through -- Detective Viergutz, at

24    Mr. Eckes's request, went through all of the default settings

25    in the BitComet to show where, if you were just using the

1    default settings, where these items were downloaded using

2    peer-to-peer software would have went.

3            THE COURT:  These are items which are part of

4    exhibit --

5            MS. LEONHARD:  8.

6            THE COURT:  Exhibit 8, but also part of -- were they

7    also part of the --

8            MS. LEONHARD:  The spreadsheet.

9            THE COURT:  The spreadsheet and his --

10           (Indiscernible crosstalk.)

11           MS. LEONHARD:  -- themselves were on 9.

12           THE COURT:  9 is the spreadsheet detailing the files

13   on Exhibit 1?

14           MS. LEONHARD:  8 are the actual files.

15           THE COURT:  What's your response about this specific

16   opinion wasn't disclosed, and he keeps saying it would have

17   been subject to a *Daubert* analysis.  He has his consultant.

18   His consultant can certainly testify, if he'd like, this

19   afternoon, even though you indicated he would not.

20           MS. LEONHARD:  Your Honor, for some reason, I don't

21   have my expert disclosure letter.  But if Mr. Eckes does --

22           THE COURT:  I'm sure Mr. Eckes has it, being as

23   organized as he is.

24           MR. ECKES:  I knew you were going to say that.  You

25   think this is organized?

1     I have Detective Couchman's in the file.  I don't know

2  where Detective Viergutz's was.  We can get that to the Court.

3  I think it's relevant to the record.

4        MS. LEONHARD:  I think so too.  I think my general

5  recollection is he would testify to the entire contents of his

6  report, what he found and where he found them.  I think that's

7  specifically what he was testifying to, about where he found

8  these particular images.  So I think the -- I think it would

9  be helpful.

10       MR. ECKES:  Judge, I could --

11       THE COURT:  Why don't you file that as an exhibit.

12 I'm going to overrule the objection.  I think it's part and

13 parcel to his report.  Every last statement that a witness

14 testifies to consistent with their report or conclusion drawn

15 from their report, is that a reasonable inference a jury could

16 conclude; if it's not in the defaulted downloaded area, that

17 someone moved it intentionally?

18    I made a note up here as we were going through the

19 spreadsheets that certain things seemed to go into certain

20 downloaded files and others did not.  I circled it with red,

21 because that tells me that that took some sort of, perhaps an

22 affirmative -- there would be a reasonable inference that it

23 took an affirmative action by the user.

24    The objection will be overruled.  Go ahead and file that

25 in the record.

1    MR. ECKES:  Judge, I do have it here, an electronic

2  copy.

3     "General processes used to analyze computers, testify

4  that examining the computer discovered images and videos of

5  minors engaged in sexual conduct, will explain where he found

6  the images, how they came to reside there, the file names,

7  some of which are indicative of child porn, and whether the

8  files were deleted.  He will also explain that he located

9  files indicating a computer user received and saved child

10  pornography files."

11     THE COURT:  Why isn't that exactly what you're

12  talking about?

13     MR. ECKES:  Judge, what he testified to as his

14  specific -- only, really, opinion that went to a reasonable

15  degree of scientific certainty was that in this one folder, he

16  has surmised that six or seven files were purposely moved

17  there.

18     And there was nothing disclosed about that they were --

19  that, you know, that there were going to be discussions of

20  folder -- of files being moved between folders and purposely

21  infer -- you know, the intent of the defendant purposely

22  putting a file into a folder.

23     That's a specific forensic question with different

24  possibilities, with different time stamps that could have been

25  looked into, with a whole lot of other stuff, alternate

1  explanations and all of that that I've got, you know, no time

2  to do.

3      The purpose of Rule 16 is to give me that time to look at

4  it, determine if it's subject to *Daubert* analysis, to talk to

5  my expert about it and to see, is it really true that someone

6  can form the opinion that you heard that those files were

7  purposely moved there, instead of just dropped there by a

8  torrent or however else.

9          THE COURT:  Dropped there by what?

10          MR. ECKES:  A torrent, amongst the way we've been

11  talking about.

12          THE COURT:  You can make an inference it was some

13  other explanation.  You're certainly doing that with

14  everything else here.

15          MR. ECKES:  Certainly, and I will but that doesn't

16  change --

17      (Indiscernible crosstalk.)

18          THE COURT:  -- he read, go ahead and file a hard copy

19  of that in the record.

20          MS. LEONHARD:  I will.

21          THE COURT:  That where a file ended up and his belief

22  regarding the explanation of that is something that I think is

23  covered within the Rule 16 disclosure.  You, of course,

24  disagree.  And perhaps the Sixth Circuit, if there is a

25  conviction, might disagree with me, and we'll try the case

1   over again.

2        But I don't think it's that earth shattering to believe

3   that the United States' Rule 16 disclosure as relates to this

4   witness did not otherwise cover what he testified to.

5        So your objection is noted and overruled.

6            MR. ECKES:  Thank you, Judge.

7            THE COURT:  Thank you.

8        Okay.  Bring the jury back in.

9        Anything else we need to take up?

10           MS. LEONHARD:  No, sir.  Thank you.

11       (The jury entered the courtroom at 2:49 p.m.)

12           THE COURT:  You may proceed with cross-examination.

13                        CROSS-EXAMINATION

14  BY MR. ECKES:

15  Q.  Good afternoon, Detective Viergutz.

16  A.  Good afternoon.

17  Q.  So the four files that began that whole thing are -- the

18  actual files are not on Brandon Moran's computer, right?

19  A.  That is correct.

20  Q.  So yesterday, those files were shown, or at least some

21  part of them, to the jury.  That didn't come from Mr. Moran's

22  machine, right?  Those files came from Detective Couchman's

23  machine?

24  A.  That is correct.

25  Q.  So nowhere on Brandon Moran's machine could you click on

1    something and get those files to play?

2    A.   That is correct.

3    Q.   Now, there was talk about how a file path was there,

4    right?

5    A.   Yes.

6    Q.   Now, having a file path is not illegal, right?

7    A.   Having a file path on a computer is commonplace, yes.

8    Q.   And it's not illegal to have the path there, right?

9    A.   I can type that path, and it would not be illegal.

10   Q.   Right.  Now, one explanation that you offered is that

11   perhaps they were deleted; is that right?

12   A.   The files that --

13   Q.   The four files.

14   A.   -- Detective Couchman?  That they were -- more than

15   likely, they were deleted or partially overwritten, if not

16   completely overwritten.

17   Q.   Okay.  We'll get there.  So let's talk about deleting

18   stuff.  You mentioned it a little bit.  Now, you, as a

19   forensic expert, you can bring back deleted files.  I'll be

20   more specific.  But in a general sense, you can bring back old

21   stuff?

22   A.   In a general sense, yes.

23   Q.   Okay.

24   A.   If it's deleted or in the recycle bin, yes, sir.

25   Q.   Okay.  And, now, one way to do it is you were talking

1   about carving, right?

2   A.   Yes, sir.

3   Q.   And then another way is to un-delete it.  Is that the

4   right verb?

5   A.   Take it out of the recycle bin or undelete or restore,

6   yes, sir.

7   Q.   Those are two distinct processes, carving and

8   un-deleting?

9   A.   Yes, sir.

10  Q.   Both you were trained how to do with your forensic

11  training?

12  A.   Forensic tool, normally we just carve or we actually see

13  deleted items as they are, like, in a hole.  The beginning of

14  the file name may actually be different, but it's essentially

15  the same file if it's just deleted.

16  Q.   If it's just deleted, it will often have a file name that

17  starts with like a dollar sign; is that right?

18  A.   Yes, sir.

19  Q.   Or a capital R, or a dollar sign and then an R?

20  A.   Yes, sir.

21  Q.   And the file list that the jury has as an exhibit has got

22  several files that start with a dollar sign, right?

23  A.   I believe it does.

24  Q.   So those are files that were un-deleted?

25  A.   Those were files that were probably deleted, actually.

1    Q.   Deleted by someone with their fingers on Mr. Moran's

2    computer but un-deleted by you?

3    A.   I think you may be mistaken.

4    Q.   Won't be the first time.

5    A.   When a file is deleted, the computer actually would

6    change that first, like, the name into a dollar sign.  The

7    computer.  That's now deleted, and the computer doesn't really

8    care about that file.

9    Q.   Right.

10   A.   If it's un-deleted, then that dollar sign, as you said,

11   goes away, and the original letter is restored.  So an

12   un-deleted file or a restored file is as it was, restored.

13   Q.   So it's restored as it was, but with a different name?

14   A.   No, it will still be the same name.

15   Q.   I think I figured this out.  If you go through the actual

16   process of un-deleting it, it would come back to have the same

17   name?

18   A.   Correct.  If you go to the recycle bin or trash bin and

19   when you see it, you hit right click/restore or drag it out,

20   it goes right back to its normal way.

21   Q.   So the files in the file list that have a dollar sign,

22   they weren't restored?

23   A.   That would be correct, if it still had a dollar sign,

24   unless it was named with a dollar sign.  But yes, sir.

25   Q.   That's probably unlikely, since --

1    A.    Probably unlikely.

2    Q.    So the ones that have a dollar sign on the file list, the

3    presumption is they were deleted by a user of the computer,

4    and you basically found them within the recycling bin?

5    A.    They were deleted.  You can skip the recycle bin, but

6    yes.

7    Q.    They were deleted and you found them?

8    A.    If it had the dollar sign, potentially, yes, sir.

9    Q.    So sometimes, you will -- now, tell me about carving.

10   What's the difference?  What's carving?

11   A.    On the carving, for the explanation, if you put something

12   in the recycle bin and you empty the recycle bin, then the

13   user cannot access it unless he has a special -- he or she has

14   a special tool.

15       With carving, with forensic tools, we're able to recover

16   and find where the computer or where that file was, and it may

17   just have that unusual dollar sign or just be in an area that

18   is no longer being used by the computer because that file was

19   deleted.  So the carving tool will actually go find the

20   beginning of the file and the end of the file to the best of

21   its ability and recover it for me, say this appears to be a

22   picture or this appears to be a video.

23               THE COURT:  What exhibit?

24               MR. ECKES:  The file list exhibit.

25               THE COURT:  9?

1          MR. ECKES:  It may be easier to look at the actual

2    files.

3    BY MR. ECKES:

4    Q.   There's carved files and files from the recycle bin on

5    your file list, correct?

6    A.   I believe so.

7          MR. ECKES:  Hold on.  I have it, Your Honor.  I'll

8    just pull it up.

9    BY MR. ECKES:

10   Q.   So we'll see in here things from the recycle bin; is that

11   right?

12   A.   That file is indicated to be in the recycle bin, yes,

13   sir.

14   Q.   And so a file like that has this dollar sign R over here

15   as its name, right?

16   A.   That one does, yes, sir.

17   Q.   Okay.  So that's an example of a file that had been

18   deleted and is in the recycle bin.  Now, down here, we have

19   files called carved index files.  Those would be carved files;

20   is that right?

21   A.   Those would be files that I was able to carve and locate.

22   Q.   And those have number file names, but they don't start

23   with an R, right?

24   A.   Are those -- is that line 208 and 209?  They do not start

25   with an R or dollar sign, that is correct.

1    Q.   And those are the carved ones, right?

2    A.   Those would be ones that I had carved.

3    Q.   All right.  But those, likewise, had been deleted off the

4    machine, and you -- forensic software, you found them or

5    recreated them?

6    A.   I was able to identify the file portions with the

7    forensic tool and bring them to -- not complete fruition, but

8    fruition.

9    Q.   And you generally need some forensic training, but

10   certainly at least some forensic tools to do that?

11   A.   Yes, sir.

12   Q.   Now, we also have, in the file list -- and I'm going to

13   mess up if I try to bring it back up, but the file list we

14   looked at has a column for "deleted?" and it tells if the file

15   had been previously deleted.

16   A.   It most -- I'd have to look at the sheet again, but it

17   most likely did.

18        THE COURT:  What you're showing them from your

19   computer is part of Government's Exhibit 9; is that right?

20        MR. ECKES:  It is Government's Exhibit 9.  Thank you,

21   Your Honor.

22   BY MR. ECKES:

23   Q.   If we could show it one more time to Detective Viergutz,

24   the column over here, the column that goes down in between

25   those two lines is a deleted column, and that's true and

1  false, right?

2  A.   Yes, sir.

3  Q.   Okay.  And this chart was created by your forensic tool,

4  right?  This Excel spreadsheet?

5  A.   Yes, sir.

6  Q.   Confirmed by you, but basically -- but you didn't type

7  all this stuff in?

8  A.   I did not type it up and it does get extracted in that

9  report.  For usability, I put it in a spreadsheet, yes, sir.

10  Q.   So the report gave it to you, and then it got dumped into

11  a spreadsheet.  The report gave you the data -- the tool.  The

12  tool gave you the data?

13  A.   The tool gave me the data, yes, sir.

14  Q.   So I've talked to you previously, and I probably should

15  have asked you this question before.  Are you familiar with

16  the phrase rickroll?

17  A.   I am familiar with it, or having someone rickrolled.

18  Q.   And I don't want to get too much levity, but it's a

19  concept on the internet where -- actually, you know it so why

20  don't you tell the jury.

21  A.   The idea of being rickrolled is that probably six or

22  seven years, eight years back ago, you would be provided a

23  link to a video that may be interesting to you or may be

24  relevant to your cause or some kind of venture.  It would

25  start out as being a normal video that you were expecting but

1    then shortly thereafter would scroll into a Rick -- I believe

2    it's Rick Astley.

3    Q.   That's correct.

4    A.   Rick Astley singing "Never Gonna Give You Up."  Popular

5    song in the 1990s, maybe 1980s.  It was a while ago.  It was

6    kind of like an "I gotcha" prank.

7    Q.   So that's an internet prank.  But let's be serious.  If

8    something of that nature happened to me, I saw something and I

9    got something that I had clicked on that I didn't want, but it

10   had already downloaded the file, and I deleted the file,

11   there's a good chance you still could find it on my machine,

12   right?

13   A.   A good chance that I would be able to find it on your

14   machine.

15   Q.   Now, you had created at one time a document called

16   preliminary findings; is that right?

17   A.   In the early stages of the examination, I did.

18   Q.   And there's ways for you and your tools to learn the

19   creation time of a file on a machine, right?

20   A.   The forensic tool can establish that via a few means.

21   Q.   You talked about it on direct.  It's commonly referred to

22   as a CR time; is that right?

23   A.   CR.

24   Q.   CR time is an abbreviation for creation time?

25   A.   Yes, sir.

1    Q.   So a CR time is when something gets written to the

2    device?

3    A.   A created time is when it does land, as I had said, or

4    get written to that volume.

5    Q.   So that could be like an external hard drive would have a

6    CR time of the first time that file touched the external hard

7    drive.  Similar, the first time it touches the whole computer

8    is the CR time, the creation time?

9    A.   The creation date or time.

10   Q.   Okay.  Now, the torrent that contains the four files in

11   question in this case or the main four files, that has the

12   following name:  D43D870C9E66E81 --

13            THE COURT REPORTER:  Wait, you have to slow down.

14            THE COURT:  When we read, we always talk more

15   quickly.

16            MR. ECKES:  Sorry.

17   BY MR. ECKES:

18   Q.   It has a bunch of numbers and then it says .torrent and

19   it starts with a D; is that correct?

20   A.   I would have to look at the --

21   Q.   Would it refresh your recollection to see your

22   preliminary findings?

23   A.   It would.

24            MR. ECKES:  May I approach, Judge?

25            THE COURT:  You may.

1          MR. ECKES:  For identification purposes only to

2    refresh recollection, I'll mark it as Defense Exhibit 2, with

3    1A and 1B being the goldfish puzzles.

4          THE COURT:  Yes.

5    BY MR. ECKES:

6    Q.  Does that sound familiar, list of letters that started

7    with D43D?

8    A.  The name of this torrent file does appear to have the

9    contents of the four files in question, yes, and this also has

10   the created, modified and record change.  On the -- just to

11   kind of -- may I add?

12   Q.  Certainly.

13   A.  On the rickroll, you don't necessarily have to download

14   it to watch it.  If you did download it, it would have a

15   created.  If you didn't download it, I wouldn't be able to

16   recover it if it wasn't saved.

17   Q.  You're not talking about this question, but you're going

18   back to -- a rickroll is through streaming, but you could have

19   a similar concept happen to you with a torrent file if you get

20   something you didn't expect, right?

21   A.  I would imagine so.

22   Q.  Okay.  So what's the CR time for the torrent -- and CR

23   stands for create time.  For the torrent in question, the

24   torrent that led to, that pointed at the four files.

25   A.  On this particular --

1    Q.   Yes, on your findings.

2    A.   The created date and time is 6 -- or June 6 of 2016.  And

3    the time?

4    Q.   Yes.

5    A.   01:59 minutes and 02 seconds with a minus 4, which is for

6    Eastern Standard Time.

7    Q.   So if it was central time, that would probably be -- that

8    would be a minus 5, right?

9    A.   Yes, sir.

10   Q.   So if we were going to do that, you would just subtract

11   an hour from this number?

12   A.   That's correct.

13   Q.   And it would be 12:59:02?

14   A.   Yes.

15   Q.   And that's the time that the torrent was written to

16   Brandon Moran's machine, right?

17   A.   It is the time at which, yes, it was created on that

18   volume.

19   Q.   Okay.  We'll move on for now, but we'll come -- so I want

20   to talk a little bit about IP addresses.  We've talked a

21   little bit about them today.  There's been evidence about how

22   an IP address was tracked back to the place where Mr. Moran

23   was living.  That's pretty common, right?  Like forensically,

24   you guys can track back IP addresses?

25   A.   I'm aware of the process from the investigative -- my

1  investigation portion of my time with the state police.  I

2  don't do IP tracking anymore, but I'm aware of how it works,

3  yes.

4  Q.  Through your training and experience, you're aware there

5  are ways that people try to hide their IP address, right?

6  A.  Yes, sir, absolutely.

7  Q.  There was no indication that Brandon Moran tried to hide

8  his IP address; is that right?

9  A.  There was no indication in this particular -- at this

10  particular point.  He did have the use of a TunnelBear.

11  TunnelBear is a VPN service.  It did not appear that it was

12  being utilized.  The availability of it was there, but I did

13  not see that it had been utilized so he was not obfuscating

14  his IP.

15  Q.  Okay.  So his IP -- so almost looked like he had software

16  that could have potentially done something to hide his IP

17  address, but he didn't?

18  A.  From what I could tell, from the analysis of the

19  computer.

20  Q.  Now, there was mention earlier about the deeper web or

21  the dark web.  Can you tell the jury a little bit about what

22  that is, a little broader explanation?

23  A.  I am no expert of deeper web or dark web.  There are

24  relative levels of what you would want to call the deep web or

25  dark web.  There's stuff on the internet that's not available

1    publicly.  You can't just Google it.  I believe that's known

2    as the dark web, where those files are in existence out there.

3        Materials for hospitals, for military, those are just out

4    there.  You would never find them unless you knew the exact IP

5    address, per se, and maybe even a convoluted IP address to get

6    into that.

7        But then you have the deeper web in which you'll need a

8    Tor, potentially, or the Onion wrapper type browser to get to

9    it, or a plug-in on Firefox or one of your browsers that

10   allows you to go to those.

11       They're sometimes not very good sites.  They're known for

12   child exploitation.  They're known for drugs and all that sort

13   of stuff.  I'm, like I said, by no means an expert of the deep

14   or dark web, but that's the kind of stuff you would find in

15   that area.  It's not commonly gotten to by the normal use of

16   the internet.

17   Q.   You might find my or your Social Security number, after

18   the Equifax hack, on the dark web?

19   A.   Pretty good chance, yes, sir.

20   Q.   But the point is this isn't that type of case, right?

21   There's dark web child pornography cases, and this is not

22   that?

23   A.   That's correct.

24   Q.   And although there was some discussion about Onion

25   earlier, that was because the file name had it, which

1    should -- which means at some point, it probably was in the

2    dark web.  I don't know.  But it wasn't that Mr. Moran was out

3    on the dark web and downloaded that file?

4    A.   He potentially could have gotten it from there, but I

5    don't --

6    Q.   You don't know --

7    A.   I don't suspect that was the case.  I think that just was

8    a reference, the OPVA, the onion pedo video archive.

9    Q.   You have no evidence that he was downloading child

10   pornography from the dark web?

11   A.   Not -- I have no evidence that it was coming from the

12   dark web.

13   Q.   Now, would you agree with me that there was a lot of odd

14   stuff on Mr. Moran's computer, and I'm not referring to child

15   pornography at this time.

16   A.   Yes.

17   Q.   There are many torrent applications besides BitComet,

18   right?

19   A.   There were other peer-to-peer software type things.

20   Q.   Do you know how many?  Was it five or six, or was it a

21   bunch?  Somewhere around there?

22   A.   I did note there was uTorrent, Vuze, which is kind of an

23   application that goes along with that, V-u-s-e [sic].  Off the

24   top of my head, I couldn't --

25   Q.   And torrent applications --

1    A.   Three to four.

2    Q.   -- could have come and gone on his computer?

3    A.   Absolutely.

4    Q.   So if he said in a statement to Detective Cooper that he

5    would download five or six in one day, that would not surprise

6    you?

7    A.   Applications or torrents?

8    Q.   Torrent client applications to try to get a specific

9    torrent to work.

10   A.   It would not surprise me.  Not every day, but there were

11   quite a few.

12   Q.   A lot of games on his computer?

13   A.   There were a number of games.

14   Q.   Japanese games?

15   A.   A lot of -- and pardon my -- I don't know if it's

16   pronounced Hinti.  Hinti stuff, which is Japanese, indicative

17   of the cartoon characters and that stuff.

18   Q.   That stuff, is that animated pornography, the Hinti

19   stuff?

20   A.   There was a tremendous amount of the animation of

21   appeared to be younger animated children.  Not necessarily

22   children, but young people having engaged in --

23   Q.   All types of stuff?

24   A.   A lot of stuff, yes, sir.  Not illegal.

25   Q.   It's not illegal because it's animated, right?

1    A.   It's not illegal to possess, that's correct.

2    Q.   And when we say all types of stuff, it's because it's

3    pretty out there, right?

4    A.   Yes, sir.

5    Q.   He also had a significant amount of adult pornography

6    downloaded on his computer?

7    A.   I would not -- I wasn't charged with looking for adult

8    pornography, per se.  I was primarily focused on the child

9    exploitation.  There was some adult pornography that would

10   have been running around.

11   Q.   Some of those were in folders with the names of the porn

12   stars?

13   A.   That is correct.

14   Q.   If we could -- I'm going to put up on the screen the

15   FrostWire exhibit, Exhibit 11.  So this is going to kill your

16   eyes, Detective Viergutz.  I'm going to try to make it larger.

17   Now, this FrostWire spreadsheet was created by your tool,

18   correct?

19   A.   Generated by the tool.

20   Q.   Generated by the tool?

21   A.   Yes.

22   Q.   It went in and found a bunch of torrent names, it

23   appears, but they weren't necessarily just from FrostWire?

24   A.   Correct.

25   Q.   FrostWire itself is a torrent application, similar to

1    BitComet.  Am I wrong, or is that right?

2    A.   It is similar to BitComet.  I believe BitComet is a

3    little more advanced, but FrostWire is a peer-to-peer type

4    sharing network or file sharing network.

5    Q.   So why would the -- did your machine or your tool call it

6    the FrostWire folder?  Why is the folder named that?

7    A.   I think it was identified as FrostWire.  During the

8    process, if I may explain, on the Internet Evidence Finder, it

9    says what are you looking for in regard to your examination,

10   and you can select a number of items.

11       If you're interested in torrent type information, which

12   we were, you select that.  And it's looking for any type of

13   .torrent or directories that may be indicative of the sharing,

14   file sharing stuff.  And I believe that FrostWire may have

15   been identified as a BitComet.  I'm unaware of why it said

16   FrostWire.

17   Q.   Gotcha.  That could have been a shorter answer, but ...

18       So on here we've got some torrent names, if you look at

19   them.  We've got Hitomi, the Miracle of Hitomi.  You see

20   Hitomi Tanaka on there.  That shows up a lot on Mr. Moran's

21   computer; does it not?

22   A.   It does.

23   Q.   Are you familiar, is that a porn star?

24   A.   I'm not familiar with that video personally.  But during

25   the course of this examination, I did review that video.

1    Q.  As we go down, you've got "Futanaris ultra naughty web

2    cam show, fake taxi."  Is that pornography, are you aware?

3    A.  I'm not familiar with that.  It wouldn't have jumped out

4    at me as being exploitation as far as children just because of

5    the MILF reference, M-I-L-F.

6    Q.  I suppose I should ask what does that mean, Detective

7    Viergutz?

8    A.  MILF, mother I would like to f-u-c-k.

9    Q.  We've got, under 180 and 284, some --

10            THE COURT:  You get some bonus if you can interpret

11   that.

12            THE WITNESS:  They're in Japanese.

13   BY MR. ECKES:

14   Q.  Do you know what language that is?

15   A.  I do not.  I'd have to assume Asian.

16            THE COURT:  Pretty good guess.

17            THE WITNESS:  Thank you.

18   BY MR. ECKES:

19   Q.  Here, 198, we have -- the jury may have heard me say this

20   before, "sea monster impregnates helpless human female."

21       "Mandy Flores," which showed up earlier, is she a porn

22   star?

23   A.  I Googled Mandy Flores to see if she was a minor or not.

24   I don't believe she was.

25   Q.  Similar with Angela Salvagno?

1    A.   I think that's a well-known porn star.  I don't know that

2    for a fact.

3    Q.   But earlier when you showed the FrostWire, you hit

4    Control-F or searched for, specifically, things indicative of

5    child pornography within this overall FrostWire file --

6    A.   Yes, sir.

7    Q.   -- right?  Okay.  So it's not all child pornography,

8    right?

9    A.   No.

10   Q.   And there's a lot of this adult pornography, legal stuff,

11   right?

12   A.   A lot of strange stuff that's not illegal, correct.

13   Q.   All right.  One point before I forget.  The four files --

14   let me withdraw that.

15        You did do the process of trying to carve files from

16   Mr. Moran's computer, right?

17   A.   Yes, sir.

18   Q.   And you were not able to carve the four files that

19   Detective Couchman's computer downloaded?

20   A.   That was correct.

21   Q.   Now, there was some discussion of some parsed search

22   queries.  I believe it was pedo forums.

23   A.   Yes, sir.

24   Q.   Are those carved?  Are those recreated?  How's that

25   process work?

1    A.   On parsed, and this is one of the things about the

2    Internet Evidence Finder tool that's commonly utilized.  Once

3    again, all those have to be validated as far as what it finds.

4    I need to basically validate, yes, that's what the case is.

5         On parsed, it would be that it's not completely there.

6    It's a portion thereof.  So it's almost like the carving of a

7    picture, where like it's not only deleted, it's put in an area

8    that's not -- well, it's just no longer identified by the

9    computer as being a logical file or a file that can be

10   recovered by restore.

11        So in this particular case -- I forgot where I was going

12   with that.  I apologize.  What was the question?

13   Q.   In this particular -- the parsed search queries that this

14   tool came up with --

15   A.   The tool has identified that these are queries for

16   searches that have been conducted on the computer.

17   Q.   And what it's parsing is the URL that's right next to it;

18   is that right?

19   A.   Yes, sir.

20   Q.   What's a URL?

21   A.   Universal resource locator.  Like when you type

22   www.cnn.com, that's the URL for that website.  What the tool

23   is most likely doing is looking for big search engine or terms

24   and looking for what's being searched for behind that.

25   Q.   So are those words the exact thing that was typed into

1    Google or Bing?

2    A.   It often will depend.  These were parsed queries, and the

3    thing about parsed or carved items, a lot of times they're

4    difficult because you don't always have time and dates.

5         In this particular case, pedo forum, I believe, was the

6    name.  We actually do have a time and date so the certainty of

7    what actually was typed into the browser is greater.  I would

8    say that it probably was typed "pedo forum," versus if we

9    didn't have all the extra stuff, the time and date and the

10   file path, it would be -- I'd be less confident.

11   Q.   Well, let me ask you, isn't it true that the link itself

12   could create that search query?  Does that make sense?  There

13   could be a link you click on, and the job of that link is,

14   that hyperlink is to search for certain things?

15   A.   Yes, that is -- that could be possible, yes.

16   Q.   So when it's a parsed search query, it is not definite,

17   set in stone that someone on that machine typed in the words

18   "pedo forums," right?

19   A.   Potentially they did that.  That's why I asked about --

20   or mentioned the time and date.  It could have been -- what if

21   it was pedo forms or formatic, something else other than just

22   pedo forum, and it just stopped.  But it actually did

23   complete, so I believe it was the full pedo forum.

24   Q.   But links could lead to that search, right?

25   A.   Absolutely, yes, sir.

1  Q.  That would be closer to a rickroll, right?

2  A.  It would be closer to it.

3  Q.  Now, forums, in general, that's -- is that like a chat

4  room?  Is it somewhere you go to learn about something?

5  A.  Normally, forums are -- and I'm not an expert in forums,

6  but they're just something that you would join.  Usually

7  involves an email address in which you can join other people

8  of like-minded content.

9      I am on a forum for cellular phone examinations so my

10  forum is all about how to examine a cell phone.

11  Q.  You learn things from it?

12  A.  Absolutely.

13  Q.  There's other acronyms and things like that that show up

14  on the internet a lot as well, like the PTHC that we've been

15  talking about?

16  A.  Yes, sir.

17  Q.  They're not all related to child pornography, obviously,

18  but let's stay in the same genre of pornography.  There's an

19  NSFW.  What does that stand for?

20  A.  From general working knowledge, "not safe for work."  So

21  if you were to see that on your email, you would not want to

22  open that at work or be punished.

23  Q.  And if I saw that on my email, it's possible I might

24  Google NSFW to see what it means; is that right?

25  A.  If you didn't know what it meant, you would probably want

1    to Google it before you opened up the email.

2    Q.   All right.  You also looked -- your tool came up with the

3    parsed search queries.  There's five pages of them, right?

4    A.   I believe so.  Tremendous amount.

5    Q.   And each of those spreadsheets or files are enormous; is

6    that right?

7    A.   Extremely.

8    Q.   This is years of somebody being on a computer and

9    searching for stuff?

10   A.   There were returns, I believe, from 2009.

11   Q.   After that, you also have a pornography URL that --

12   folders that were created, correct?

13   A.   Yes.

14   Q.   And those appear to be pornography sites that had been

15   visited?

16   A.   They do appear -- from my review, I believe they were

17   adult.

18   Q.   Okay.  So we've got adult pornography sites under the

19   pornography URLs, right?

20   A.   Yes, sir.

21   Q.   And if you click on one of those, does it sound about

22   right that each -- or at least the first one that I looked at

23   had a thousand pornography sites that had been visited?

24   A.   I'd have to see the report, but it wouldn't --

25   Q.   Does that sound about right?

1   A.   It sounds roughly correct.

2   Q.   And there was three pornography URLs pulled out of that,

3   right?

4   A.   I'd have to once again look at the report for sure,

5   but --

6   Q.   Would it refresh your recollection to see the report real

7   quick?

8   A.   If you don't mind.

9        MR. ECKES:  This will only be shown to Detective

10  Viergutz for the purpose of refreshing.

11  BY MR. ECKES:

12  Q.   Can you see that?

13  A.   Here it is.

14  Q.   We've got five parsed search queries and three

15  pornography URLs?

16  A.   Yes, sir.

17  Q.   And along that side, that's where we also get the

18  FrostWire stuff?

19  A.   Yes, sir.

20  Q.   Okay.

21        THE COURT:  You can take that down now.

22        MR. ECKES:  Yes.

23        THE COURT:  Thank you.

24  BY MR. ECKES:

25  Q.   Now, we're going to talk a little bit about the parsed

 1    search queries.  Try to let the file load for a little while.

 2    There was a lot of stuff that was searched for, and one thing

 3    you would agree with me -- still loading.

 4        While this is loading, I'll move on a bit.  So these

 5    forensic tools, I believe you gave the name of some of them,

 6    you go to trainings on how to use those, right?

 7    A.   Yes, sir.

 8            MR. ECKES:  If we could pull up to Detective Viergutz

 9    my computer.  This is parsed search queries, for the record.

10    BY MR. ECKES:

11    Q.   One of the things that appears to have been searched for

12    is Captain America Civil War; is that right?

13    A.   Yes, sir.

14    Q.   And another thing that was searched for was Real On Top.

15    Do you see that under 602?

16    A.   Yes, sir.

17    Q.   Real On Top could potentially mean something related to

18    pornography, would you agree?

19    A.   It potentially could.

20    Q.   Potentially.  Could also potentially be somebody wanting

21    to see if Real Madrid is in first place this year?  Real

22    Madrid, the soccer team.  Are you familiar with Real Madrid,

23    the soccer team?

24            THE COURT:  Everybody is not a European soccer fan.

25            MR. ECKES:  Sorry.  Googled it this morning.

1   BY MR. ECKES:

2   Q.   So there's a soccer team in Spain, one of the most famous

3   ones, besides Barcelona, called Real Madrid.  So Real On Top

4   could be something completely unrelated to pornography.  Could

5   be searching for a soccer team, right?

6   A.   Absolutely.

7   Q.   We also see that there was a search for Dragon Ball Z

8   under 800.

9   A.   Yes.

10  Q.   Are you familiar with what that is?

11  A.   I am unaware of what Dragon Ball Z is.

12  Q.   And then there's a search for Rio Blaze.  Do you see

13  that?

14  A.   I do.

15  Q.   I know you didn't go through all of these parsed search

16  queries.  So did you look at all?  Are you familiar with

17  whether that's a porn star or --

18  A.   I didn't know.

19  Q.   You would just have to infer, okay.  Now, these search

20  queries are artifacts; is that right?

21  A.   Artifacts?

22  Q.   Yes.

23  A.   You could say they are from the artifacts report.  But

24  yeah, they are technically artifacts.

25  Q.   And they have a source file.  Let's just go to the very

1   top and just look at the first one.

2       So like we have a search term of ABXOGAE.  Do you see

3   that?

4   A.   Yes, sir.

5   Q.   And then you have the URL, which we have already talked

6   about, right?

7   A.   Yes, sir.

8   Q.   You have a search engine, and then you have a source, and

9   the source is Sherry/Favorites/YouTubeJackieChanAdventures,

10  right?

11  A.   Yes.

12  Q.   Are you familiar with who Jackie Chan is?

13  A.   I'm familiar he's an Asian actor, I believe.

14  Q.   So that makes, you know, some sense that the source of

15  where that artifact came from was from that video.  Is that

16  right?  Or explain that to me.

17  A.   Can you scroll further to the right, my right?  And now

18  all the way to the left, if you would, please.

19      I'm familiar with Jackie Chan, but I don't know how the

20  letters of AB -- it's kind of obfuscated on my screen, those

21  series of letters would come up to that unless it was

22  referenced in maybe the additional information of the YouTube

23  video.  It may be a reference to the movie.  I'm not sure.

24  Q.   But that source file is telling you something about this

25  artifact, right?

1   A.   Yes, sir.

2   Q.   Okay.  So Captain America Civil War, if we go look at the

3   source, it's got its root as downloads\cpack_newfag_happiness.

4   What's going on there?

5   A.   That's the file path of -- later on, as far as with the

6   file name.

7   Q.   Well, what I'm wondering is why is the search for Captain

8   America Civil War, which is a movie, in any way related to

9   cpack_newfag_happiness.

10  A.   I can't say definitively why, unless it's Captain America

11  Civil War is referenced within the torrent.  But I don't think

12  that would be the case.

13  Q.   So we see Real on Top again?

14  A.   Yes, sir.

15  Q.   We go over to its source, now we've got web video

16  collection HJKI.

17  A.   13-year-old Laura pthc pedo.

18  Q.   Right.  So, again, the source file is mixing up somehow

19  with Real On Top.

20  A.   No time and age stamps either so I'd have to assume that

21  it's not getting a good carve or it's essentially not related.

22  It could be related.  I don't have that torrent or the rest of

23  the artifact, but I don't think it would be related, the

24  soccer team or sexual position.

25  Q.   So Dragon Ball Z, we see the source, web video

1    collection, and now we've got a Russian valya digest volume 1.

2    Probably not related to Dragon Ball Z, but something's going

3    on, right?

4    A.    I would have to say that Dragon Ball Z may not be related

5    to the 13-year-old euro preteen unless Dragon Ball Z is

6    something involving that actress or porn star, but I don't

7    think that would be the case.

8    Q.    One more.  Let's do Rio Blaze.  If we look at Rio Blaze,

9    our source is back to cpack_newfag_happiness with a boy girl

10   golden shower of some sort.  You also note there's a BC at the

11   end of that.  That means it's an incomplete file, right?  The

12   BC at the end of that, BC with an exclamation point?

13   A.    I'm not sure if that's the indicator.  I know if you get

14   rid of the BC exclamation point, the file will play or has

15   played for our tools.

16   Q.    Okay.  Well, let me load something else, if I could have

17   the PowerPoint of the BitComet installation.

18            THE COURT:  16.  That was just for demonstrative

19   purposes, though.  It was not admitted.

20            MR. ECKES:  If I may approach, Judge?

21            THE COURT:  Very well.  You can use the Elmo, if

22   you'd like.

23            MR. ECKES:  That's a good point.

24   BY MR. ECKES:

25   Q.    Do you see where it says BC exclamation point file

1    extension to an unfinished file?  Would you like to see the

2    actual paper?

3             THE COURT:  Go ahead, show him the actual paper.

4             THE WITNESS:  Yes, I see that, and it's by default.

5    BY MR. ECKES:

6    Q.  So by default, an incomplete file is going to get that BC

7    at the end of it, it appears.

8    A.  Yes, sir.

9             MR. ECKES:  For the record, Judge, I've pulled up

10   parsed search queries, page 5 from Detective Viergutz's

11   report, if we could show that to him.

12   BY MR. ECKES:

13   Q.  Now, we couldn't get date information for all of the

14   parsed search queries, right, but we could get it for some?

15   A.  Correct.

16   Q.  So I just want to go over real quick, because there's

17   three important dates, what information you were able to get

18   from those dates, okay?

19        So if you see where it says "numbness in fingers," does

20   that appear to be the first search on 5/15/2016?

21   A.  Listed on here, yes.  It does appear to be the first

22   search.

23   Q.  Okay.  So I want to go through the searches of 5/15/2016.

24   I'll go through it.  Numbness in fingers, numbers, numbers TV

25   series, Donald Trump Vladimir Putin kiss, enlightenment

1    palladian, Jodi West pool three times, four times, five times.

2    Jodi West facial, Bones TV show.

3         And then it moves to 5/16; is that right?

4    A.   That is correct.

5    Q.   Now, earlier, I talked about how you could click on a

6    link and it would search for something for you, potentially.

7    A.   Potentially.

8    Q.   So like, for instance, there may be a website out there

9    or a web page that you click on, and it automatically searches

10   Donald Trump and Vladimir Putin kiss for you.  Is that

11   possible?

12   A.   It is possible to be redirected, yes, sir.

13   Q.   So let's look at June 6th.  Do you see where the split

14   from June 5 to June 6 is?

15   A.   I do.

16   Q.   We've got X-Men adds apology, Beth Rona twice, GOT

17   season 6, episode 8.

18        Does GOT stand for Game of Thrones; do you know?

19   A.   I don't know.

20   Q.   Manga Panda, Jack Black, watch cartoon online, one piece,

21   asking Kanye West if he likes fish sticks three times, Kanye

22   West comments on South Park three times, Miss Brat, Miss Brat

23   BBC, and Richard Simmons.  Is that right?

24   A.   Those are the ones that are listed.

25   Q.   June 12th, do you see where it switches over from 11 to

1    12?

2    A.    That Pam Bondi?

3    Q.    Pam Bondi, Trump University, Manga Panda, Shinekino nokia

4    den 8 and 82, X videos, U flash, drive-through cum face five

5    times, best of cum walk face several times, boko no hero

6    academia, how to lose belly fat, and Manga Panda again; is

7    that right?

8    A.    That is correct.

9    Q.    Okay.  It would take a while to search, but did you

10   notice at any time in here that the searches were actually

11   Japanese letters?  Would I have to show you an example?

12   A.    I believe there were Japanese characters, but I don't --

13   it could have been a copy/paste.

14   Q.    Right.  So it could be a copy and paste, or it could be

15   that thing before where you click on a link and it throws in

16   those Japanese letters, potentially?

17   A.    Potentially.

18   Q.    And would it surprise you -- or actually, I could find it

19   pretty quickly -- to find that he searched for Hitomi Tanaka

20   bodacious bikini baby?

21   A.    It would not surprise me.

22   Q.    So you go to trainings and you learn how to use this

23   forensic software that creates all this stuff, right?  And

24   it's filling in blanks for you, correct?  It's filling in all

25   this stuff?

1    A.   I would say it's filling in blanks.  It's identifying

2    data that it thinks is relevant or may be relevant to what

3    you're requesting.

4    Q.   It's looking for what you're requesting, right?

5    A.   It is.

6    Q.   And what you're looking for mostly is child pornography,

7    correct?

8    A.   Or the lack thereof, but yes.

9    Q.   And you rely on these tools, you would agree?

10   A.   We rely on what we validate to.

11   Q.   And the reason you have to rely on them is because -- you

12   pretty much testified to this -- there's no human way to go

13   through an entire hard drive at this point; is that right?

14   A.   It would be a tremendous task to go through the entire

15   hard drive.

16   Q.   So the tool goes through the hard drive for you?

17   A.   It searches and looks for pointers and also looks for

18   identifying characteristics of the type of data files that

19   we're searching for.

20   Q.   And the tool created the file list that we looked at

21   earlier, right?

22   A.   Yes.

23   Q.   You verified it, but it created that list?

24   A.   Absolutely, yes, sir.

25   Q.   The tool created the parsed search queries that we've

1    just gone over a little bit?

2    A.   It identified the information and provided it for us,

3    yes.

4    Q.   A tool carves the files for you, right?

5    A.   I don't think to say that IEF would be a carving tool.  I

6    understand what you're saying, because it does look like it's

7    carving.  I think it's just identifying.  Potentially, it's

8    carving, but I wouldn't necessarily -- I think it's

9    identifying a certain amount of area with pointers, and that's

10   how it's saying that it thinks that it's FrostWire when

11   actually it may be BitComet.  But there's reference to

12   BitComet in the results so it kind of makes sense that way.

13   Q.   Back to when we talked about carving files earlier, like

14   separately, like the ones that are in the file list, that's a

15   separate tool that you use to carve those?

16   A.   Yes, sir.

17   Q.   Okay.  But all these tools require a level of

18   interpretation from somebody who knows what they're doing;

19   would you agree?

20   A.   Absolutely.

21   Q.   Okay.  So BitComet, let's talk about BitComet.  So I had

22   requested that you figure out what the default settings for

23   BitComet were, correct?

24   A.   Yes, sir.

25   Q.   And essentially, short way, the default is that you're

1    going to be sharing everything, right?

2    A.   Yes, sir.

3    Q.   We had --

4    A.   The philosophy of the BitTorrent and file sharing works

5    that way.

6    Q.   We had a question as to whether that would be the

7    default, and you said I can check on that, right?

8    A.   Absolutely.

9    Q.   And then that's when you went through and installed it

10   and created the demonstrative exhibit that we all looked at?

11   A.   Yes, sir.

12   Q.   So you would have to do affirmative action to not be

13   sharing this stuff on BitComet, right?

14   A.   Correct.  By default, you --

15   Q.   If you went through and clicked on everything when you

16   got -- to get the program started and running, you're going to

17   be sharing?

18   A.   Especially with BitComet.

19   Q.   And you said, I believe, how that's different than

20   normal -- I don't want to say normal.  But what was -- there's

21   HTTP and there's another one, FT --

22   A.   FTP.

23   Q.   FTP.  Those, you're not automatically sharing.  I thought

24   that's what I heard you say earlier.

25   A.   When we're going through the settings, I forgot what it

1    was in regard to as far as choosing HTTP or hypertext transfer

2    protocol or FTP, which would be file transfer protocol.  I

3    forget what it was in reference to within the settings, but

4    you don't necessarily need an application such as BitComet to

5    do either one of those.  You could use another application,

6    like Internet Explorer or Bit Switch.

7    Q.   So when we started with BitComet, we first started

8    talking about how you wanted to make sure you got the right

9    version; is that right?

10   A.   Yes.

11   Q.   Because these client applications, the BitComets, the

12   uTorrents, the FrostWires, they're constantly giving new

13   updates, right?

14   A.   They usually are.

15   Q.   And it could change up the default settings each time,

16   potentially?

17   A.   On a new install or an update of an application, I would

18   always check.  But potentially, it could change your settings.

19   Q.   Okay.  Now, you had testified that you wanted to make

20   sure that the hash values matched so that you were getting the

21   right BitComet program, correct?

22   A.   Yes, sir.

23   Q.   This is similar to when, if I want to download any

24   program on my computer, my IT people make me call them first

25   and get on my computer, and they watch me do it so that I make

1   sure I get the right program, the right Adobe or something

2   like that.

3   A.   I'm unaware of how they install it at your location.  But

4   for the sake of verification of getting the right application,

5   and that's not necessarily the same BitComet that would be on

6   the suspect's computer.  It's just making sure that I have the

7   right BitComet from on their server --

8   Q.   Right.

9   A.   -- for my application.

10  Q.   Because someone could put out something called

11  BitCometsetup.exe that has a whole bunch of other stuff in it?

12  A.   Potentially, yes.

13  Q.   The name of the file would be similar, BitComet_1.39

14  setup.exe, but it could have a whole lot of stuff that comes

15  along for the ride?

16  A.   And often does.

17  Q.   And often does, because people like to put malware or

18  other things along with the download, correct?

19  A.   Yes, sir.

20  Q.   And my convoluted long question about the IT, you want to

21  make sure that you're going to get the actual program you

22  want.  That's what you're confirming here?

23  A.   That's why you go to the actual URL, the bitcomet.com.

24  You're more likely to be getting the proper application there,

25  rather than from a file sharing site or something like that.

1   Q.  Because the file sharing sites are more likely to put

2   other stuff in it, aren't they?

3   A.  It potentially could.

4   Q.  So if you already had a -- say you had uTorrent and you

5   wanted to use it to get BitComet.  That's not a smart way to

6   do it, is it?

7   A.  I would not suggest that, but I'm not also a big promoter

8   for file sharing.

9   Q.  Sometimes these devious people, they'll go as far as to

10  like try to recreate the BitComet website to try to make you

11  click on a thing that says it's BitComet, and it's going to

12  carry a bunch of stuff along for the ride?

13  A.  Like a phishing scam, would you say that?

14  Q.  Yes.

15  A.  Phishing scams, they often, if you have your bank, they

16  give you link that may not necessarily be from the bank itself

17  taking you to another site.  That's why you want to go to the

18  actual website.

19  Q.  And while I'm probably not careful enough to double check

20  the hash value, that's a super safe way to make sure you're

21  getting the exact thing you want, right?

22  A.  Yes, sir.  Absolutely.

23              THE COURT:  Isn't there also like a little --

24              THE WITNESS:  Lock.

25              THE COURT:  -- lock on the line there where it's www

1    dot such and such?

2            THE WITNESS:  Yes, Your Honor.  For security purposes

3    when you're going to a username and login site, you want the

4    lock and https in the URL.

5    BY MR. ECKES:

6    Q.   The long and short is be careful, right?

7    A.   Indeed, yes, sir.

8    Q.   I can show it to you again, but you'll probably remember,

9    there's this part where you go to the -- Google gets kind of

10   integrated, the Google search thing?

11   A.   In the BitComet instructions?

12   Q.   Yes.  In the startup or the --

13   A.   The additional options, after you've installed, you have

14   an option of what browser or what search engine.  Is that what

15   you're referring to?

16   Q.   Yes, that part.

17   A.   I believe you can change it from Google to your default

18   search engine, which may be Bing or Yahoo or YouTube.

19   Q.   I'm a little confused there, but what exactly are you

20   integrating?  What's Google doing for BitComet?

21   A.   Searching.

22   Q.   Okay.  So you're searching Google through the BitComet

23   interface?

24   A.   That's what I'm seeing, my limited exposure to the

25   BitComet application.  Within the application itself, if

1    you're searching for something, it uses your search engine

2    that you normally would use inherent to your computer or your

3    laptop or what have you to search for it.

4    Q.   One of the default settings is to start BitComet when

5    Windows starts.  Does that sound familiar?

6    A.   I believe you can select that.

7    Q.   And that's one of the defaults?  I can show you this.

8    A.   Yes, sir.

9    Q.   So BitComet is going to come up and start running as soon

10   as your computer comes on, is that right, on the default

11   settings?

12   A.   That is correct, on the settings for this first one.

13   Q.   We talked a little bit about where the default settings

14   will send the file, to what directory.  Do you recall that?

15        We can turn to -- these aren't paged, but you'll get to

16   one is directory and checked is c:\downloads.

17   A.   The default settings for the BitComet version 1.39, the

18   download default location would be the C drive, and then a

19   folder called downloads.

20   Q.   And it appears that BitComet, as it was operated on

21   Mr. Moran's machine, was sending torrent files or the files

22   that are contained within the torrent or the files that are

23   pointed at by the torrent to c:\downloads.  Would you agree

24   with that?

25   A.   There were a number directed to the -- must have been to

1    the downloads folder within the C drive, yes.

2    Q.   But in reviewing this, the default settings, it also

3    provides you some other candidates right there on that screen

4    for where it could send stuff, correct?

5    A.   You can also choose downloads, desktop, pictures, music,

6    videos.

7    Q.   One of them is pictures?

8    A.   Say again?

9    Q.   One of them is pictures?

10   A.   Yes, sir.

11   Q.   If you could go to the page called integration, it's a

12   top right corner page, probably about two pages beyond.  So

13   some of the setups that we have is that this is always the

14   default torrent client on startup; is that right?

15   A.   Yes.

16   Q.   We again see that you start automatically when you start

17   Windows?

18   A.   That's where the setting is, yes, sir.

19   Q.   It gives you an option to add, quote, download with

20   BitTorrent to your contacts menu, right?

21   A.   Your IE contact -- content menu.

22   Q.   Content?

23   A.   Yes, sir.

24   Q.   So that first one we talked about, default torrent client

25   application, there was talk yesterday about BitComet as a

1    client application being kind of like a helper application to

2    your computer.  Like Adobe, it jumps into action when you

3    click -- Adobe jumps into action when you click on a PDF.

4    A.   You can change that .pdf to launch for Microsoft Word.

5    But, yes, that would be normal, normally the case.  I don't

6    see how BitComet would support Windows or support something

7    unless it's directly related to -- I suppose you could have

8    all your media go to be viewed by BitComet.

9    Q.   No, I'm more like you just click on a torrent -- there

10   was testimony about you click on a torrent file and BitComet

11   jumps into action.  Similar to how, when you click on a PDF,

12   Adobe jumps into action.

13   A.   Yes.

14   Q.   What this is clarifying for me is Adobe makes itself the

15   default as soon as it comes on your computer.  It takes over.

16   I got this, guys.  I'm going to open up PDFs.

17   A.   Yes.

18   Q.   When you put on BitComet, it's saying, I'm now going to

19   be your default if you click on a torrent file.  That sound

20   right?

21   A.   That sounds right.

22   Q.   If you go down to virus scan, it gives you the option to

23   perform a virus scan whenever you finish a task download,

24   correct?

25   A.   Correct.

1   Q.   It gives you that option, but the default is to not have

2   the box checked, right?

3   A.   That is correct.

4   Q.   But below it, it says be sure to always protect your

5   computer with antivirus software, right?

6   A.   Yes, sir, it does.

7   Q.   So it's telling you, perhaps for legal purposes, you

8   should have -- you should virus scan this stuff, but the

9   default is not to virus scan it, right?

10  A.   I don't -- yes, that is correct.  I don't think they

11  would look for viruses.  That's their disclaimer, I would

12  imagine.

13  Q.   If we could go -- it came up in the frequently asked

14  questions where the description was that most HTTP or FTP file

15  transfers stream data in one direction, from a file server to

16  you.  BitTorrent is different.  Do you recall that?  That was

17  part of the frequently asked questions.

18  A.   I do vaguely recall that, because of the -- you have to

19  upload if you're going to download.  Basically, they're

20  encouraging your sharing.

21  Q.   And so but just to be clear that these warnings, these

22  answered questions under the frequently asked questions

23  occur -- you found those by clicking on the frequently asked

24  questions link, right?

25  A.   More than likely from the website.

1    Q.   But none of this stuff came up during the installation

2    process; is that right?

3    A.   The FAQ, no.

4    Q.   There's another affirmative step if you want to clarify

5    how it shares and stuff like that, and that's clicking on the

6    FAQs, right?

7    A.   It would be a good idea.

8    Q.   I want to talk a little bit about malware.  We've talked

9    about it a little bit with how it can come to your computer,

10   but there's several different types of computer viruses; is

11   that right?  You agree?

12   A.   Yes, sir.

13   Q.   So there's a virus -- would you agree that basically the

14   definition of a virus would be that code attaches to a program

15   to do something else?  How would you define virus?

16   A.   That probably is a good definition.  There are many

17   viruses and many virus types.  You could even say malware.

18   Malware does unusual things as well.  But that's a definition.

19   Q.   And a Trojan horse, how would you define that?

20   A.   Just as you would think a Trojan horse is.  It comes in

21   as one thing.  Once it resides in your computer or what have

22   you, it opens up and it's something else, such as a Trojan

23   horse.

24   Q.   From the Greek myth or Roman myth?

25   A.   That's right.

1    Q.   What's a worm?

2    A.   A worm, for the sake of general knowledge, I'm not an

3    expert on worms, but just resource, it's going to travel

4    through your computer, and it propagates by possibly, you

5    know, you email an attachment.  When you receive an

6    attachment, double click it, it can execute a worm.  It's

7    usually more of a resource hog than a virus, per se.

8    Q.   I just want generals.  And, generally, what's ransomware?

9    These are just the ones I know.  What's ransomware, just very

10   generally?

11   A.   You receive a -- your computer is locked until you pay

12   this amount of money, anywhere from a couple hundred dollars

13   to a couple thousand.  If you don't provide a certain key

14   within a certain amount of time, your data becomes locked.

15   Q.   The devious stuff that's out there that people are --

16   A.   Absolutely.

17   Q.   Now, when it says -- often, screens come up that say, you

18   know, do not download this unless it's from a trusted source.

19   Do you know what I'm referring to there?

20   A.   Absolutely.

21   Q.   Why is your computer alerting you to that?

22   A.   If you are downloading information or data from a

23   non-trusted source or a source that you're not that familiar

24   with, you could be getting a virus for malware or some type

25   of -- I know Apple already has precautions in place.  That's

1    what why you can't get an app for your iPhone if you don't

2    have a trusted source from iTunes.  Same for Android, like the

3    Play store.  You don't want to get them from anywhere.

4    Q.  Would you ever consider downloading a torrent from an

5    index site to be a trusted source?

6    A.  I personally would not.

7    Q.  Would you agree with me that a virus could potentially

8    lay dormant for a little while or for a long while?

9    A.  Absolutely.  There are some viruses that are zero day

10   that are sent to execute off on a certain day.

11   Q.  Okay.  So let's talk about torrents.

12           THE COURT:  How much longer do you have?  Couple

13   hours?  Because if you do, I'm going to take a break.

14           MR. ECKES:  I do not have a couple hours.

15           THE COURT:  That's good.

16           MR. ECKES:  Do you want me to continue or take a

17   break?

18           THE COURT:  We'll take a five-minute break, ladies

19   and gentlemen.  We'll take a five-minute recess.  Continue to

20   heed the prior admonitions of the Court.

21       (The jury exited the courtroom at 4:11 p.m.)

22       (Recess from 4:11 p.m. until 4:17 p.m.)

23           THE COURT:  Jury's not in.  Is there anything we need

24   to take up?

25           MS. LEONHARD:  No, sir.

1          MR. ECKES:  No.

2      (The jury entered the courtroom at 4:18 p.m.)

3   Q.  So in touching on the overall concept of torrent files,

4   yesterday, there was a lot of testimony on how they work and

5   how torrent files point to other files, and then the BitComet

6   application retrieves those files.  You're familiar with how

7   that works, correct?

8   A.  I'm somewhat familiar.  I believe Detective Couchman

9   might be better at that.

10  Q.  I just want to do a general there's a -- torrents are

11  often kept on indexing sites.  Are you aware of that?

12  A.  Yes.

13  Q.  And those indexing sites may contain the actual torrent

14  files themselves, the actual torrent file; is that right?

15  A.  Yes, sir.

16  Q.  Or they could contain links to where you get that torrent

17  file, correct?

18  A.  I believe so, yes.

19  Q.  And then the link, when we're talking about links, we're

20  talking about, like, blue highlighted letters that you go

21  over, you click on, and it does something, right?

22  A.  Over hypertexts or HTML, yes.

23  Q.  It's often called a hyperlink?

24  A.  Hyperlink, yes, sir.

25  Q.  We learned that hyperlinks could be a small symbol you

1    click on, right?

2    A.   Yes, sir.

3    Q.   Or it could be a picture that you click on is a link,

4    correct?

5    A.   Yes, sir.

6    Q.   And in the context of torrents, you click on the

7    hyperlink and then it gets you the torrent file, right?

8    A.   If that's the intended purpose, I believe so.

9    Q.   And the BitComet jumps into action like we talked about

10   and activates the torrent and goes and retrieves the files

11   that are within that torrent, correct?

12   A.   That should be the case if it's working properly.

13   Q.   And the torrent has a name in itself, right?

14   A.   In reference to the D, starting with the D on our --

15   Q.   Right, in reference to D4, many numbers, dot torrent?

16   A.   Yes, sir.

17   Q.   And then the files that are described within the metadata

18   of the torrent have names as well?

19   A.   Yes.

20   Q.   And certainly at the level of the hyperlink that you

21   click on to start this process, you're not seeing any file

22   names, are you?

23   A.   When you're clicking on that torrent?

24   Q.   Right.

25   A.   I do not know for sure.  I don't believe you're going to

1   see it in the file name of the torrent.

2   Q.   Okay.

3   A.   I'm not sure if that answered your question.

4   Q.   Well, Detective Couchman did.  So you had some exhibits

5   where you were showing, like, that had all the file names or

6   some demonstrative exhibits that had all the file names of

7   what the torrent had within them, right?

8   A.   Yes, sir.

9   Q.   That's not something generally the user sees that's

10  working at the torrent level, right?

11  A.   To my knowledge, I'm not sure.

12  Q.   You had to go in to the file folders and look for this

13  information?

14  A.   Yes, sir.

15  Q.   Yesterday, that process was described by the word

16  "decoding."  I don't know if you agree with that word,

17  "decoding" the torrent to go look at what the files are within

18  it.

19  A.   That would sound about right, as far as what it's doing.

20  You probably would be able to see a lot of that stuff within

21  the BitComet application, I would think.

22  Q.   If you knew where to look, you could potentially see

23  where the file names are?

24  A.   Yes, sir.

25  Q.   Now, one of these torrent names -- and, again, we have

1    three levels.  We have the hyperlink, the torrent name, and

2    the file names, right?

3    A.   Yes, sir.

4    Q.   And so this middle level, yesterday referred to as

5    cat.torrent, this middle level has a name that is a

6    word.torrent or a bunch of letters.torrent, right?

7    A.   Potentially, yes.

8    Q.   Or a lot of Japanese.torrent?

9         I want to go over some torrent names and try to do this

10   in a expedited fashion.  Some of them, we know, that are

11   relevant to this case are incoming.torrent.  That's one that

12   you had shown the jury, right?

13   A.   Yes, sir.

14   Q.   XXX6.2.torrent was a relevant one, right?

15   A.   Yes, sir.

16   Q.   And, again, if you need to refresh your recollection,

17   just let me know.  Two big ones, let's just get these out of

18   the way.  Web video collection is a torrent that's very

19   relevant to this case, right?

20   A.   Yes, sir.

21   Q.   Cpack_newfag_happiness is a big one?

22   A.   Yes.

23   Q.   Other ones that were found in the FrostWire exhibit,

24   there's a torrent called FrostWire, right?  The name of the

25   torrent is FrostWire?

1  A.  I believe that there probably was a torrent that was

2  called FrostWire.torrent.

3  Q.  And there's several that are XXX then with a number?

4  A.  Yes, sir.

5  Q.  There's a torrent that's just II.  It's the Roman numeral

6  II.  Does that sound right?

7  A.  Yes, sir.

8  Q.  There's a torrent that's just a whole bunch of crazy

9  symbols?

10 A.  I would not doubt that.

11 Q.  There's a torrent called torrent?

12 A.  Torrent.torrent?

13 Q.  Yes.

14 A.  Very likely.

15 Q.  There's one called download, download.torrent?

16 A.  Yes, sir.

17 Q.  And there's some that have Japanese letters, as I'm sure

18 we'd all expect at this point.

19 A.  Yes.

20 Q.  Can you describe -- and this is going to be super broad.

21 Can you describe to the jury what you would consider hacking

22 to be?  What does hacking mean?

23 A.  In my interpretation of hacking and what you can do,

24 there's computer hacking.  There's also social engineering.

25 In social engineering type hacking, I can hack my way past the

1    guards downstairs.  I wouldn't really do that, of course.

2         But there are different types of hacking.  Basically,

3    you're installing somebody's -- potentially their trust to

4    gain access and then do what you may have a plan to do.

5    Q.   That was too broad.  Is hacking generally consensual with

6    the person, the person that's being hacked?

7    A.   Not often.

8    Q.   The general way that peer-to-peer networks work with the

9    over-arcing sharing, would you consider it hacking to say that

10   when somebody retrieves a file from -- a file piece from your

11   computer, did they hack you?

12   A.   If you're putting it in a shared folder and allowing

13   them.

14   Q.   BitComet shares it with the world.  Did you get hacked by

15   that happening?

16   A.   I would not refer to that as a hacking.

17   Q.   Okay.  Real quick, can you explain a little bit, what

18   is -- a rar file is very similar to a zip file, correct?

19   A.   Yes, sir.

20   Q.   Rar file is r-a-r, right?

21   A.   Yes, sir.

22   Q.   And you need a separate helper application to unzip zip

23   files and rar files, right?

24   A.   Not necessary -- well, potentially, you could use a

25   separate application.  Windows will do zips.  Zip files

1    inherently are axiomatic.  And then your tar files or rar

2    files, I think you may have to use a special tool.  I'm not

3    sure if BitComet does that or not.

4    Q.    Okay.  And those tools, when you unzip things or un-rar

5    things, that --

6    A.    Potentially.

7    Q.    -- could place files in certain locations, right?

8    A.    It's often asking you where you want to put these.  Like

9    I said, it will say do you want to unzip it.  Or in this

10   particular case, when they had a zipped or a file that was

11   downloaded, they would click it, and it would basically put it

12   right underneath, and you have directory after directory

13   underneath the downloads.

14   Q.    Okay.  So one way for it to work is it could just put it

15   right around where it is?

16   A.    It can often do that.

17   Q.    It could also be directed somewhere else?

18   A.    Yes, sir.

19   Q.    So the first time it touches the machine is in a

20   different folder, the actual files that are in the zip and

21   rar, right?

22   A.    You can direct it elsewhere.

23   Q.    Just to be safe, let's talk a little bit about what a zip

24   and rar file is.  That is, I think, maybe the best way.

25   Explain how a zip file is different than a torrent file.

1    A.   The idea -- and I'm, once again, not an expert in the tar

2    or rar file or a zip file or a torrent.  But the idea is that

3    it's encapsulated.  It's like if you have a folder of pictures

4    and you want -- or let's say you have five pictures you want

5    to send them.

6    Q.   Like you zip it up and send them in one file, but it's

7    got all five?

8    A.   Correct.  That would be a zip.  A torrent's very similar

9    to that, except it's more for the file sharing.

10   Q.   Because it's going out in the peer-to-peer world to get

11   them?

12   A.   Correct.

13   Q.   When you unzip a file, you're just unzipping them.  The

14   files are on your machine.  You've got to unzip them with

15   software?

16   A.   Right.

17   Q.   Okay.  But a torrent file, you still don't have the files

18   on your machine.  BitComet or uTorrent or something has to go

19   do its thing to get them.

20   A.   Once you go get them, yes.

21   Q.   A general computer concept that I want to go over with

22   you.  If you open up a file -- let me go back one step.

23   Withdraw that question.

24        The interface of a lot of these client applications, like

25   BitComet, allow you to view or play the picture or video right

1    there within the application?

2    A.   Yes.

3    Q.   Is that right?  Okay.  Now, stepping back from that, I

4    want to talk about a general way that, like, Microsoft Word

5    works.  If you have a document open in Microsoft Word,

6    hypothetically, and you're working on it, it's an open

7    application.  Would you agree?

8    A.   Yes.

9    Q.   Be a way to describe it?  Okay.  If you go over to your

10   file manager, which I believe is what it's called now on my

11   computer -- used to be called file something else.  You look

12   for it in the folder directories.

13   A.   Windows Explorer.

14   Q.   Explorer.  And you try to delete that file, what's going

15   to happen?

16   A.   While you're working on it?

17   Q.   While it's still open.

18   A.   I don't believe it will let you.  I'm not for sure, but I

19   don't think it will let you.

20   Q.   Now, you had had some stuff you talked about that was --

21   the word AppData came up.

22        Do you recall that?

23   A.   Yes.

24   Q.   Now, AppData is a place that you often look as a forensic

25   examiner, right?

1    A.   Yes, sir.

2    Q.   But a normal user is not looking, generally speaking,

3    through their AppData folder?

4    A.   They would not have a need to.

5    Q.   Generally, people don't actively manage their AppData

6    folder?

7    A.   The computer pretty much does it for them.

8    Q.   It's an automated process.

9         Now, one of the other ways that BitComet has been

10   described is as a download manager.  Why is it described as a

11   download manager?

12   A.   Not being an expert on BitComet per se, but you are

13   downloading torrents and the torrent data within.  You're

14   searching and downloading additional information, whether it

15   be software or pictures or videos.

16        I suppose you could download other stuff within that, but

17   I don't -- it would normally be a torrent file, because it

18   knows how to read the network or use the protocol.

19             MR. ECKES:  Judge, if I could have one moment.

20             THE COURT:  Very well.

21   BY MR. ECKES:

22   Q.   So in terms of this download manager, BitComet is more

23   than just a strictly file sharing application.  Would you

24   agree with that?

25   A.   You can also view the video from torrents and stuff.

1    Q.   And it also has downloader friendly options that you

2    talked about, where you could like control bandwidth stuff

3    and, you know, integrate FTP and http and stuff like that?

4    A.   I wouldn't say user friendly, but they are options that

5    are there for the user.

6    Q.   Okay.  I just want to be clear, when we saw the two

7    things about the incoming torrent from Azureus, do you recall

8    that, the exhibits that the jury saw?

9    A.   Incoming.torrent and XXX6.2.torrent?

10   Q.   During that, Ms. Leonhard was calling it screenshots.

11   Those screenshots were from your forensic tool, right?

12   A.   I created those for the purposes of explanation, but yes.

13   Q.   Okay.  Now, if we could bring up the download logs.  Do

14   you have the download logs up there?  I know you talked about

15   them.

16   A.   The BitComet PowerPoint?

17   Q.   The download logs from Detective Couchman.

18   A.   No.

19   Q.   You are aware that Detective Couchman did some downloads?

20   A.   Yes.

21          MR. ECKES:  Judge, for the record, I'm showing the

22   witness a physical copy of the details exhibit download logs.

23          THE COURT:  Do you have an exhibit number?

24          MR. ECKES:  3.

25          THE COURT:  3, okay.  Government 3 or your 3?

1         MR. ECKES:  Government 3.

2         THE COURT:  All right.

3    BY MR. ECKES:

4    Q.  Detective Viergutz, those are download logs, do you

5    agree, from the four files that were downloaded from

6    Mr. Moran's computer?

7    A.  Just being vaguely familiar with the files and this

8    examination, I do believe that these are the download logs

9    from Detective Couchman.

10   Q.  Can you look on there for us and see when Detective

11   Couchman's computer exchanged handshakes with Mr. Moran's

12   computer?

13   A.  Will it be highlighted?

14   Q.  It won't likely be highlighted.  It will be on the first

15   page.

16   A.  Successfully exchanged handshakes at 20160606, 00:59 and

17   17 seconds.

18   Q.  So 00:59:17 seconds is when Detective Couchman's computer

19   had exchanged handshakes with Mr. Moran's computer; is that

20   right?

21   A.  That does appear to be the case, yes.

22   Q.  Would you agree with me that that is 15 seconds after the

23   torrent file, D4 dot-dot-dot torrent, was created on

24   Mr. Moran's computer from earlier we talked about?

25   A.  Let me find the name of the torrent file, if it's the

1   next line here.  Info by remote client.

2   Q.  It's on yours.

3   A.  Yes, sir.  The hash of the torrent that is on the

4   suspect's computer is the same hash or the same file name

5   after the handshake.  I didn't do -- did you say 15 seconds?

6   Q.  Yes.

7   A.  It is 15 seconds different.

8   Q.  And to clear up any confusion with the 01, this is a time

9   difference issue, right?

10  A.  Yes, it is.

11  Q.  This is Madisonville or whatever Kentucky, and this is --

12  A.  Eastern Standard.

13  Q.  Eastern Standard Time.  And this CR time we talked about

14  was the CR time for the torrent file, right?

15  A.  The created time for the torrent file?

16  Q.  Yes.  1:59:02 is the CR time for the torrent?

17  A.  Yes.

18  Q.  We don't have the CR times for the files on Mr. Moran's

19  computer because we don't have those files, right?

20  A.  Detective Couchman had those, right.

21  Q.  But Detective Couchman's CR time has nothing to do with

22  Brandon Moran's CR time, right?  We don't have them on Brandon

23  Moran's computer, right?  The four files?

24  A.  Just references to.

25  Q.  We've got a torrent showing up purportedly at 02 seconds,

1    right?

2    A.   Yes, sir.

3    Q.   And if you look at that download log, it will also show

4    you that when the handshake occurred between the two

5    computers, that Moran's machine had zero of 92 pieces.  Do you

6    see that?

7    A.   Client acknowledges it has zero of 92 pieces.

8    Q.   Moran didn't have any of the files, did he, at that time?

9    Moran's computer.

10   A.   That would be, I guess -- I'm not an expert on the log,

11   but that would be the indication of the client telling us

12   that.  Zero of 92 pieces.

13   Q.   The first time that Moran has a piece is at 59:47

14   seconds; is that right?

15   A.   Client acknowledges that it has piece 56.  Possess 1 of

16   92.

17   Q.   So it's 30 seconds after --

18   A.   Yes, sir.

19   Q.   -- Detective Couchman's computer is talking with Brandon

20   Moran's computer, right?

21   A.   Yes, sir.

22           MR. ECKES:  No further questions, Your Honor.

23           THE COURT:  Any redirect?

24                          REDIRECT EXAMINATION

25   BY MS. LEONHARD:

1    Q.   Detective Viergutz, I want to go back to sort of the very

2    beginning.  When you were taking photographs of the evidence

3    in this case; specifically, the laptop that we've been talking

4    about that was seized from the defendant's residence, you

5    photographed the outside and the inner components too,

6    including the hard drive; is that correct?

7    A.   That is correct.

8    Q.   So I had you flip over the laptop, and it showed that it

9    was manufactured in China; is that right?

10   A.   That is correct.

11   Q.   When I asked you that, does that mean that the shell of

12   the computer was manufactured in China?

13   A.   The chassis of the computer was probably manufactured in

14   China.

15   Q.   You also took pictures of the hard drive, and that was

16   also manufactured in China; is that correct?

17   A.   That is correct.

18   Q.   We talked a lot today about the fact that the files that

19   Detective Couchman downloaded from the defendant, you were not

20   able to find the files themselves on the computer when you

21   examined it, correct?

22   A.   That's correct.  All they reference is to the files.

23   Q.   And what did those references tell you from a forensic

24   standpoint?

25   A.   That more than likely, the files were there at one point

1    in time, given the file path.

2    Q.   Okay.  And we've also taken a look at -- maybe we can

3    pull up for reference what's been admitted as Government's

4    Exhibit 9, that spreadsheet.

5        This is the spreadsheet that just contains all of the

6    information about all the files that were recovered during

7    your forensic exam.  Do you remember all of these?  I think

8    there's 219 entries.

9    A.   There were quite a few, but yes.

10   Q.   And you actually created a column here about whether the

11   files that you found were deleted or not.  If they were, you

12   put true.  If they weren't, you put false, correct?

13   A.   I did not create the column.  It's actually produced with

14   the tool.

15   Q.   Very good.  That's what part of this spreadsheet

16   reflects, correct?

17   A.   That is correct.

18   Q.   And if we scroll down, out of the 219 files that you

19   found, looks like it's not until row number 199 that we

20   finally find one that's marked "true" as being deleted,

21   correct?

22   A.   Yes, according to the spreadsheet.

23   Q.   So if we scroll down a little further, at the very end,

24   out of 219 entries, it looks like from 199 to 219.  So 20 of

25   those 200 some odd entries.  Only 20 were deleted; is that

1    right?

2    A.   Yes, ma'am.

3    Q.   And also, Mr. Eckes asked you questions about files that

4    have the extension dot BC exclamation point, which

5    represents -- what does that represent again?

6    A.   He pointed out to me that it's an incomplete download.

7    Q.   Okay.  And on this, again, the spreadsheet of all the

8    files that were recovered from the defendant's computer,

9    Special Agent Kidd, just for assistance purposes, highlighted,

10   of those entries, how many have that particular extension.

11   Looks like we count how many?

12   A.   According to the highlight, there's three identified.

13   Q.   Let's move down a little further.  There might be a

14   couple more.

15   A.   And appear to be another three.

16   Q.   So six total in that whole spreadsheet that have that

17   particular file extension, correct?

18   A.   That's correct.

19   Q.   Can we pull up the FrostWire spreadsheet?  Mr. Eckes

20   asked you a lot of questions about some of the entries on this

21   particular spreadsheet that may not have meant much of

22   anything.  There's a lot of entries on this spreadsheet that

23   are indicative of material involving the exploitation of

24   children, correct?

25   A.   There is.

1    Q.  We go down a little bit further, have you seen, in your

2    training and experience, handling these types of cases, is

3    "falko" one of those sort of key words that you look for when

4    trying to identify these types of materials?

5    A.  It is.  It's representative of a certain series.

6    Q.  Also, "siberian mouse," we discussed that earlier, didn't

7    we?

8    A.  Yes, sir.  I'm not sure exactly what's siberian mouse,

9    but it's indicative of child exploitation.

10   Q.  Okay.  Go down.  If we stop there.  Actually, this one,

11   we see "hidden spy cam, hand clips, amateur hand jobs, pthc,

12   kingpass, Lord of the ring, hussyfan, Vicky."

13       Again, those are all key word search terms that are

14   important for you when you're looking for this type of

15   material because it's indicative of child exploitative

16   material, correct?

17   A.  They are.

18   Q.  And, again, this is all information that your Internet

19   Explorer finder pulled from wherever you were telling it to

20   look on the defendant's computer, correct?

21   A.  IEF is Internet Evidence Finder.

22   Q.  Internet Evidence Finder, I'm sorry.

23   A.  That's okay.

24   Q.  Here we see entries 299, 301, 324, again, all contain a

25   lot of the same key words, search terms, and acronyms that are

1    indicative of child exploitative material, correct?

2    A.   Yes, ma'am.

3    Q.   There was a lot of discussion about the parsed search

4    queries that you found when you were examining the defendant's

5    computer.  Were those helpful for you in any way?  Did they

6    tell you anything?

7    A.   The bulk of them were not really that helpful.  Most of

8    them were strange searches, I guess you could say.  The one

9    that stuck out was the pedo forum.

10   Q.   The search terms that we saw in that spreadsheet that

11   Mr. Eckes kept showing you, the terms themselves, do they mean

12   anything to you?  Are you able to say that the defendant

13   searched for those terms, or are they helpful for you in any

14   way, meaningful in any way?

15   A.   They can be a leaping point or step-off point to

16   somewhere else.  But overall, the searches and stuff are not

17   all that helpful.

18   Q.   In this case?

19   A.   In this particular case.

20   Q.   Because --

21   A.   Torrent.

22   Q.   It's like sort of looking over here, when all the

23   evidence that you found was over here; is that kind of fair?

24   A.   You could potentially say it that way.

25   Q.   Because in this case, you didn't find any of the -- any

1    of the artifacts or any of the evidence on the defendant's

2    computer that IEF would have been directed to.  That's not

3    where you found the images of child or files of child

4    pornography; isn't that right?

5    A.   The BitTorrent type cases are still relatively new in the

6    grand scheme.  The cases before, where it was just file

7    sharing, was a little more obvious because you were

8    downloading that file.  With BitTorrent, you don't really

9    possess the entire thing.  You have to go get the rest of it

10   to bring it together to make the entire content.

11   Q.   So in this case, were the parsed search queries, the

12   URLs, the other sort of internet related searches, internet

13   related artifacts on the defendant's computer, were those

14   particularly helpful in this case?

15   A.   Not in the overall.

16   Q.   What part of the defendant's computer was particularly

17   helpful?

18   A.   Well, just the fact of the downloads that were actually

19   possessed there.  And then, of course, the use of the file

20   sharing, that that's what was being used to move this stuff as

21   far as receive it and share it.  Possibly some registry files.

22        That would be much -- just the logical stuff and the

23   stuff that is no longer there, that you can only get pointers

24   to stuff that's not really there sometimes.

25   Q.   So this isn't a case like back in the day where P2P

1   software was a little easier to use.  This wasn't a situation

2   where you were going to be looking for internet related items

3   because that wasn't leading -- none of the images or files

4   that you found led you to think that that's how they came to

5   be on the computer; is that right?

6   A.   That's correct.

7   Q.   Instead, your examination revealed that these files had

8   been downloaded and shared on the defendant's computer via

9   special software that had been shared on it, the peer-to-peer

10  software?

11  A.   Which would make sense.

12  Q.   Okay.  You mentioned sometimes registry files might be

13  helpful when you're conducting an examination.  Did you find

14  any evidence or anything that would lead you to do any further

15  investigation about some of the things that Mr. Eckes asked

16  you about, malware?

17  A.   Nothing in particular.  Maybe we do look for the

18  anti-forensic or just make note if something like CC Cleaner

19  is used.  I didn't rely wholly on the registry.  We need to

20  look at the overall system to see what else is going on the

21  computer.

22  Q.   Did you see anything when you did your examination that

23  would have led you to believe that any of those things that he

24  mentioned were at play or in operation here?

25  A.   As far as malware or viruses, I didn't note anything

1    consequential.

2    Q.   Mr. Eckes also asked you about the default settings in

3    BitComet, the same version that the defendant had on his

4    computer that you installed on yours.  Don't worry, I'm not

5    going to go through the default settings again.  But the

6    default setting for the downloads was the c:\downloads folder,

7    right?

8    A.   Correct.

9    Q.   There was another option that you could pick to select

10   desktop\pictures, correct?

11   A.   That is correct.

12   Q.   That's a very different file path than those seven files

13   that you found that were in the Users\Sherry\pictures folder,

14   correct?

15   A.   Yes.

16   Q.   Explain to the jury the difference between those two file

17   paths.

18   A.   Well, one is at the root of C.  The other would have

19   occurred within the user's profile.  In this particular case,

20   Sherry is the user profile name.  Sherry is not necessarily

21   the person behind the computer, per se.

22   Q.   So even if the defendant had selected that as part of the

23   default settings to put the downloads in the desktop pictures

24   file, that's a very different place than where the seven files

25   that you picked out were found?

1   A.   It is.

2   Q.   Okay.  I think you mentioned this on -- in response to

3   one of Mr. Eckes' questions about what a user can see in terms

4   of torrent file versus the individual file names of the files

5   that are contained within that torrent.  We saw in what's been

6   admitted two spreadsheets that were pulled from -- that

7   contain information that was pulled from BitComet, from the

8   defendant's computer.  All those files are readily apparent in

9   not only the My History folder of the BitComet but also the My

10  Shares folder, correct?

11  A.   They are.

12  Q.   Can I ask you just one more question?

13          MS. LEONHARD:  Your Honor, may I approach the

14  witness?

15          THE COURT:  You may.

16  BY MS. LEONHARD:

17  Q.   These are pieces or pages from your preliminary findings

18  that you provided to Detective Cooper that you were previously

19  shown by Mr. Eckes.

20  A.   Sure.

21  Q.   I just want to ask that time that Mr. Eckes referenced,

22  the 59 and two seconds, is that the time the torrent landed on

23  the defendant's computer, or do your records reflect that's

24  when it was made available for sharing via his computer?

25  A.   I'd have to look at the file again.  But, I mean, it

1    would be when it was made available.

2    Q.   Okay.

3             MS. LEONHARD:  Your Honor, may I have one moment?

4             THE COURT:  Very well.

5             MS. LEONHARD:  Your Honor, I don't have any other

6    questions.

7             THE COURT:  Recross has to be limited to the

8    redirect.

9             MR. ECKES:  Just a few more hours, Judge.

10            THE COURT:  That wouldn't be limited.

11            MR. ECKES:  May I approach to see the preliminary

12   findings?

13                     RECROSS-EXAMINATION

14   BY MR. ECKES:

15   Q.   So just to clear that up, the CR time of the torrent in

16   question, we established as 1:59:02.  On the sheet, not on the

17   download logs.

18   A.   Correct.

19   Q.   And that is the time that the torrent landed,

20   theoretically, on Mr. Moran's machine, the

21   D439blahblahblah.torrent.

22   A.   This would better be a question asked for Detective

23   Couchman, but I don't know what you're trying to get at as far

24   as what exact time.

25   Q.   I thought it was clear, but I got confused there.  The CR

1  time on your preliminary findings --

2  A.   Created time.

3  Q.   -- is 1:59:02.

4  A.   Right.

5  Q.   There was just a suggestion that that's the time it

6  became available for sharing.  But my understanding is that

7  would be the same time.  Like as soon as you have it, it's

8  available for sharing, right, probably on BitComet?

9  A.   Not an expert in BitComet.  If a file is there but not

10 complete, it is not going to be available for sharing until

11 it's complete.

12 Q.   Right.  But regardless of any of that, this is the time

13 that it was created on Moran's machine, the torrent file,

14 right?

15 A.   The torrent file, when it starts the process of getting

16 there, and then it gets the rest of it, then it is now

17 available, or else -- you can't take something that's not all

18 there.

19 Q.   Yeah.  I'm just trying to clear up the sharing part in

20 the sense of what I care about is the CR time.  Your findings

21 are that the CR time is 1:59:02?

22 A.   The created time is 1:59:02.

23 Q.   To be clear, that's for the torrent that pointed at four

24 other files, right?

25 A.   Or contained four other files, but yes.

1    Q.   And those four files we don't have on Moran's machine?

2    A.   They're not on Moran's machine anymore.

3    Q.   And we can infer that at this time, 59:17, 15 seconds

4    later, when the handshake happens, those files were not on

5    Moran's machine because it recognized that he had zero of 92

6    pieces; is that right?

7    A.   According to this log, it says client acknowledges it has

8    zero of 92 pieces, yes, sir.

9    Q.   So when Detective Couchman's computer has started talking

10   to Moran's machine, Moran's machine did not have the four

11   files in question.  They were talking before he ever had the

12   files, right, according to that log?

13   A.   One moment.  Once again, I think this would have been

14   better posed to Detective Couchman, not myself.

15   Q.   Let me just put it -- at that time, he had zero of 92

16   pieces, right?

17   A.   At 59 and 17 seconds.

18   Q.   That means he didn't have any of the four files,

19   generally, right?

20   A.   Zero of 92 pieces, yes.

21   Q.   It says the client has zero of 92, "the client" being

22   Moran's machine, right?

23   A.   Yes.

24   Q.   Okay.  So if he did get them, which you're inferring that

25   he eventually got the files or the machine got the files

1    because you've got a file path, right?

2    A.   Yes.

3    Q.   But they're gone, right?  At this point, they're gone?

4    A.   The files themselves are gone.

5    Q.   The four files.  So the best guess that they got deleted,

6    right?

7    A.   Potentially, yes.

8    Q.   This is June 6th, right, all this stuff?  And the warrant

9    got executed when; do you know?  About a week later?

10            THE COURT:  June 14.

11   Q.   June 14.  It's in the indictment.  Okay.

12        CC Cleaner, you talked about.  You didn't find that on

13   Moran's machine?

14   A.   Not to my recollection.

15   Q.   Okay.  But CC Cleaner would be a way to try to clean up

16   your computer, right?

17   A.   Yes, sir.

18   Q.   To try to get rid of stuff for good so that you can't

19   find it?

20   A.   It does some other good things too, but yes.

21   Q.   Okay.  The torrent program, BitComet, is a client

22   application, among many other ones, right?  There's uTorrent,

23   right?

24   A.   Yes, sir.

25   Q.   And there's FrostWire, right?  And there's a bunch --

1    there's Azureus, whatever that is, right, and a bunch of those

2    were on Moran's machine?

3    A.   Some were there and some were not still there.

4    Q.   Some used to have been there but weren't anymore?

5    A.   Right.

6    Q.   And every one of those programs would have, you know, you

7    could have gone through and tried to figure out which specific

8    program he had and then gone through the default to all of

9    those programs, right?

10   A.   You could potentially do that as well.

11   Q.   And all of those programs could potentially have had a

12   different default location that it was sending the files to?

13   A.   The focus of the investigation was BitComet, and I think

14   they were putting it in c:\downloads.

15   Q.   According to BitComet, but those other programs could

16   have put it somewhere else?

17   A.   Absolutely.

18           MR. ECKES:  No further questions, Judge.

19           THE COURT:  Anything further?

20           MS. LEONHARD:  Nothing.  Thank you.

21           THE COURT:  May this witness be finally excused?

22           MR. ECKES:  Yes, Your Honor.

23           MS. LEONHARD:  Yes, thank you.

24           THE COURT:  Very well.  You may step down.

25           THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  Ms. Leonhard?

2          MS. LEONHARD:  Your Honor, at this time, I'd ask --

3   may we approach?

4          THE COURT:  You may.

5      (Sidebar conference.)

6          THE COURT:  Let the record reflect we're at the bench

7   with the attorneys.

8      Ms. Leonhard?

9          MS. LEONHARD:  Your Honor, if you could read the

10  stipulation.  Also, that the fact that Maysville --

11         THE COURT:  Mason County is in the Eastern District.

12  I can do that.

13         MS. LEONHARD:  That's all.

14     (Sidebar concluded.)

15         THE COURT:  Ladies and gentlemen, I'm going to read a

16  brief stipulation.  Before I do that, I'm going to take

17  judicial notice that Maysville and Mason County are in the

18  eastern judicial district of Kentucky, and I'll give an

19  instruction on that as well.

20     The stipulation reads follows:  Come the parties hereto,

21  The United States of America, by and through counsel,

22  Assistant United States Attorney Elaine K. Leonhard, and the

23  Defendant Brandon Moran, by and through counsel, Eric G.

24  Eckes, and in order to expedite and simplify the trial of this

25  case, do hereby stipulate and agree that the files contained

on Government's Exhibits 2, 6, 7, and 8 depict minors engaged
in sexually explicit conduct.

It is further agreed that this Stipulation may be read to
the jury in its entirety and introduced into evidence as an
exhibit, and that the facts herein stipulated are to have the
same status, dignity, and effect as the uncontradicted
testimony of credible witnesses and may be considered by the
jury in the same manner as if they had been so testified to.

It is further stipulated and agreed that the
representatives of the parties herein may incorporate the
facts contained in this stipulation into any opening or
closing statements, charts or summaries, and none of the
parties shall be barred from introducing other evidence
tending to explain the facts stipulated herein or the
identity, intent or knowledge of the parties in relation
thereto; and, further, any party may introduce other evidence
which is not inconsistent with the facts stipulated.

In agreement with the above stipulation, the parties to
this action have affixed their signatures thereto.

And this is signed by Ms. Leonhard, Mr. Eckes, and
Mr. Moran.

This is Exhibit 18; is that right?

MS. LEONHARD:  It is, thank you.

THE COURT:  So it will be admitted.

Anything further?

1          MS. LEONHARD:  Your Honor, at this time, the United

2     States rests.

3          THE COURT:  All right.  Ladies and gentlemen, we're

4     going to go ahead and break for the evening.

5          I was hoping to get you the instructions tonight, but

6     that's not going to be possible.  We'll just come back in the

7     morning at 9:00, at which time hopefully I'll have a full set

8     of instructions for you.  I'll read the instructions to you.

9     They do tend to be a little bit lengthy so that will probably

10    take about a half an hour.

11         Then the attorneys will present their closing arguments.

12    So that's the tentative schedule for tomorrow.

13         During the overnight recess, continue to heed the

14    admonitions of the Court.  That's presuming that the defendant

15    is not planning on presenting any proof.  Given what he said

16    during his prior statements during *voir dire*, I'm presuming

17    he's not going to be presenting any witnesses.  If he does,

18    that will certainly change the equation a little bit.

19         At this point, that's the Court's tentative schedule.

20    Have a good evening.  We'll see you back in the morning.

21         Thank you.

22         (The jury exited the courtroom at 5:07 p.m.)

23         THE COURT:  The jury's left.  Mr. Moran, you have a

24    right, as any defendant, to testify in this case.

25         Do you understand that?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Have you spoken with your attorney about

3     your rights to testify?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  If you do testify, you'll be subject to

6     cross-examination, just like any other witness.

7        Do you understand that?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  And whatever questions are asked, you

10    can't just not answer a question because you don't want to.

11       Do you understand that?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  If you decide not to testify, which your

14    attorney has pretty much told the jury previously -- not

15    definitively, but has suggested that, I would be instructing

16    the jury they could not consider your silence in any way in

17    determining whether or not you were guilty.  In fact,

18    something I told them during jury selection.

19       Do you understand that?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  You understand the rights I've explained

22    to you, sir?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  Very well.  The record will reflect that

25    the Court went through the defendant's rights to testify and

1    not testify, something I do in every criminal case.

2         All right.  Mr. Eckes, as far as scheduling goes, are you

3    planning on calling any witnesses?  Do you want to talk to

4    your client during the overnight recess?

5         MR. ECKES:  I'm not, Your Honor.  There will be no

6    witnesses.

7         THE COURT:  That's what I figured.

8         What I'd like to do is just jump right in --

9         MR. ECKES:  Would you like me to address Rule 29 at

10   this time or in the morning?

11        THE COURT:  You can do that.  Let's separate them

12   out.  Let's start with Count 4, the possession count.

13        MR. ECKES:  Judge, I'm going to make a general

14   Rule 29 motion for all counts except for the distribution and

15   just talk about the distribution.

16        THE COURT:  Okay.  So on the receipt and the

17   possession counts, you're just making a general motion?

18        MR. ECKES:  That's correct, Judge.

19        THE COURT:  Go ahead with the distribution count.

20        MR. ECKES:  Judge, I think the evidence at this

21   point, no reasonable juror could find Mr. Moran guilty of

22   distribution, because it has to be knowingly.

23        And what we have is evidence that a torrent that starts

24   with D was -- in the light most favorable to a prosecution, a

25   torrent is on Mr. Moran's computer at 1:59:02.  The

1  government's computer or Detective Couchman's computer has

2  exchanged handshakes 15 seconds later.  At that time, zero of

3  92 pieces of the four files that are alleged to have been

4  distributed are on Moran's computer.

5        THE COURT:  Well, how do you explain the idea that it

6  was a single source?  It had to come from his computer.

7  You're saying that it didn't come from his computer; is that

8  right?

9        MR. ECKES:  No.  In terms of this argument right now,

10  in the light most favorable to the prosecution, I get that the

11  Court's going to assume, based on the evidence, that it came

12  from Moran's machine, those four files.

13        THE COURT:  I have to take the testimony of the

14  witness that he testified to.

15        MR. ECKES:  Let's assume that the four files came

16  from Moran's computer.

17        THE COURT:  Okay.

18        MR. ECKES:  We know at 59:17, Moran does not have the

19  files at that point.  So he doesn't have them at 59:17.

20  There's indications that the torrent was created 15 seconds

21  prior, but we all know that the torrent has to activate, and

22  it needs to go get the files and bring the four files to

23  Moran's machine.

24     Let's assume it did that, but we know it didn't do it

25  before 59:17.  We know, then, that the first piece of any of

1    the files is purportedly -- and we'll just assume, for

2    purposes of this argument, that the first piece shows up on

3    Moran's computer at 59:47.

4        And then the Torrential Downpour program has a completed

5    file from Moran's computer, assuming it got it from Moran's

6    computer, at 1:02:35.  So about --

7            THE COURT:  Three minutes.

8            MR. ECKES:  -- three minutes.

9        So it's impossible for Moran to knowingly distribute

10   something that is being taken from him as he's downloading it.

11   If Detective Couchman's program is uploading while Moran's

12   program is downloading, how is it possible that he knows it's

13   child porn?  He can't.  He can't even access it yet.  They're

14   taking it before he can even play it on his machine.

15       So regardless --

16           THE COURT:  Does he have to have played it?

17           MR. ECKES:  Say that again?

18           THE COURT:  Does he have to have played it, any of

19   these things, before it could be done knowingly?

20           MR. ECKES:  I submit yes.  I submit as a matter of

21   law --

22           THE COURT:  What about someone, like a gas station

23   owner that offers his gas.  Well, that's kind of a bad

24   analogy.  I mean, so you're saying unless he saw it --

25           MR. ECKES:  It can't be knowingly.

1          THE COURT:  Then he should be acquitted on all

2     counts, don't you think?  If he got these via hacking or

3     anything, wouldn't that --

4          MR. ECKES:  No.  I mean, if he saw it and kept it,

5     then, light most favorable to the prosecution, you knowingly

6     have possessed it.

7          THE COURT:  So you're focusing on the distribution

8     count.  He can't knowingly distribute something he doesn't

9     have yet.  That's, in essence, what you're saying?  I see a

10    lot of yeses in the back.  And I would also tell you --

11         MR. ECKES:  I think you have to --

12         THE COURT:  Let me finish.  All of you in the back

13    have been very animated.  I think the jury's picked up on

14    that.  I don't know how positive that is for Mr. Moran.  I

15    only bring that up, Mr. Eckes has not had eyes in the back of

16    his head and hasn't been able to see that.

17         So now that the jury's not in the courtroom, I think it's

18    important that you all know that.  When you do yes and shake

19    your head no and laugh and other things, I think some of the

20    jurors are picking up on that, and I only bring that up to

21    tell you that it might not be a good thing.

22         Go ahead, Mr. Eckes.

23         MR. ECKES:  It's more nuanced, Judge.  It's more

24    technical.  It's not that you can't distribute something that

25    you don't possess because in the light most favorable to the

1    prosecution, the pieces made its way to Moran's machine --

2            THE COURT:  Eventually did, yes, we know that.

3            MR. ECKES:  What I'm saying is when the upload is

4    simultaneous with the download, as the evidence shows in this

5    case, then you cannot knowingly have distributed, because you

6    don't know what it is until you can play it.

7            THE COURT:  Okay.  Let me ask for a response.

8            MS. LEONHARD:  Your Honor, I think the knowing

9    element modifies the distribution, and I think the case law is

10   clear on this, that as long as you put something in a folder

11   that is accessible to others, you are doing so.  You are

12   knowingly distributing.

13       And so I think all of this idea that -- I don't know why

14   we're focusing on the time when the machines made handshakes

15   to each other.  Eventually, when you get down to it,

16   Mr. Moran's computer got all of the pieces of that -- all of

17   the pieces of the files that made up those four files, and

18   Detective Couchman downloaded them from him.  So there is a

19   distribution.

20           THE COURT:  What about his idea that he wasn't able

21   to make a -- well, let me ask you this.

22       What about this idea that once you allow your sharing,

23   and I'm looking, and we've got *Darway* and we've got the other

24   case from the Tenth Circuit.  The name's escaping me right

25   now.  *U.S. v. Shaffer*, which in essence is a published case

1    standing for the same thing.

2        The knowing passive distribution of child pornography on

3    a shared network is sufficient to sustain a conviction.

4        Now, knowing passive -- passive -- distribution, what

5    that, in essence, says, the Sixth Circuit says if you sign up

6    for this BitTorrent or BitComet, knowing that it's going to be

7    shared, the knowing element is the knowing that it's going to

8    be shared, not necessarily a particular file.

9        Why should it modify the particular file versus the

10   knowing sharing?

11           MR. ECKES:  Because the jury instruction, there's two

12   levels of knowingly.  It's knowingly distributing it and

13   knowing that it's child pornography.  You have to know both

14   those things.

15           THE COURT:  Well, but if you're sharing your files,

16   expecting to get pornography -- your defense isn't he got all

17   this adult porn and also got child porn.  It was all mixed in.

18   That has been successful in this courtroom one time in the

19   last 16 years.  That's not what we have here, because --

20           MR. ECKES:  Judge, I want to be clear that the

21   knowing aspect does -- it's not both.  You have to

22   knowingly --

23           THE COURT:  I'm looking at the jury instruction here.

24   The defendant knowingly distributed an item of child

25   pornography.

1          MR. ECKES:  Yes.

2          THE COURT:  And then -- this is a question I'm going

3     to have for you -- that at the time of such distribution, the

4     defendant knew that such item constituted or contained child

5     pornography.

6          MR. ECKES:  That's what I'm talking about.

7          THE COURT:  How do you satisfy the third element?

8          MS. LEONHARD:  I think there's plenty of

9     circumstantial evidence that he was using various peer-to-peer

10    networks searching out this type of material.

11         THE COURT:  Why wouldn't that be sufficient?

12         MR. ECKES:  Because this is about four files.  We're

13    talking about a distribution count of four files, and there's

14    no way -- the name of the torrent, Judge, is

15    D4bunchofletters.torrent.  That's all he clicked on.  And

16    before he could even see what's inside of it, the government

17    has it.  There's no way that that's knowing distribution for

18    clicking on D4bunchofnumbers.torrent.

19         THE COURT:  Who clicked on all of that?

20         MR. ECKES:  The inference you can make is that

21    Brandon Moran did.  He clicked on D4 whatever, but he doesn't

22    knowingly distribute what's inside of it until he actually

23    has -- there's a difference between the files in pieces.  As

24    the pieces are coming, the pieces are going, and the

25    government's got them, uploading while downloading.  So by the

1    time he could ever actually click play, the government's got

2    it.  So there's no way that he knows what it is because he

3    can't click play.

4              THE COURT:  I'll give you the last word.

5              MS. LEONHARD:  The distinction that's being missed

6    here is that this was in his shared folder.  It wasn't in his

7    just c:\downloads\My History.  It was in his shared folder.

8    And the My Shares spreadsheet reflects that it was that

9    particular file, that "new pthc opva2014" was in his shared

10   folder.

11             THE COURT:  It had to have been clicked on by him

12   prior to 1:59:02, or it wouldn't have been there; is that

13   right?  Is that a fair inference?

14             MR. ECKES:  Would have had to been clicked on --

15             THE COURT:  By the person sitting at that computer or

16   standing at that computer prior to 1:59:02.  Is that fair?

17             MR. ECKES:  That's fair, but what did he click on?

18             THE COURT:  Isn't there a reasonable inference if

19   he's clicking on something --

20             MR. ECKES:  That he knows what it is?

21             THE COURT:  Absolutely.  Absolutely there's a

22   reasonable inference of that.

23             MR. ECKES:  When it's called D489.torrent?

24             THE COURT:  Someone who has all of this on his

25   machine, there's an inference.  He's not reading time.com to

1    read about Donald Trump and Vladimir Putin.

2            MR. ECKES:  And that's proof of a knowing element

3    beyond a reasonable doubt that a --

4            THE COURT:  No.  Is there a reasonable inference,

5    that's the question.  Is there a reasonable inference, based

6    upon the testimony or the evidence that she summarized?

7        The motion is going to be denied.  You can make that

8    argument to the jury.  I think it's a jury issue.  I think

9    there's enough here from which a reasonable jury could

10   conclude the distribution beyond a reasonable doubt on all

11   three counts.

12       The other three, we've got 200-plus images of child

13   pornography which were found on his computer.  While certainly

14   you can make an argument they're there because of malware,

15   ransomware, some other ware, there's certainly evidence that

16   that was seized from his computer.

17       The receipt counts, there's evidence of that contained in

18   the computer.

19       So the Rule 29 motion will be denied for the reasons

20   stated.

21       I'm not going to issue an written order.

22           MR. ECKES:  Judge, if I may say one thing for the

23   record.  I'm not asking a written order.  In terms of for the

24   record --

25           THE COURT:  We're always on the record.

1          MR. ECKES:  I'm just trying to say I'm not bringing

2     this up to try to change your mind and keep this going.

3          THE COURT:  You can try, but that would be overruled.

4          MR. ECKES:  Ms. Leonhard testified they were in a

5     shared folder.  The testimony is that that's automatic.  They

6     weren't placed in the shared folder.

7          THE COURT:  There's also plenty of evidence that he's

8     a tech savvy -- really not tech savvy, but tech savvy.  He

9     knows exactly how, from his statement to Cooper, exactly how

10     these BitTorrent, BitComet things work.  They're shared.

11        The inference can be drawn that he knew exactly, when he

12     was installing it, the default settings.  He could have

13     changed it if he wanted.  There's evidence of that.

14          MR. ECKES:  I'm not arguing that inference.  I'm

15     arguing that the shared folder business, in the context of

16     this happening, they're uploading as he's downloading, the

17     fact that it's in a shared folder is automatic.  It's not

18     like, you know, he clicks on D4abunchofnumbers, and the

19     sharing is automatic once those files become available.

20          THE COURT:  That's correct.

21          MS. LEONHARD:  I would only note that's not what the

22     testimony was.  The testimony was when they're downloaded,

23     they go to the c:\downloads folder.  That's where they go.

24          THE COURT:  That was the testimony.

25          MS. LEONHARD:  That was the testimony.  I would also

1   note one more thing.  One piece of evidence that I neglected

2   to add is the admissions that the defendant made on the

3   recorded statement when Detective Cooper asked him about will

4   I find this particular video on your computer, he said yes.

5           MR. ECKES:  Again, the argument is about the fact

6   that they're uploading as he's downloading.  The *mens rea*

7   occurs at that time.  He must knowingly distribute it.  He

8   can't knowingly distribute it if he can't even look at it.

9       And to just clear up the My Shares and the c:\downloads,

10  clearly, we have a different -- not different memory, but a

11  different interpretation.

12      The My Shares folder is a spreadsheet that BitComet

13  creates itself.  And the c:\downloads is where the files go on

14  your hard drive.  So the file can be in both places.  The My

15  Shares is a My Shares folder that BitComet keeps.  That's not

16  his computer.  That's BitComet creating a spreadsheet that

17  Detective Viergutz relied upon in his opinion.  It's

18  different.

19          THE COURT:  Sounds like you've got a pretty good

20  argument to the jury.

21          MR. ECKES:  I will make it.

22          THE COURT:  I'm sure you will.

23          MR. ECKES:  Nothing further, Judge.

24          THE COURT:  All right.  Jury instructions.  I have

25  made a couple of edits.

1      Instruction 13 on page 16, it reads that the defendant

2  knowingly received instead of the defendant received

3  knowingly.  That's a change from the draft set that was given.

4          MR. ECKES:  Can you say that one more time?

5          THE COURT:  Instruction 13, Counts 1 and 3 charge him

6  with knowingly receiving.  I flip-flopped the words knowingly

7  and received in paragraph 1.

8          MR. ECKES:  That makes sense.

9          THE COURT:  Instruction 15, same thing in

10  paragraph 1, flip-flopped knowingly possessed.

11      Instruction 17, I removed the defendant's testimony.  I

12  think we need to modify that to say defendant's failure to

13  testify in the caption, and I removed the defendant's

14  testimony instruction.

15          MR. ECKES:  Judge, I would ask that the word not be

16  "failure."

17          THE COURT:  Election?

18          MR. ECKES:  Election not to testify.

19          THE COURT:  Election, there we go.

20      Instruction 18, I've removed the reference to Cooper as

21  an opinion witness.

22      Any objection to that?

23          MS. LEONHARD:  No, sir.

24          MR. ECKES:  No.

25          THE COURT:  All right.  I inserted instruction 19,

1  transcript of tape recording.

2      Any objection to that?

3          MR. ECKES:  No objection.

4          MS. LEONHARD:  No, sir.

5          THE COURT:  And I changed the judicial notice

6  instruction, Instruction 20, to reflect Mason County.

7      Any objection to that?

8          MS. LEONHARD:  No, sir.

9          MR. ECKES:  No objection.

10         THE COURT:  All right.  Now, those are the changes I

11  made.  Do you all have any substantive objections to the set

12  that was given?  I know you had previously objected to the

13  definition of distribution, and I had told you when we got

14  started yesterday that the Court had looked at the *Darway* case

15  and the *Shaffer* case, which I mentioned this morning.

16     The explanatory second sentence after the first full

17  sentence of the elements in Instruction 14, you object to

18  that, correct?

19         MR. ECKES:  Judge, I object to that.  I'm going to

20  make it as simple as possible.  At this point, my objection is

21  just a request to insert the word "knowingly" before

22  maintained so that it's "distribution is also said to occur

23  when images and/or videos of child pornography are knowingly

24  maintained in an accessible public folder."

25         THE COURT:  Why isn't that redundant, because the

1    word knowingly is mentioned at least two other times in the

2    instruction?

3         MR. ECKES:  Because, Judge, I think it needs to be

4    made clear that the act of simply having something accessible

5    in a folder is not, per se, distribution.

6        It's got to knowingly be in that open, that possessed --

7    you know, if that's the law, if we agree it's the law and all

8    we're being is duplicative, there's not really a good reason

9    not to be duplicative and just clarify that it's got to be

10   knowingly maintained.

11        THE COURT:  Why can't you still make that argument?

12        MR. ECKES:  I'm not saying I can't make that

13   argument, and I will, but I want the jury to be instructed on

14   what the law is clearly.

15       Clearly, we should have the word "knowingly" there so

16   that we don't remove -- you know, we don't downplay the

17   *mens rea* by removing it from this extra instruction that I

18   objected to.

19        THE COURT:  But this is only defining what

20   distribution is.  This defines the word distribution.

21   Knowingly is defined elsewhere.

22       They're separate elements.

23       One, "the defendant knowingly distributed an item of

24   child pornography."

25       Your argument is he couldn't have knowingly distributed

1    anything because he didn't know what it was.

2        That "such item has been transported."

3        That's not an issue.

4        And then "at the time of such distribution, the defendant

5    knew that such item constituted child pornography."

6        So the explanatory paragraph is just defining what

7    distribution is.  If I'm defining a noun -- or a verb, I

8    guess.  I don't generally define the *mens rea* in verb.  The

9    *mens rea* is defined elsewhere.

10        To me, 1 and 3 require the *mens rea*, knowingly.

11   Inserting the *mens rea* into the definition of distribution

12   seems like it's, one, not necessary under the law.  Two, kind

13   of overkill.  I mean, you can still make all the arguments you

14   want, even though it's not within that definition of

15   distribution.

16        MR. ECKES:  Judge, but in isolation, jurors are

17   getting this.  They don't have the background of the case law

18   that led to this description of distribution.  The fact that

19   we all agree that it is the law that it has to be knowingly

20   maintained, and the only reason not to do it is because it's

21   overkill, I don't think that's a proper reason to not instruct

22   the jury.  I don't think it confuses them.  It doesn't do

23   anything more than to restate the law in a more clear manner.

24        MS. LEONHARD:  My response is it does the exact

25   opposite, and that was my response to Mr. Eckes when he

1  mentioned it.  I said almost verbatim what the Court said.

2  It's duplicative.  That paragraph is meant to define

3  distribution, which is already modified by knowing.  And so by

4  adding it again, that explanatory paragraph does the exact

5  opposite of what Mr. Eckes is claiming it's going to do.

6        THE COURT:  I'm going to overrule the objection to

7  adding that word to the definition of distribution,

8  Instruction 14.  It's duplicative.  It's also not the

9  definition of distribution.  Maintaining files in an

10  accessible public folder constitutes distribution.

11      That's *Darway,* holding that making child pornography

12  available for others to access and download through a

13  peer-to-peer file sharing program qualifies as distribution.

14      A LimeWire program was designed to share and barter

15  files.  By downloading the images and making them accessible

16  to others, the defendant's conduct meets the definition of

17  distribution.

18      Now, he has to knowingly distribute.  None of these

19  definitions I've read in *Darway* include knowingly.  Now, the

20  statute requires it, but the definition of distribution does

21  not require it.  I'm defining the term distribution.  You can

22  make all the arguments you want based upon the current

23  instruction as it exists.

24      The objection to adding that word will be overruled.

25      Any other changes that you need or request?

1          MR. ECKES:  No, Your Honor.

2          THE COURT:  Anything else?

3          MS. LEONHARD:  Nothing.

4          THE COURT:  We'll go ahead and have sets for you in

5     the morning.  I will be reading these in their entirety,

6     including all the language.

7          One other thing.  Bottom of Instruction 13, "you are

8     instructed that it is not a crime to possess virtual images."

9     Since this case doesn't involve virtual images, I'm going to

10    remove the bracketed section.

11         Any objection to that?

12         MR. ECKES:  I wouldn't have, but only because it did

13    come up with -- Detective Viergutz did testify that there were

14    some anime; there were some animated, underage videos.

15         THE COURT:  So you want me to leave that in?

16         MR. ECKES:  I would like you to leave it in.

17         THE COURT:  Any objection?  I guess I could leave it

18    in.

19         MS. LEONHARD:  That's fine.

20         THE COURT:  We'll leave it in.  Usually, that's

21    designed for all virtual versus -- but I'll leave it in at

22    your request.  It is a correct statement of the law.

23         Very well.  I'll have you back here at 8:30 in the

24    morning in the event there are things we need to take up

25    outside the presence of the jury.

1          See you in the morning at 8:30.

2               MR. ECKES:  Judge, if you could remember for me to

3     stand up and say "we rest" in the morning.

4               THE COURT:  You can remind me of that, thank you.

5               MR. ECKES:  I'm reminding you because I'm going to

6     forget.

7               THE COURT:  You won't forget anything.

8          (Proceedings adjourned at 5:34 p.m.)

9                              - - -

10                    C E R T I F I C A T E

11          I, LISA REED WIESMAN RDR-CRR, certify that the
      foregoing is a true and correct copy of the transcript
12    originally filed with the clerk of court on August 1, 2018 and
      incorporating redactions of personal identifiers requested by
13    the following attorney of record, Elaine K. Leonhard, in
      accordance with Judicial Conference policy.  Redacted
14    characters appear as an ███ in the transcript.

15

16    _\s\ Lisa Reed Wiesman_              ___August 7, 2018___
      LISA REED WIESMAN, RDR-CRR                Date of Certification
17    Official Court Reporter

18

19

20

21

22

23

24

25

1                              INDEX
**GOVERNMENT'S WITNESSES**
2

JEFF CRAYCRAFT
3    Direct Examination.............................. Page 2

4    BRIAN COOPER
     Direct Examination.............................. Page 8
5    Cross-Examination............................... Page 41

6    MICHAEL VIERGUTZ
     Direct Examination.............................. Page 46
7    Cross-Examination............................... Page 154
     Redirect Examination............................ Page 214
8    Recross-Examination............................. Page 224

9

                             - - -
10

**GOVERNMENT'S EXHIBITS**
11

| Exhibit | Description | Identified | Admitted |
|---|---|---|---|
| 14 | Limestone Cablevision email | 6 | 6 |
| 4 | Photos taken during search warrant | 29 | 29 |
| 1 | Dell laptop | 30 | 31 |
| 5 | Audio recording | 35 | 35 |
| 16 | BitComet PowerPoint, demonstrative only | 84 | -- |
| 6 | Files downloaded on to defendant's computer on 5/15/16 | 105 | 109 |
| 7 | Files downloaded on to defendant's computer on 6/12/16 | 106 | 109 |
| 8 | Files of child exploitation extracted from the defendant's computer | 107 | 109 |
| 9 | Spreadsheet of information contained in Exhibit 8 | 107 | 109 |

**GOVERNMENT'S EXHIBITS** (continued)

| Exhibit | Description | Identified | Admitted |
|---------|-------------|------------|----------|
| 10A | Spreadsheet of My History on BitComet | 108 | 109 |
| 10B | Spreadsheet of My Shares on BitComet | 108 | 109 |
| 11 | Spreadsheet of FrostWire activity | 108 | 109 |
| 13 | Screenshots of incoming Torrent files | 109 | 109 |
| 15 | Screenshots of files on defendant's computer | 109 | 109 |
| 18 | Stipulation | 230 | 230 |

**DEFENSE EXHIBITS**

| Exhibit | Description | Identified | Admitted |
|---------|-------------|------------|----------|
| 2 | Detective Viergutz preliminary report | 164 | -- |

- - -